EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

| | |
|---|---|
| **KIMBERLY RUBIO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of A.A.R,** *deceased minor,* **et al.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**DANIEL DEFENSE, LLC, et al.,**<br><br>*Defendants.* | Case No. **2:24-CV-00069-AM**<br><br><br>**PLAINTIFFS' MOTION TO REMAND** |

## INTRODUCTION

Dressed in all black, a slight, newly-minted eighteen-year-old named Salvador Ramos (the "Shooter") made four visits to Oasis Outback. He acquired two assault rifles, hundreds of rounds of ammunition, and asked for help installing a holographic battle sight that has one purpose: killing in close-quarter combat. One witness who observed the Shooter thought he looked like a school shooter. For Oasis Outback, who had full knowledge of the Shooter's shopping spree, age, and behavior, this conclusion should have been obvious.

Texas law recognizes a retailer's liability for supplying a firearm or other dangerous item to a person whose actions and behavior demonstrate "agitation, instability, incompetence, recklessness or intent to commit a crime." *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 847 (Tex. App. – San Antonio 1989), *writ denied* (July 12, 1989). Multiple witnesses provide firsthand accounts consistent with this standard. Nevertheless, Defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc. ("Daniel Defense") removed this case to federal court, claiming that Oasis Outback was improperly joined.[1]

To establish this claim, Daniel Defense bears the "heavy" burden of showing that "there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573–74 (5th Cir. 2004) (en banc.) When making this prediction, "[a]ny contested issues of facts *and* any ambiguities of state law must be resolved in favor of remand," *Palmquist v. Hain Celestial*

---

[1] Several issues raised by Daniel Defense regarding Oasis Outback's liability overlap with issues pertaining to the liability of other defendants. If the Court determines that it possesses subject matter jurisdiction over this Action, Plaintiffs anticipate that Defendants will file Rule 12(b)(6) motions (Daniel Defense and Oasis Outback already have filed such motions) that will require extensive briefing by the parties on these overlapping issues.

*Grp., Inc.*, 103 F.4th 294, 304 (5th Cir. 2024) (emphasis added) (citations and quotation marks omitted).

Daniel Defense falls far short of meeting this heavy burden. It uses its Notice of Removal to preview novel and dubious interpretations of the Protection of Lawful Commerce in Arms Act ("PLCAA") and assert scattershot arguments concerning duty and causation. Accordingly, Plaintiffs move, pursuant to 28 U.S.C § 1447, for an order remanding this action to the 38th District Court of Texas.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The Defendants in this case are: (1) Daniel Defense, who sold the Shooter the Daniel Defense DDM4v7 AR-15 he used at Robb Elementary School; (2) Oasis Outback, LLC, a gun store in Uvalde that delivered the DDM4v7 to the Shooter, sold him an additional AR-15 and hundreds of rounds of ammunition, and installed a holographic battle sight on the DDM4v7; (3) EOTech, LLC; Project Echo Holdings, LLC; and Koucar Management, LLC ("EOTech"), who manufactured, marketed, and sold to the Shooter – then a seventeen-year-old civilian – a holographic battle sight that he used in the shooting; and (4) Firequest International, Inc. and Flash Co., Inc. ("Firequest"), who manufactured, marketed, and sold to the Shooter a "Hell-Fire Gen 2 snap-on trigger system," which illegally converts a semi-automatic AR-15 into a machine gun capable of automatic fire.

Plaintiffs are the families of seventeen children between the ages of nine and eleven shot and killed on May 24, 2022, and two children who survived the shooting by hiding beside their dead classmates' bodies. Plaintiffs bring claims of negligence, negligence per se, aiding and abetting wrongful conduct, strict liability for abnormally dangerous activity, and gross negligence.

## A.      Daniel Defense Courts the Uvalde Shooter

Daniel Defense manufactures, markets, and sells AR-15s. ECF 1-3, Pls.' State Court Petition (filed May 24, 2024) (hereinafter "Pet.") ¶ 55. For months, prior to the Uvalde Shooting, Daniel Defense courted the then-seventeen-year-old Shooter. Daniel Defense has perfected a marketing strategy that targets troubled adolescent boys such as the Shooter with a message of adrenaline, power, sexual prowess, Call of Duty, and pop culture icons. *E.g.*, *id.* ¶¶ 113, 121–33, 252–80. On social media, Daniel Defense advertises its AR-15s as perfect for "hunt[ing]" human targets. *Id.* ¶¶ 146–47. It extols its AR-15s as "totally murdered out" when equipped with the EOTech holographic battle sight used by the Shooter. *Id.* ¶ 151. It portrays its firearms used for criminal sniper missions against civilian targets on city streets. *Id.* ¶¶ 152–57. It urges users to "[r]efuse to be a victim." *Id.* ¶ 167. It portrays its assault rifles as items to be "lusted over" and shows scantily clad women eyeing Daniel Defense AR-15s longingly. *Id.* ¶¶ 170–75. Daniel Defense also targets boys by featuring the DDM4v7 prominently in Call of Duty: Modern Warfare, a popular video game in which players compete to kill each other. *Id.* ¶¶ 206–08; 211–16.

The Shooter was exposed to Daniel Defense's message of adrenaline-soaked violence, real-life first-person shooting, power, sex, and masculinity through social media and Call of Duty. *E.g.*, *id.* ¶¶ 137, 293. This marketing accomplished exactly what Daniel Defense intended it to do: it lured the Shooter to Daniel Defense's website. *E.g.*, *id.* ¶¶ 297–98. Once he was there, Daniel Defense successfully urged him to create an account and provide his email address. *Id.* ¶¶ 231–33, 368–69. Meanwhile, Daniel Defense used cookies to track the Shooter's online activity and build a profile on him. *E.g.*, *id.* ¶¶ 236, 376–78. When the still seventeen-year-old Shooter added a Daniel Defense DDM4v7 to his shopping cart on Daniel Defense's website, Daniel Defense set the hook. It sent him an email asking, "Hi Salvador, are you on the fence?"; declaring, "Your

4

DDM4v7 is ready in your cart!"; urging him to "RETURN TO CART"; and offering to sell him that specific AR-15. *Id.* ¶ 372. Daniel Defense knew the Shooter was under eighteen when it offered to sell him the AR-15 he used in the shooting, and Daniel Defense intended to make that offer to the under-eighteen Shooter. *Id.* ¶¶ 374–94. Daniel Defense's offer was a blatant violation of Texas Penal Code § 46.06, which makes it a crime to "intentionally or knowingly . . . offer[] to sell, rent, lease, or give to any child younger than 18 years of age any firearm." *Id.* ¶ 373.

At 12:23 a.m. on May 16, 2022 – just twenty-three minutes after turning eighteen – the Shooter purchased the DDM4v7 from Daniel Defense's website. *Id.* ¶¶ 403–04. Daniel Defense then shipped the DDM4v7 to Oasis Outback for him to pick up. *Id.* ¶¶ 404–06.

### B. Oasis Outback Supplies the Shooter with Two Assault Rifles and Hundreds of Rounds of Ammunition and Installs His Battle Sight

The Shooter celebrated his eighteenth birthday by visiting Oasis Outback on May 16. The next day, May 17, he purchased a Smith & Wesson AR-15 at Oasis Outback for $1,081.42. *Id.* ¶ 411. On May 18, he purchased 375 rounds of M193, a 5.56mm 55-grain round with a full metal jacket, at Oasis Outback. *Id.* ¶ 412. On May 20, the Shooter received an email saying that his DDM4v7 had arrived at Oasis Outback. *Id.* ¶ 426. He immediately called Oasis Outback and went there to pick up the DDM4v7. *Id.* ¶¶ 427–28. The Shooter brought his holographic battle sight – an accessory designed to optimize for fast-paced, close-quarter killing – with him. *Id.* ¶ 429. To work properly, such a sight needs to be correctly installed. *Id.* He had never fired a firearm, let alone mounted a military-grade battle sight on an AR-15. *Id.* Therefore, the Shooter had Oasis Outback install the battle sight on the DDM4v7. *Id.* ¶¶ 429, 575.

Despite having just turned eighteen, the Shooter spent thousands of dollars on two AR-15s and hundreds of rounds of ammunition, and had acquired an $800 battle sight. *Id.* ¶¶ 333, 571. Oasis Outback knew this – it had sold him the Smith & Wesson AR-15 and the ammunition, and

it had transferred the DDM4v7 to him. This was so unusual that it caused Oasis Outback's owner to question the Shooter as to where he got the money. *Id.* ¶ 571. Other patrons at Oasis Outback noticed the Shooter acting unusual, nervous, and alarming during these repeat visits. *Id.* ¶ 572. He dressed in all black on every visit and, as one customer described him, he looked "odd" and "like one of those school shooters." *Id.* Other customers described the Shooter as "very nervous looking" and giving off "bad vibes." *Id.* Yet, Oasis Outback ignored all of this and provided him with the arsenal, motivation, and confidence he would need to carry out a mass shooting. The store provided critical assistance to the kid who looked "like one of those school shooters." *Id.* ¶ 572.

### C.    EOTech Sells the Shooter a "Battle Proven" Holographic Sight

Daniel Defense was not the only company marketing and promoting violence. In April 2022, when he was still seventeen years old, the Shooter purchased a holographic battle sight from EOTech.[2] Pet. ¶ 331. Daniel Defense's marketing extols the lethality of EOTech's holographic battle sights when combined with Daniel Defense's assault rifles. This is the combination that Daniel Defense celebrated as "totally murdered out" in its social media marketing. *Id.* ¶ 151. That is an apt description, as the sight is, in EOTech's words, "engineered with a singular purpose: to help you acquire and hit the target before the target acquires you." *Id.* ¶ 340. It is not a hunting sight; it is "for close-quarter battle." *Id.* ¶ 339 (quoting EOTech). Fittingly, EOTech calls the sight's targeting ring the "donut of death." *Id.*

_____

[2] EOTech's holographic sights are state-of-the-art combat sights, used by military operators and special forces. They are mounted on firearms and allow their users to look through a glass viewing window, where a targeting reticle is projected onto holographic film. This allows the user to aim with both eyes open, allowing an unrestricted field of view and peripheral vision. These are major advantages for fast-paced, close-quarters combat, in which enemies need to be visualized, targeted, and killed in split seconds. They are also major advantages for killing within the close quarters of a classroom, especially when victims may be attempting to flee or hide, and when responding officers may be approaching. Pet. ¶ 332.

The Shooter knew the lethal purpose of EOTech's sight. EOTech's marketing made clear that it was optimized for killing as many people as possible, as quickly as possible. *Id.* ¶¶ 337–40, 343–47. The sight is also featured in several Call of Duty games. *Id.* ¶¶ 334–36. The Shooter purchased the holographic battle sight directly from EOTech for $800 to equip himself to carry out a close-quarter mass shooting, and to play Call of Duty in real life with his DDM4v7. *Id.* ¶¶ 331, 333.

### D. Firequest Sells the Shooter a Device to Convert the DDM4v7 to an Illegal Machine Gun that Can "Unleash Hell Fire"

AR-15s sold to civilians are semi-automatic. Pet. ¶¶ 81–82. Both federal law and Texas law prohibit Daniel Defense from selling automatic AR-15s to the public, classifying them as machine guns. *Id.* ¶¶ 322–23. The same laws also prohibit selling devices that can convert semi-automatic rifles into machine guns. *Id.* ¶¶ 321–23. Despite this, Daniel Defense markets its AR-15s as capable of automatic fire and promotes the thrill of using a Daniel Defense AR-15 in "full auto." *Id.* ¶ 328.

Although a Daniel Defense AR-15 cannot fire automatically when it is shipped to the consumer, it can be easily modified – illegally – to enable automatic fire. Daniel Defense knows this. *Id.* ¶ 508. Defendant Firequest knows this as well, but Firequest evidently has no regard for laws prohibiting the sale of devices that convert semi-automatic firearms into machine guns. *Id.* ¶ 324. It manufactures, markets, and sells exactly that type of device. Firequest's "Hell-Fire Gen 2 snap on trigger system" snaps onto the grip of an AR-15 and sits behind the trigger. *Id.* ¶ 312. When the user pulls on the trigger and continues to exert pressure, the device causes the AR-15 to continuously fire rounds until the magazine is empty or the user releases pressure on the trigger. *Id.* Firequest markets the device as "the epitome of . . . any rapid-fire system ever . . . . All you have to do is squeeze the trigger to shoot at rates up to 900 [rounds per minute]." *Id.* ¶ 314. Its marketing urges viewers to unleash "HELL-FIRE" and shows a gunman wearing a skull mask as

he uses the Hell-Fire Gen 2 to unleash automatic fire from an AR-15. *Id.* ¶¶ 316–17. The Shooter purchased a Hell-Fire Gen 2 snap on trigger system from Firequest's website. *Id.* ¶¶ 310–11.

### E.  The Robb Elementary School Shooting

On the morning of May 24, 2022, the Shooter shot his grandmother in the head, stole her truck, and drove to Robb Elementary School. Pet. ¶¶ 465–469. He brought his "totally murdered out" Daniel Defense DDM4v7 equipped with the "close-quarter battle" EOTech sight, his Firequest trigger device, and hundreds of rounds of ammunition into Robb Elementary School. *Id.* ¶ 470. Armed with this arsenal, he murdered nineteen children and two teachers and shot at responding law enforcement officers. *Id.* ¶¶ 479–87.

The Robb Elementary Shooting should not have happened. Defendants' conduct was a substantial factor resulting in the shooting. Defendants encouraged, promoted, and validated in the Shooter a fantasy of violence, criminality, and domination. Then they offered to sell, and did sell him, the weapons and combat accessories that they told him were necessary to inflict violent domination. Defendants inspired and encouraged the Shooter to carry out the shooting, and they validated and preyed on his desire for dominance, notoriety, and revenge. They gave him the tools and twisted confidence he needed to carry out the Shooting. They increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that Plaintiffs would be shot, be injured, suffer mental anguish, or be killed. *Id.* ¶ 488.

### F.  The Notice of Removal

Daniel Defense removed this action on July 1, 2024, asserting diversity jurisdiction as the sole basis for federal subject matter jurisdiction. ECF 1, Notice of Removal (filed July 1, 2024) (hereinafter "Notice"). Plaintiffs, however, are citizens and residents of Texas, and Oasis Outback was formed in Texas and has its principal place of business in Texas. Pet. ¶¶ 21–51, 64. In an effort

to manufacture complete diversity, Daniel Defense claims that Oasis Outback is improperly joined. As set forth below, each of Daniel Defense's arguments fails to meet its heavy burden under the Fifth Circuit's test for improper joinder.

## II. DANIEL DEFENSE FACES A HEAVY BURDEN OF SHOWING THAT NO REASONABLE BASIS EXISTS FOR PREDICTING THAT PLAINTIFFS MIGHT RECOVER AGAINST OASIS OUTBACK IN STATE COURT

### A. A Claim of Improper Joinder Tests the Joinder – Not the Merits – and Raises Significant Federalism Concerns

A claim of improper joinder permits a limited jurisdictional inquiry, in which "[t]he burden of persuasion on a party claiming improper joinder is a heavy one," and "[a]ny contested issues of facts *and* any ambiguities of state law must be resolved in favor of remand." *Palmquist v. Hain Celestial Grp., Inc.*, 103 F.4th 294, 304 (5th Cir. 2024) (citations and quotation marks omitted). "[T]he focus of the inquiry must be on the joinder, not the merits of the plaintiff's case." *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004).

The limited nature of the improper joinder inquiry is compelled by federalism and the separation of powers. "Federal courts are courts of limited jurisdiction" and "possess only that power authorized by [the] Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (citations omitted). Removal on any ground "raises significant federalism concerns," because it "deprive[s] the state court of an action properly before it." *Palmquist*, 103 F.4th at 301. Removal based on a claim of improper joinder raises the jurisdictional stakes, because it also threatens to bring to a federal district court an action over which that court lacks subject matter jurisdiction. *See Merkel v. Treestand Mfgs. Ass'n*, No. 4:13-cv-00235, 2014 WL 12654869, at *3 (N.D. Miss. Sept. 3, 2014)

("[I]n cases where a district court erroneously concludes that fraudulent joinder has been established, this may result in lengthy federal court litigation being vacated on appeal . . . .").

### B.   A District Court Engaging in an Improper Joinder Prediction Must Construe Both The Facts and the Law in the Plaintiffs' Favor

The Fifth Circuit has "recognized two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Smallwood*, 385 F.3d at 573 (citation and quotation marks omitted). Under the second way, "the test for fraudulent joinder is whether the defendant has demonstrated that there is *no possibility of recovery* by the plaintiff against an in-state defendant, which stated differently means that there is *no reasonable basis for the district court to predict that the plaintiff might be able to recover* against an in-state defendant." *Id.*

The Fifth Circuit has described this prediction by a district court as "a Rule 12(b)(6)-type analysis," because the federal pleading standard applies. *Palmquist*, 104 F.4th at 302, 304. Thus, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the court "must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." *Id.* (internal quotation marks omitted).

However, an improper joinder prediction is *not* the same as a traditional Rule 12(b)(6) analysis, and courts should not permit a removing party to abuse improper joinder as a vehicle for addressing the merits of an action before jurisdiction is established. As the Fifth Circuit has stressed, "the district court's first inquiry is whether the removing party has carried its heavy burden of proving that the joinder was improper . . . until the removing party does so, the court does not have the authority to do more; it lacks the jurisdiction to dismiss the case on its merits." *Smallwood*, 385 F.3d at 576.

Unlike a normal Rule 12(b)(6) analysis, the improper joinder prediction involves a second layer of deference: "[a]ny contested issue of facts *and* any ambiguities of state law must be resolved in favor of remand." *Palmquist*, 103 F.4th at 304 (emphasis added) (citations and quotation marks omitted). Thus, when a claim involves "an unsettled issue of state law," a removing party's already heavy burden becomes "an exceptionally difficult (if not impossible) one." *Merkel*, 2014 WL 12654869 at *2; *cf. Soto v. Bushmaster Firearms Int'l, LLC*, 139 F. Supp. 3d 560, 563 (D. Conn. 2015) ("[T]he 'no possibility' standard for fraudulent joinder is similar to the Rule 11 standard . . . [which] seeks to deter frivolous litigation without chilling creative advocacy.").

Further, "[t]he principle . . . that a defendant must demonstrate that there is no possibility of recovery by the plaintiff . . . suggests that courts should construe an unclear federal affirmative defense to a state-law claim in the plaintiff's favor, just as the principle requires courts to construe state law in favor of the plaintiff." *Smallwood*, 385 F.3d at 590 (Clement, J., dissenting, concurring in judgment only).[3] In other words, a defendant that seeks to establish improper joinder by way of a federal defense "must show that no reasonable basis exists for construing a federal affirmative defense as not applying." *Id.* Just as an unsettled issue of state law turns the removing party's heavy burden into an exceptionally difficult one, "where an issue of whether a federal affirmative defense applies is *res nova*, and there is a non-frivolous, reasonable basis for construing the federal affirmative defense as not applying, a defendant cannot show fraudulent joinder." *Id.*

---

[3] The *Smallwood* majority did not reach this issue. Judge Jolly's dissenting opinion, which was joined by seven judges (including Judge Jolly and Judge Clement), agreed with Judge Clement's partial concurrence on this point. *Smallwood*, 385 F.3d at 584 n.11.

III.    **THE CASE MUST BE REMANDED**

A.    **Daniel Defense Cannot Meet Its Heavy Burden of Showing that PLCAA Immunizes Oasis Outback for Installing the Shooter's EOTech Sight**

Plaintiffs allege that Oasis Outback was negligent for, inter alia, installing a holographic sight on the Daniel Defense DDM4V7 assault rifle used in the Shooter's attack on Robb Elementary School. Pet. ¶¶ 575–78. The Shooter, a firearms novice, brought the sight with him to Oasis Outback when he went to pick up the DDM4V7 rifle he had ordered online from Daniel Defense, and then solicited assistance in mounting and installing the sight. *Id.* ¶ 429. Despite the fact that the EOTech sight is designed for combat, this was the Shooter's fourth visit to Oasis Outback in five days (the first of which was the same day he turned eighteen), other patrons of the store observed the Shooter behaving strangely and "like" a "school shooter," and Oasis Outback had personally sold or transferred two assault rifles and 375 rounds of ammunition to a teenager, Oasis Outback nevertheless installed the EOTech sight for the Shooter. *Id.* ¶¶ 410–12, 426–29, 571–72.

Under these circumstances, installing a holographic battle sight on the Shooter's AR-15 was negligent, wrongful, and, frankly, incomprehensible. Yet, Daniel Defense contends that Oasis Outback enjoys immunity from this claim because Plaintiffs have alleged a "qualified civil liability action" against a "seller" of firearms, as those terms are defined in the Protection of Lawful Commerce in Arms Act ("PLCAA"). Notice at 14–19. PLCAA has no application to Oasis Outback's conduct in installing the EOTech sight – an accessory that it neither manufactured nor sold, and that is not a "qualified product" under PLCAA. To make a square peg fit a round hole, Daniel Defense asks the court to distort the text of PLCAA through unprecedented interpretations of the Act. Plaintiffs engage with these arguments at some length, but under the standard for improper joinder, the Court need not do so. If "there is a non-frivolous, reasonable basis for

12

construing" federal law as not barring a claim, "a defendant cannot show fraudulent joinder."

*Smallwood*, 385 F.3d at 590 (Clement, J., dissenting, concurring in judgment only).

### 1.    The EOTech Sight Is an Accessory, Not a "Component Part"

Daniel Defense argues that any firearm sight, including the EOTech holographic sight, "is

a 'component part of a firearm' under the PLCAA" and, therefore, a "qualified product." Notice

at 16. This argument is integral to its claim that PLCAA immunizes Oasis Outback for negligence

related to the sight, because PLCAA's protections are framed exclusively in relation to "qualified

products." The statutory definitions of "manufacturer" and "seller" are couched in terms of how

those entities interact with qualified products. *See* 15 U.S.C. § 7903(2) ("The term 'manufacturer'

means, with respect to a qualified product . . . ."); *id.* § 7903(6) ("The term 'seller' means, with

respect to a qualified product . . . ."). Moreover, the type of action prohibited by PLCAA, a

"qualified civil liability action," is one that "result[s] from the criminal or unlawful misuse of a

qualified product." *Id.* § 7903(5)(A). In short, if the EOTech sight is not a "qualified product,"

PLCAA does not apply to Plaintiffs' claims concerning the sight's installation. It is not a qualified

product, and, therefore, Daniel Defense's claims fail on that basis alone.

PLCAA provides the following three-pronged definition of "qualified product":

> The term "qualified product" means [1] a firearm (as defined in subparagraph
> (A) or (B) of section 921(a)(3) of title 18), including any antique firearm (as
> defined in section 921(a)(16) of such title), or [2] ammunition (as defined in
> section 921(a)(17)(A) of such title), or [3] a component part of a firearm or
> ammunition, that has been shipped or transported in interstate or foreign
> commerce.

15 U.S.C. § 7903(4). Daniel Defense's argument is confined to prong 3; it argues that the EOTech

sight is a qualified product because it is a "component part of a firearm." Notice at 16. PLCAA

does not define "component part," and Daniel Defense acknowledges that the phrase must be given

its "ordinary meaning." *Id.* (citation omitted). "When a word is not defined by statute, we normally

construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).

The common understanding of "component part" is something that plays an integral or necessary role in the entity it comprises. Indeed, the Merriam-Webster dictionary in circulation at the time PLCAA was enacted defined "component" as a "constituent part," and "constituent" as "an *essential* part." *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018) (citing Merriam-Webster Collegiate Dictionary 255, 267 (11th ed. 2003) (emphasis added); *cf. Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–67 (2012) (consulting older dictionaries "in use" when the statute in question was enacted). This comports with the ordinary meaning of the phrase. An engine is a component part of a car; a bumper sticker is not. A screen is a component part of a laptop; a ring light affixed to the screen to augment lighting during video calls is not.

Using that common-sense understanding, the EOTech sight at issue here clearly is not a component part. It does not play an integral or necessary role in the operation of the underlying weapon: discharging a round of ammunition. It is an after-market accessory that impacts the shooter's experience, not the weapon's function. Treating any accessory that touches a firearm as a "component part" stretches the phrase's ordinary meaning beyond reason. "That a definition is broad enough to encompass one sense of a word does not establish that the word is ordinarily understood in that sense." *Taniguchi*, 566 U.S. at 568 (holding that even though "interpreter" could apply to someone who translates in writing, rather than orally, that is not how the word is usually understood).

To the extent there is any ambiguity in the ordinary meaning of "component part," two rules of statutory interpretation compel the conclusion that defendants' interpretation is untenable. First, it is a fundamental tenet that every word within a statute is there for a purpose, and "courts

must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 364 (2000). If Congress intended for any part attached to a firearm, regardless of function or purpose, to be considered a "qualified product," there was no need to include the word "component." The simpler term "part" would have conveyed the broad meaning Daniel Defense now advances. But Congress chose instead to use the phrase "component part," and both words must be construed to have meaning. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024) ("Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are 'superfluous' or 'void' of significance.").

Second, when the phrase is read in its proper context – within the whole definition of "qualified product" – its meaning becomes clear. *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). As set forth above, the first prong of the qualified product definition is "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18)." The definition incorporated by reference is from the Gun Control Act ("GCA") of 1968. The subparagraphs identified, (A) and (B), define a firearm as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," respectively. 18 U.S.C. § 921(a)(3). This is as far as PLCAA tracks and incorporates the GCA, and this fact is significant.

Under the GCA, Congress defined "firearm" more expansively – under subparagraph (C), a "firearm" is also "any firearm muffler or firearm silencer." *Id.* Mufflers and silencers, like sights, are after-market accessories that are not essential to the weapon's basic function of "expel[ling] a projectile by the action of an explosive." *See id.* This demonstrates that Congress was aware of

such accessories and that, in certain contexts, Congress found it appropriate to analogize them to firearms.

It also demonstrates, with equal clarity, that Congress chose *not* to paint with such a broad brush in drafting PLCAA. The incorporation of subparagraphs (A) and (B) *but not* (C) – a weapon which expels projectiles with an explosive, and a frame or receiver of such a weapon, *but not* a muffler or silencer –  into the meaning of "qualified product" was an intentional choice. It should therefore be "presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217–18 (2001) (the meaning of a provision may be "clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (citation and quotation marks omitted). Further, even when Congress *did* mention certain accessories in the GCA (mufflers and silencers), it said nothing about after-market sights.

Finally, in a last-ditch attempt to contort PLCAA's meaning, Daniel Defense looks to recent federal authority construing the meaning of "component part." Curiously, Daniel Defense relies on *Prescott v. Slide Fire Solutions, LP*, 341 F. Supp. 3d 1175 (D. Nev. 2018), a case that is not only unhelpful to its position, but directly contradictory. Daniel Defense cites the case for the proposition that an "aftermarket modification" to a firearm (in *Prescott*, the product at issue was a bump stock) may nevertheless be a "qualified product." But the *Prescott* court's analysis dismantles Daniel Defense's argument with surgical precision. The court adopted a definition of "component part" from a dictionary published shortly before PLCAA was enacted: "an essential portion or integral element." *Id.* at 1188. It contrasted that with an "accessory," which it defined

16

as "a thing of secondary or subordinate importance," or "an object or device that is not essential in itself but adding to the beauty, convenience, or effectiveness of something else." *Id.*

So, although the bump stock is an "aftermarket modification," the relevant question is not *when* the bump stock was installed but *how* it operates within the weapon as a whole. Thus, the *Prescott* court's focus was the fact that the bump stock replaces the original stock, which is indispensable to the rifle's functioning: "upon installation, *the bump stock is a rifle's operative stock and, therefore, becomes an integral part of a rifle.*" *Id.* at 1189 (emphasis added); *see also id.* (the fact that bump stocks "are substituted in for the original stock render[s] them essential units."). The court even explicitly contrasts a rifle stock with a sight, classifying the latter as a non-component part:

> Unlike cable gun locks, *sights*, and compensators – without which a rifle is fully functionally [sic] – a rifle cannot operate as a rifle without a stock. As noted *supra*, the Court finds significant the fact that bump stocks replace existing stocks rendering them component parts, even if they are after-market enhancements.

*Prescott*, 341 F. Supp. 3d at 1190 (emphasis added); *cf. United States v. Berger*, 2024 WL 449247, at *17 (E.D. Pa. Feb. 6, 2024) (holding that a silencer is not an "arm" under the Second Amendment because "it is merely an accessory which is unnecessary to the essential operation of a firearm").

Daniel Defense cannot marshal any support for its argument that the EOTech sight negligently installed by Oasis Outback is a "component part" under PLCAA. A common-sense understanding of the phrase, canons of statutory interpretation, and relevant federal caselaw all say otherwise. As set forth above, the statute is only concerned with liability arising from "the criminal or unlawful misuse *of a qualified product*." 15 U.S.C. § 7903(5)(A) (emphasis added). Claims pertaining to non-qualified products, like the EOTech sight used by the Shooter, fall wholly outside PLCAA's reach.

### 2.       Daniel Defense Expands PLCAA's Scope Beyond Recognition

Daniel Defense makes a separate, but related, argument that Oasis Outback is shielded by PLCAA for its installation of the EOTech sight, because regardless of "whether the sight is a 'component [part]' of a firearm under the PLCAA," Oasis Outback "sells" other "'qualified product[s]' and Plaintiffs seek damages resulting from the Assailant's unlawful use of 'qualified product[s].'" Notice at 15. Daniel Defense asks this Court to hold – *for the first time in PLCAA's history* – that a firearms seller is immune from liability for *any* wrongful conduct by the seller that causes harm to a plaintiff, so long as that harm was in some way also connected to the criminal misuse of a firearm by a third party. This extreme and unprecedented expansion of the statute must be rejected.

PLCAA applies to a specific category of liability: the liability of sellers or manufacturers of qualified products for damages resulting from the misuse of *their products* by third parties.[4] Daniel Defense effectively concedes this when it quotes PLCAA's preamble, stating that "PLCAA was enacted for the express purpose of prohibiting" qualified actions against manufacturers and sellers of qualified products "'resulting from the misuse of *their products* by others.'" *Id.* at 17 (emphasis added) (quoting preamble to PLCAA, Pub. L. No. 109-92, 119 Stat. 2095 (2005)).

Congress did not intend to immunize sellers from liability for their own misconduct causing harm simply because a third party's misuse of *some* qualified product also contributed to the harm. During debate, Senator Craig, PLCAA's sponsor, explained, "[t]his bill does not create a legal shield for anybody who manufactures or sells a firearm. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. *It does not prevent*

---

[4] Even this is subject to six exceptions. *See* 15 U.S.C. § 7903(5)(A)(i)-(vi).

*them from being sued for their own misconduct*." 151 Cong. Rec. S9088 (statement of Sen. Craig) (emphasis added). Senator Sessions explained further:

> The bill is incredibly narrow. It only forbids lawsuits brought against lawful manufacturers and sellers of firearms or ammunition if the suits are based on criminal or unlawful misuse of *the product* by a third party. . . . Manufacturers and sellers are *still responsible for their own negligent or criminal conduct* and must operate entirely within the complex State and Federal laws.

151 Cong. Rec. S8911 (statement of Sen. Sessions) (emphasis added).

A simple hypothetical demonstrates the extreme and absurd nature of Daniel Defense's argument. Suppose a small-town gun store keeps a spare key for the local school behind its counter. An individual walks in acting erratically and threatening other customers. He walks up to the counter and says "I want to shoot up the school, but the doors are locked. I heard you have a spare key. Will you lend it to me?" The gun store hands over the key and the individual uses it to enter the school and commit a mass shooting using a firearm. Under Daniel Defense's reading of PLCAA, the gun store is immune from liability for handing over the key simply because it "sells 'qualified product[s].'" Notice at 15. That is a shocking and absurd result. It contradicts the intent of Congress, and the Court cannot adopt that bizarre expansion of the statute. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (refusing to construe statute to "produce an absurd and unjust result which Congress could not have intended").

Daniel Defense argues that "Congress' decision to use the indefinite article 'a'" in the phrase "resulting from the criminal or unlawful misuse of *a* qualified product by the person or a third party" "reflects a clear legislative intent to immunize qualified sellers from liability resulting from a third-party's unlawful misuse of *any* 'qualified product.'" Notice at 15 (emphasis in original) (quoting 15 U.S.C. § 7903(5)(A)). Daniel Defense fails to cite a single case adopting its novel construction of PLCAA. *See id.* at 15–16. That is unsurprising, not only because Daniel

19

Defense's version of the statute is extreme, but also because the statute simply does not say "any" qualified product. Even if the language of the statute used the word "any," this would conflict with PLCAA's preamble, the legislative history, and the rule against absurdity, resulting in statutory ambiguity that must be resolved in Plaintiffs' favor on a motion to remand. *Smallwood*, 385 F.3d at 590 (Clement, J., dissenting, concurring in judgment only).

### B. Daniel Defense Cannot Meet Its Heavy Burden with Regard to Negligent Entrustment

In contravention of the requirement that "any ambiguities of state law must be resolved in favor of remand," *Palmquist*, 103 F.4th at 304, Daniel Defense ignores that Texas courts have recognized the viability of negligence claims against sellers of firearms and ammunition. For example, in *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841 (Tex. App. – San Antonio 1989), *writ denied* (July 12, 1989), the Court of Appeals sitting in San Antonio, which exercises appellate jurisdiction over actions filed in Uvalde County, concluded that "a standard of ordinary care on the part of a firearms seller does exist toward a third party who might be injured by an unreasonable sale of a firearm to a minor," or to "mentally imbalanced persons." *Id.* at 847 (citing *Hulsebosch v. Ramsey*, 435 S.W.2d 161, 163–64 (Tex. Civ. App. – Houston 1968)); *see also Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. – Corpus Christi-Edinburg 1997) ("Other Texas appellate courts have found that a standard of ordinary care on the part of a firearms seller does exist toward a third party who might be injured by an unreasonable sale of a firearm. . . . We see no reason why this standard of ordinary care should not extend to the seller of ammunition.") (citing *Peek*, 768 S.W.2d at 847, and *Hulsebosch*, 435 S.W.2d at 164); *Tisdale v. Pagourtzis*, No. 3:20-cv-140, 2020 WL 7170491, at \*5 (S.D. Tex. Dec. 7, 2020) ("But Texas courts have also recognized, under common-law negligence principles and without the assistance of negligence per se, that ammunition sellers owe a duty of ordinary care toward third parties who

might be injured by an unreasonable sale of ammunition."); *cf. Erwin v. Dunn*, 201 S.W.2d 240, 242–43 (Tex. Civ. App. – Galveston 1947) (recognizing viability of negligence claim for sale of fireworks to a ten-year-old).

The court in *Peek* granted summary judgment against the plaintiff only because a witness's statement that the purchaser "appeared nervous to her" included "no description by her of the physical manifestations of this nervousness," and, therefore, fell short of "evidence of reasonably observable manifestations at the time of the sale of agitation, instability, incompetence, recklessness or intent to commit a crime." *Peek*, 768 S.W.2d at 847. Here, Plaintiffs allege, inter alia, that the Shooter was "dressed in all black," "spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period," – "[d]espite his youth and having turned eighteen just days before" – prompting "Oasis Outback's owner to question the Shooter as to where he got the money," and behaved in such a suspicious manner that a witness described him as appearing "like one of those school shooters." Pet. ¶¶ 571–72. The Shooter also signaled his lack of experience with firearms and interest in shooting people in close quarters by asking Oasis Outback to install a state-of-the-art, military combat sight for him because he could not do so himself. *Id.* ¶¶ 571, 575.

Daniel Defense chose not to bring *Peek* to the Court's attention. Instead, Daniel Defense cites *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021), which held that the PLCAA negligent entrustment exception does not apply to the Texas common-law cause of action that Texas courts call "negligent entrustment." *Id.* at 31–32. PLCAA expressly exempts from its scope "an action brought against *a seller* for negligent entrustment," and the Act defines "negligent entrustment" as "the supplying of a qualified product by *a seller* for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use

the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903 (5)(A)(ii), (B) (emphasis added). *In re Academy* held that this exception could not encompass Texas common-law negligent entrustment actions, which do not apply to sales of chattel.[5] 625 S.W.3d at 31–32.

By relying on *In re Academy* here, Daniel Defense asks this Court, in effect, to rewrite PLCAA's negligent entrustment exception to state that "negligent entrustment means a state common-law action that courts in the state at issue label 'negligent entrustment' and no other type of action." But that is not what PLCAA says. PLCAA exempts any action, no matter its label, that involves "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903 (5)(A)(ii); *see Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 324 (Mo. 2016) ("[A] state-law claim may continue to be asserted, even if it is not denominated as a 'negligent entrustment' claim under state law, if it falls within the definition of a 'negligent entrustment' claim provided in the PLCAA.") (citation omitted).

The negligence claims recognized in *Peek* and similar cases and asserted by Plaintiffs here clearly meet this definition. At most, Daniel Defense could argue that *In re Academy* casts doubt on *Peek* and similar decisions, but the Fifth Circuit has mandated that "any ambiguities of state law must be resolved in favor of remand." *Palmquist*, 103 F.4th at 304. Further, seven judges of

---

[5] The extent of the facts alleged here sets this case apart from *In re Academy*, which involved a sale of one AR-15 and one magazine. *See* 625 S.W.3d at 24. That is far less than the arsenal that Outback Oasis knew the eighteen-year-old Shooter, dressed in all black and behaving suspiciously, had amassed during his four visits to the store. Whether a set of facts gives rise to a negligence claim depends on the "particular circumstances" of a party's conduct. *See Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.2d 137, 145 (Tex. 2022).

the Fifth Circuit have indicated – without any judge disagreeing – that "courts should construe an unclear federal affirmative defense to a state-law claim in the plaintiff's favor," *Smallwood*, 385 F.3d at 590 (Clement, J., dissenting, concurring in judgment only). Therefore, Daniel Defense cannot meet its heavy burden with respect to the PLCAA's negligent entrustment exception.

### C.  Daniel Defense Cannot Meet Its Heavy Burden on Causation

Daniel Defense asserts, without so much as pretending to address Plaintiffs' specific allegations, that  "Plaintiffs fail to allege any facts supporting the allegation that Oasis Outback's installation or adjustment of the sight at issue had any causal connection to the harms they suffered, much less that Oasis Outback failed to follow any cognizable standard of care." Notice at 23. As alleged in Plaintiffs' Petition, the purpose of the holographic sight is to help a shooter kill many people in close quarters. Pet. ¶¶ 331–52. In EOTech's own words, the "Holographic Weapon Sight [is] built for close-quarter engagements with fast-moving targets" and "allow[s] the shooter to quickly pick up and lock on a target." *Id.* ¶ 338. According to EOTech, the sight is "breach-ready," meaning that it is ideal for bursting into a room and killing people. *Id.* ¶ 344. Plaintiffs allege that "[t]he Shooter's purchase of the EOTech sight gave him both a practical tool and, in EOTech's words, increased 'confidence.'"  *Id.* ¶ 362. And, in fact, the Shooter used a Daniel Defense AR-15 equipped with an EOTech holographic battle sight to enter a room and shoot children, teachers, and responding officers in close quarters. In all these ways, the sight "increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that Plaintiffs would be shot, be injured, suffer mental anguish, or be killed." *Id.* ¶ 579.

The Shooter, who had no real-world experience with firearms, relied on Oasis Outback to install and adjust this holographic battle sight, so that he could burst into rooms and kill people in close quarters as efficiently as possible. *Id.* ¶¶ 344, 575. Plaintiffs allege that Oasis Outback, under

circumstances alleged, "had a duty to exercise reasonable care in . . . installing firearms accessories . . . and to refrain from any activity creating reasonably foreseeable risks of injury to others," and that Oasis Outback "breached its duty to exercise reasonable care by . . . installing the EOTech holographic combat sight" and "'zeroing' or otherwise adjusting the EOTech holographic combat sight for the Shooter." *Id.* ¶¶ 570–72, 578.

Plaintiffs have plainly alleged facts supporting causation and breach of a duty of care. At the very least, resolving "[a]ny contested issues of facts and any ambiguities of state law . . . in favor of remand," *Palmquist*, 103 F.4th at 304, and drawing all reasonable inferences in their favor, there is a "reasonable basis for the district court to predict" that the state court "might" find that these allegations are sufficient, *Smallwood*, 385 F.3d at 573. Put simply, Oasis Outback enabled the Shooter to use a firearm accessory that optimizes for close-quarter shooting – despite Oasis Outback's knowledge of the Shooter's ominous shopping spree and suspicious behavior – and the Shooter was then emboldened to use his firearm equipped with that accessory to shoot children, teachers, and law enforcement officers in close quarters.

### D.    Daniel Defense Cannot Meet Its Heavy Burden on Duty

It is well settled under Texas law "that [a] tortfeasor's negligence will not be excluded where the criminal conduct is a foreseeable result of such negligence." *Peek*, 768 S.W.2d at 846; *see also, e.g.*, *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) ("Although the criminal conduct of a third party may be a superseding cause which relieves the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence."). Daniel Defense ignores this aspect of Texas law when it asserts that "Oasis Outback had no duty to prevent the Assailant's unforeseeable criminal conduct," because "there generally 'is no duty to control the conduct of third persons

absent a special relationship,'" and "intentional criminal conduct is *not* foreseeable." Notice at 24–25 (emphasis in original) (citations omitted). Once again, Daniel Defense asks the Court to contravene the requirement that "any ambiguities of state law must be resolved in favor of remand." *Palmquist*, 103 F.4th at 304.

The Shooter's actions were obviously foreseeable to Oasis Outback. As stated above, Plaintiffs allege that the Shooter "spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period," – "[d]espite his youth and having turned eighteen just days before" – prompting "Oasis Outback's owner to question the Shooter as to where he got the money," asked Oasis Outback to install a military-grade holographic battle sight that optimizes for killing in close-quarter combat, "dressed in all black," and behaved in such a suspicious manner that a witness described him as appearing "like one of those school shooters." Pet. ¶¶ 571–72. The Shooter did all of this promptly after turning eighteen, and with a sense of urgency that should have made it abundantly clear to Oasis Outback that the Shooter had twisted plans for his two assault rifles, hundreds of rounds of ammunition, and holographic battle sight.

Daniel Defense egregiously understates Plaintiffs' allegations, flouting the requirement that the Court "must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." *Palmquist*, 104 F.4th at 304 (citations and quotation marks omitted). Daniel Defense mischaracterizes Plaintiffs' Petition as "alleg[ing] only that Oasis Outback's owner questioned how the Assailant could afford the products he purchased," and asserts, without citation to any authority, that because the Shooter had recently turned eighteen and could purchase firearms legally, "age cannot be a foreseeability factor here." Notice at 25–26. Daniel Defense's

head-in-the-sand approach to this portion of its Notice of Removal mirrors the attitude that Oasis Outback demonstrated during the Shooter's shopping spree, to tragic effect.

The primary case relied on by Daniel Defense, *Allen v. Wal-Mart Stores, LLC*, No. CV H-16-1427, 2017 WL 978702, at *10 (S.D. Tex. Mar. 14, 2017), dismissed a claim against a retailer on the grounds that the "complaint's vague allegations that WalMart employees sold a towel . . . and other inhalant paraphernalia without specifying what that paraphernalia was or who sold it to her" failed to show that it was foreseeable that the plaintiff's decedent would use these items together to inhale aerosolized sprays in a dangerous manner. *Id.* at *16. Here, there can be no doubt that it was foreseeable to Oasis Outback that the Shooter could use two assault rifles, hundreds of rounds of ammunition, and a holographic battle sight designed to optimize for close-quarter combat to kill and injure people in close-quarter combat.

### E.    The Forum-Defendant Rule Bars Removal of This Action

Under 28 U.S.C. § 1441(b)(2), also known as the forum-defendant rule, "[a] civil action otherwise removable solely on [diversity jurisdiction] . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." Oasis Outback, a properly joined and served defendant, is a citizen of the state of Texas. Daniel Defense's Notice of Removal therefore violates § 1441(b)(2).[6]

## IV.    CONCLUSION

For the reasons stated above, this action must be remanded to the 38th District Court of Texas.

---

[6] Although this issue is raised in the Notice of Removal and the Plaintiffs' instant Motion, it is redundant with the issue of improper joinder.

Respectfully Submitted,

**THE PLAINTIFFS,**

By:    /s/ Erin Rogiers
       Erin Rogiers, Esq.
       TX State Bar No. 24083597
       Francisco Guerra IV, Esq.
       TX State Bar No. 00796684
       Bailey Vannatta, Esq.
       TX State Bar No. 24119113
       GUERRA LLP
       875 East Ashby Place, Suite 1200
       San Antonio, TX 78212
       Tel: (210) 447-0500
       Fax: (210) 447-0501
       erogiers@guerrallp.com
       fguerra@guerrallp.com
       bvannatta@guerrallp.com

By:    /s/ Joshua D. Koskoff
       Joshua D. Koskoff, Esq. (*pro hac vice* forthcoming)
       CT State Bar No. 410518
       Alinor C. Sterling, Esq. (*pro hac vice* forthcoming)
       CT State Bar No. 411754
       Colin S. Antaya, Esq. (*pro hac vice* forthcoming)
       CT State Bar No. 440953
       Katherine Mesner-Hage, Esq. (*pro hac vice* forthcoming)
       CT State Bar No. 436299
       KOSKOFF, KOSKOFF & BIEDER, PC
       350 Fairfield Ave., Suite 501
       Bridgeport, CT 06604
       Tel: (203) 336-4421
       Fax: (203) 368-3244
       asterling@koskoff.com
       jkoskoff@koskoff.com
       cantaya@koskoff.com
       kmesnerhage@koskoff.com