**FILED**

November 21, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
AM
                    DEPUTY

**KIMBERLY RUBIO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of A.A.R, *deceased minor,* et al.,**

**Plaintiffs,**

**v.**

**DANIEL DEFENSE, LLC, et al.,**

**Defendants.**

**Case No. 2:24-CV-00069-AM**

**PLAINTIFFS' RESPONSE TO DANIEL DEFENSE DEFENDANTS'**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF NO. 19-1)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

I.    FACTUAL AND PROCEDURAL BACKGROUND ...................................2

    A.    Daniel Defense's Courtship of Adolescents.........................................3

    B.    A Courtship in Four Steps...................................................................4

        1.    Step One: The Message ............................................................4

        2.    Step Two: Delivery ..................................................................5

        3.    Step Three: The Lure ...............................................................6

        4.    Step Four: Making the Offer to Sell .......................................7

    C.    The Uvalde Shooter: Daniel Defense's Ideal Customer ....................8

    D.    What Is Already Known About Daniel Defense's Offers to Sell the
        DDM4v7 to the Seventeen-Year-Old Shooter ...................................9

II.    LEGAL STANDARD ...............................................................................13

III.    ARGUMENT: THE MOTION TO DISMISS MUST BE DENIED .............14

    A.    Plaintiffs' Claims Fall Within PLCAA's Exceptions for Violations of
        Predicate Statutes and Negligence Per Se.........................................15

    B.    Daniel Defense's Illegal Offers to Sell the DDM4v7 to the Seventeen-Year-
        Old Shooter Were PLCAA Predicate Violations................................17

        1.    Daniel Defense Offered to Sell the DDM4v7 to the Seventeen-
            Old-Shooter – At Least Twice – in Violation of Texas Penal Code
            § 46.06(a)(2) .........................................................................17

        2.    Daniel Defense's Offers to Sell the DDM4v7 to the Underaged
            Shooter Were Knowing and Intentional..................................24

            a.    Knowledge ...................................................................25

            b.    Intent ...........................................................................27

        3.    Daniel Defense Ignores the Complaint's Detailed Factual
            Allegations Regarding Knowledge and Intent.........................28

i

4. Daniel Defense's Illegal Offers to Sell the DDM4v7 to the Shooter Were Proximate Causes of the Plaintiffs' Damages ............................. 29

5. Daniel Defense's Attempt to Restrict the Predicate Exception to the Examples Provided in PLCAA Is Contrary to PLCAA's Plain Language and Absurd ........................................................................... 33

C. Daniel Defense's Violation of the Federal Trade Commission Act Was a PLCAA Predicate Violation ................................................................. 35

D. Daniel Defense's Violation of Penal Code § 46.06(a)(2) Satisfies PLCAA's Negligence Per Se Exception ................................................................ 36

E. The First Amendment Provides No Protection for Daniel Defense's Conduct ... 41

1. Daniel Defense's Offers to Sell Broke the Law and Are Unprotected by the First Amendment ........................................................................... 42

a. The Offers Were Speech Integral to Criminal Conduct ............. 42

b. Daniel Defense Improperly Challenges the Constitutionality of § 46.06 Without Proper Certification ..................................... 44

c. Daniel Defense Has Only Itself to Blame .................................... 45

2. Daniel Defense's Advertisements Constitute Commercial Speech That Promotes Illegal Activity ................................................................. 46

a. Both the Offers and Daniel Defense's Marketing Campaign Described in the Complaint Are Commercial Speech ............... 47

b. Daniel Defense's Commercial Speech Is Unprotected ............... 50

i. The Commercial Speech Identified in the Complaint Concerns Illegal Activity and Is Unlawful ...................... 51

ii. The Plaintiffs Prevail on the Remaining Three Factors of *Central Hudson,* to the Extent They Are Relevant Here ....................................................................................... 54

F. Alternatively, the Court Should Grant the Plaintiffs Leave to Amend ............... 55

CONCLUSION ....................................................................................................... 55

## INTRODUCTION

Daniel Defense broke Texas and federal law, and the result was catastrophic. Daniel Defense's marketing scheme targeted adolescents as customers for its AR-15 assault rifles. It promoted vengeance and killing with its branded firearms as solutions for adolescents' feelings of aggrievement and isolation. The company pushed its marketing where it knew adolescents would go to escape: the killing simulator Call of Duty, and Instagram. It used influencers and its own social media campaigns to market its weapons directly to minors. The goal of this scheme was to lure minors to Daniel Defense's online store, where Daniel Defense welcomed them and pressed them to buy its AR-15s. One of those minors was the Uvalde Shooter.

The 594 paragraph First Amended Complaint lays out Daniel Defense's months-long course of illegal and wrongful conduct directed at the Shooter. Even the limited evidence available before discovery shows that Daniel Defense repeatedly contacted the Shooter *directly* when he was just seventeen years old. Daniel Defense urged him to create an account on its webstore, solicited his contact information, sent him at least three emails, and *at least twice* offered to sell him the DDM4v7 AR-15, in violation of Texas's statutory ban on offering to sell firearms to minors. Daniel Defense's illegal scheme worked perfectly on the seventeen-year-old from Uvalde. Its courtship of him, culminating in its offers to sell him the DDM4v7, won him over as a brand loyalist and cemented his brand identity as a Daniel Defense, Call of Duty killer. Nineteen children and two teachers paid with their lives for Daniel Defense's disregard of Texas law.

The Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, ("PLCAA") was not created to prevent meritorious claims with provable facts of misconduct, particularly where that conduct violates state or federal law. PLCAA does what it says, no more and no less.

1

It protects *lawful* commerce in arms. It does not protect unlawful commerce in arms, and it certainly does not protect criminal commerce in arms. Both PLCAA's predicate exception and its negligence per se exception confirm this intent: they authorize victims of gun violence that results from the affirmative misconduct of gun companies to hold those companies accountable. PLCAA's protections are the most basic bargain imaginable. If gun companies conduct their business carefully and lawfully, and the allegations of a complaint do not sufficiently state otherwise, they have a defense to suit. If they conduct their business unlawfully – as Daniel Defense did here – PLCAA authorizes claims to proceed. Congress never intended to protect gun makers and sellers who violate the law – let alone protect a systematic violator like Daniel Defense. Both PLCAA's predicate exception and its negligence per se exception authorize the plaintiffs' claims against Daniel Defense to proceed.

Nor does the First Amendment provide any shield to Daniel Defense's illegal conduct. The First Amendment provides no protection for Daniel Defense's speech integral to criminal conduct. And it provides no protection for Daniel Defense's commercial speech that promoted unlawful activity.

For these reasons and as further set forth below, the Motion to Dismiss must be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are the estates and families of seventeen children between the ages of nine and eleven shot and killed in their classrooms at Robb Elementary School on May 24, 2022, and two children who survived the shooting by hiding beside their dead classmates' bodies. They bring claims against Daniel Defense for negligence, negligence per se, and gross negligence. *See* FAC ¶¶ 483-509.

2

A.      **Daniel Defense's Courtship of Adolescents**

Daniel Defense[1] manufactures, markets, and sells AR-15s. FAC ¶ 56. It has perfected the art of indoctrinating a particular demographic: adolescents who are vulnerable to marketing that stokes their sense of aggrievement and desire for power; who can be courted directly and exclusively online, behind the backs of parents and guardians, and who can be groomed as Daniel Defense customers. *Id.* ¶ 5. The explanation for this conduct is straightforward. Daniel Defense is a small player in a niche and hyper-competitive business. It profits from one kind of weapon, the AR-15. The AR-15 is a battlefield weapon, developed to meet the United States military's needs in combat. It is a fearsome, efficient killing machine. Daniel Defense must sell AR-15s or perish. To outflank its competitors, the company seeks to be the first to attract new users. The younger the relationship is established, the better the chance for a sale. And what better way to do so than to cultivate brand loyalty in teenagers before they turn 18, to hook and reel in a steady stream of new potential customers from the millions of teens scrolling Instagram and being trained and habituated to mass killing in Call of Duty. *Id.* ¶¶ 7, 124-32.

Daniel Defense has developed a marketing and sales scheme to lure adolescents into a relationship with its brand of AR-15s. It speaks to the common struggles, insecurities, and aggrievements of adolescent boys, promising to solve these problems with a Daniel Defense AR-15. FAC ¶ 9. It targets boys by featuring the DDM4v7 in Call of Duty, an immensely popular video game in which players compete to kill each other, and by marketing to them through social media and influencers. *Id.* ¶¶ 170-179, 188-98, 209-20. Daniel Defense promises power in place of their feelings of weakness, revenge in place of their feelings of aggrievement, glory in place of

---

[1] The plaintiffs refer to defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc. as "Daniel Defense" throughout this Response.

their feelings of anonymity, companionship in place of their feelings of isolation, masculinity in place of their feelings of inadequacy, and killing in place of their feelings of powerlessness. *Id.* ¶ 10. It promises adolescents that, armed with a Daniel Defense branded AR-15, they will be a "force to be reckoned with," "totally murdered out," and equipped to "hunt" their enemies. *Id.* ¶¶ 148-49, 153, 167. In doing so, Daniel Defense builds brand loyalty with adolescent boys before they turn eighteen and are legally able to purchase an AR-15 from Daniel Defense or its competitors. *Id.* ¶¶ 123-25. It does this for one purpose: converting these adolescent boys into Daniel Defense customers. *Id.* ¶ 132. When this goes as intended, the adolescent's first – and most important – firearms purchase upon turning eighteen will be a Daniel Defense AR-15. That is exactly what occurred with the Uvalde Shooter.

### B.    A Courtship in Four Steps

Daniel Defense is an expert marketer. It knows that to succeed in turning adolescent boys into customers, it must develop a message that is attractive to them, deliver that message to them, and ultimately lure them to its website where it can track their browsing activity and deliver targeted offers to sell them specific AR-15s they show interest in.

### 1.    Step One: The Message

First, Daniel Defense develops the message for its targeted adolescent market. Daniel Defense has developed a message and narrative attractive to aggrieved adolescent boys. FAC ¶ 134. Its marketing message glorifies violent and criminal conduct, advertising its AR-15s as perfect for "hunt[ing]" human targets. *Id.* ¶¶ 148-49. It promotes killing, extolling its branded AR-15s as "totally murdered out" when equipped with the EOTech holographic battle sight. *Id.* ¶ 153. It portrays its firearms used for criminal sniper missions against civilian targets on city streets. *Id.* ¶¶ 154-61. It appeals to adolescent aggrievement and feelings of inadequacy by

urging adolescents to "[r]efuse to be a victim." *Id.* ¶ 169. It capitalizes on feelings of sexual inadequacy, promoting its assault rifles as items to be "lusted over" and shows scantily clad women eyeing Daniel Defense branded AR-15s longingly. *Id.* ¶¶ 171-77. Reaching for the adolescent market another way, Daniel Defense portrays its assault rifles in the hands of pop culture icons, like the famous singer Post Malone or characters from hit Netflix series. *Id.* ¶¶ 179-80.

### 2. Step Two: Delivery

It is not enough for Daniel Defense to develop a message that promotes crime, murder, sexual conquest, vengeance, and companionship in an effort to win over adolescents and teens. For Daniel Defense to profit, it has to find its targets and deliver the message. Daniel Defense goes where its targeted "end users" go, where adolescent boys spend huge amounts of their time: on social media, especially Instagram, and in Call of Duty. FAC ¶ 135. Not only is the user base of Instagram massive – 2 billion users – it gives Daniel Defense a way to speak ***directly*** to adolescent boys, behind their parents' backs. *Id.* ¶ 190. Instagram is designed to addict adolescent users, delivering them dopamine hits for opening and using the app, and leading to compulsive Instagram use, all of which is a tremendous benefit for an advertiser like Daniel Defense seeking to reach the adolescent market. *Id.* ¶¶ 192-97. Daniel Defense advertises heavily on Instagram and other social media platforms, delivering its message of adrenaline, power, violence, revenge, and sexual prowess directly to adolescent boys. *E.g.*, *id.* ¶¶ 148-49, 153-61, 169, 171-77, 179, 209-20.

Daniel Defense also uses Call of Duty to deliver the message of empowerment through criminal use of AR-15s to adolescent boys. Call of Duty is the most popular, realistic, and immersive "first person" (i.e., the user takes on a first-person perspective of holding a rifle and

5

aiming at other players' heads) killing simulator and video game franchise ever created. Since 2009, a version of Call of Duty has been the best-selling video game nearly every year. *Id.* ¶ 212. Approximately 100 million people play Call of Duty in a given month, and tens of millions of those players are below the age of eighteen. *Id.* ¶¶ 213-14. Daniel Defense recognized that Call of Duty presented an unparalleled marketing opportunity to target teens and young men who are interested in firearms and drawn to Call of Duty's hallmarks: epic gun battles, indiscriminate mass killing in civilian environments, hyper-realistic simulations of combat, and carnage. *Id.* ¶ 215. Daniel Defense seized that opportunity with the release of Call of Duty: Modern Warfare in 2019. *Id.* ¶ 216. With the cooperation of Activision, the maker of Modern Warfare, Daniel Defense's DDM4v7 was featured on the loading screen of the game, in which a shadowy soldier brandishes a version of a Daniel Defense DDM4v7 equipped with a holographic combat sight. *Id.* ¶ 209. Since then, Daniel Defense has routinely referenced and cross-marketed Call of Duty in its advertisements on social media. *Id.* ¶¶ 224-26.

### 3.     Step Three: The Lure

The third step involves luring minors to the online store. Daniel Defense is not passive in targeting, courting, and luring minors for its commercial purposes. Getting the target to the store is the goal of the scheme. Once there, row upon virtual row of AR-15s are on display. *Id.* ¶ 136. Daniel Defense chose not to have any age verification measures on its website. *Id.* That is because Daniel Defense lures customers to its online store that it knows to be under eighteen years of age. *Id.* ¶¶ 248-49. Once there, the minor can browse AR-15s, add an AR-15 to his shopping cart, and ***even purchase an AR-15 directly from Daniel Defense*** online without Daniel

Defense once asking his age.[2] *Id.* ¶ 243. And when an adolescent does as Daniel Defense intends, when he accesses and begins to browse Daniel Defense's website, on every page – from the homepage to the page for a specific firearm – Daniel Defense prompts the adolescent to "STAY UP TO DATE" by entering his email address. *Id.* ¶ 233. Daniel Defense also urges him to "CREATE AN ACCOUNT," and provide his email address. *Id.* ¶ 234. Daniel Defense solicits the teen's email address so it can initiate contact with the teen and keep the teen's focus on its brand. *Id.* ¶ 236. From that point on, Daniel Defense uses the teen's email address in addition to cookies to track the teen's use of its website and the firearms he shows an interest in. *Id.* ¶ 238.

Not only does Daniel Defense intend for its off-site marketing to draw minors to its website, it knows this marketing scheme worked. It ***knows*** that minors are accessing its website, signing up for accounts, browsing its firearms, and ultimately receiving offers from Daniel Defense to sell them AR-15s. Daniel Defense uses cookies to collect personal information from visitors to its website, which includes "social media cookies" and "targeting cookies" that track a user's browser across other sites and build a profile of the user. FAC ¶ 367. Daniel Defense also receives demographic information about users of its website from Facebook and Instagram. *Id.* ¶ 374-79. Indeed, Daniel Defense has publicly admitted to having "internal data" on its customers that is detailed enough to know their political affiliations. *Id.* ¶ 365.

### 4. Step Four: Making the Offer to Sell

Through its marketing, Daniel Defense has drawn the minor to its online store. Once there Daniel Defense pushes its line of AR-15s on the adolescent. FAC ¶ 136.  The goal is to get

---

[2] In its Motion to Dismiss, Daniel Defense invites the Court to consider the ***current*** contents of its website. MTD at 13 n.8. But it has significantly changed its website since the plaintiffs exposed its wrongdoing in this lawsuit. For example, several months after the plaintiffs filed this lawsuit – and more than two years after the Robb Elementary Shooting – Daniel Defense finally added an age gate to its website.

the target to add an AR-15 to his shopping cart. *Id.* At all times relevant in this suit, no age verification measure stops him. The rifle populates to "his" cart, with price, quantity and shipping rate displayed. *Id.* ¶¶ 136, 360. At the time this case was filed and before, the teen could then pay for the AR-15 he had chosen. *Id.* ¶ 243.

The whole time the minor is on its website, Daniel Defense monitors his activity through cookies. If the minor does not complete the offered purchase, Daniel Defense uses the contact information it previously solicited from the adolescent, repeating its targeted offer to sell him the weapon he had chosen in a personalized email addressed to him. *Id.* Daniel Defense does this intentionally and knowingly. *E.g.*, *id.* ¶¶ 178-84, 189-226, 380.

### C.    The Uvalde Shooter: Daniel Defense's Ideal Customer

The Uvalde Shooter was the *ideal target* for Daniel Defense's teen marketing scheme. The Shooter grew up poor, without a father figure, and with a mother who struggled with drug use. FAC ¶¶ 256-58, 268. As a young child, the Shooter was sexually assaulted by one of his mother's boyfriends. *Id.* ¶ 261. He struggled academically and was bullied by his peers because of his stutter, his clothing, and his haircut. *Id.* ¶¶ 259-62. The Shooter thought of himself as a victim of abuse, of bullying and harassment, and of a cruel world. *Id.* ¶¶ 263-65.  Like virtually every bullied adolescent, he fantasized about getting revenge on his bullies." *Id.* ¶ 265. By the age of seventeen he had only completed the ninth grade. *Id.* ¶ 269-70. That year, Uvalde High School involuntarily withdrew him due to his failing academic performance and habitual truancy. *Id.* By mid-2021, he became increasingly isolated.

Like many teens looking to escape, the Shooter retreated further into a world of social media and video games, worlds in which Daniel Defense lay in wait. FAC ¶ 271. He used Instagram compulsively, often staying up all night. *Id.* ¶¶ 272-73. The Shooter became engrossed

8

in violent video games, including Call of Duty. *Id.* ¶ 283. People he played video games with online reported that he became enraged when he lost. He was flailing for purpose, meaning, and a solution to his feelings of aggrievement. *Id.* ¶ 278. He began to express an inchoate, vague fantasy of becoming famous and proving his superiority over all the people he felt aggrieved by. *Id.* ¶ 277.

Socially isolated, bullied, abused, feeling inadequate, and struggling with his masculinity and feelings of weakness, the Shooter was exactly the type of susceptible aggrieved teen that Daniel Defense's marketing targeted. FAC ¶ 288. He was not only likely to respond to Daniel Defense's marketing and be lured to its online store, he was also highly susceptible to its offers to sell. *Id.* And that is exactly what happened. Courted as a teen and exposed to Daniel Defense's marketing, the Uvalde shooter was easily lured to the online store, and Daniel Defense twice offered to sell him the DDM4v7 while he was under the age of eighteen. *Id.* ¶¶ 286, 360, 362. Within minutes of turning eighteen, he accepted Daniel Defense's offers to sell him a DDM4v7. Eight days later, he took the rifle to Robb Elementary, held 376 police officers at bay for 77 minutes, and killed nineteen children and two teachers. The massacre was the foreseeable outcome of Daniel Defense's months-long effort to court the Shooter before he turned eighteen and sell him a solution of carnage. FAC ¶ 254.

**D.    What Is Already Known About Daniel Defense's Offers to Sell the DDM4v7 to the Seventeen-Year-Old Shooter**

Daniel Defense heavily promoted its relationship with the first-person-shooting juggernaut Call of Duty, a simulation that trains users on how to indiscriminately kill other players in both combat and civilian environments. In November 2021, the Shooter purchased Call of Duty: Modern Warfare by direct download onto his PlayStation. FAC ¶ 284. Soon after, he began to research firearms online. *Id.* ¶ 285. At least as early as that time and carrying forward

to the Robb Elementary School Shooting, the Shooter was exposed to Daniel Defense's marketing. *Id.* ¶ 286. The cache in the Shooter's phone contained numerous Daniel Defense marketing images for the DDM4v7 and other Daniel Defense firearms. *Id.* ¶ 287. The marketing successfully lured the Shooter to Daniel Defense's online store  where he was presented with a lineup of Daniel Defense's AR-15s. *Id.* ¶ 290. From that point on, until he carried out the shooting, the Shooter repeatedly visited Daniel Defense's online store and was exposed to Daniel Defense's advertising. He repeatedly viewed the DDM4v7 online. The Shooter visited Daniel Defense's website so frequently that the Safari browser on his iPhone automatically created a bookmark for Daniel Defense's webstore as a "frequently visited site." *Id.* ¶ 291, 295.

On April 27, 2022, when the Shooter was still seventeen, he created a Daniel Defense account, precisely as the company intended its teen customers to do. Prompted by Daniel Defense's repeated urging that he "CREATE AN ACCOUNT," FAC ¶ 234, the Shooter clicked the button, provided his email address, and requested to sign up for an account on the website. *Id.* ¶ 358. Daniel Defense created an account for him. *Id.* Daniel Defense then quickly sent the Shooter an email with the subject line, "Welcome, Salvador Ramos!" and informed him that now that he'd made an account, he could "[p]roceed through checkout faster when making a purchase." *Id.* ¶ 359. Right after receiving the account confirmation email, the Shooter took up Daniel Defense's invitation to initiate the checkout process. *Id.* He viewed Daniel Defense's webpage for the DDM4v7. *Id.* ¶ 360. He clicked the "add to cart" button. *Id.* Because there was no age-barrier, when the Shooter clicked that button, Daniel Defense's website populated the firearm to his shopping cart, confirming Daniel Defense's intent to sell it to him. *Id.* ¶ 360. The shopping cart also populated with – and displayed to the Shooter – the price of the DDM4v7, the quantity (one), and the cost of shipping, again confirming the company's intent to sell. *Id.* These

10

actions by Daniel Defense constituted an offer to sell the DDM4v7 to the Shooter (hereafter, the "cart offer") and violated Texas law.

Two days later, Daniel Defense reached out to the Shooter to repeat the offer. It sent the Shooter an email with the subject line, "Hi Salvador, are you on the fence?" The body of the email reminded the Shooter of the initial offer to sell: "Your DDM4®v7® is ready in your cart!" The email listed the price of the DDM4v7 and contained a "RETURN TO CART" button that hyperlinked directly to the Shooter's shopping cart on Daniel Defense's website, so that the Shooter could simply click the button and complete his purchase. FAC ¶ 362. This second offer ("the email offer") again violated Texas law. That same day, the Shooter began to take the steps necessary to accept the offers. He logged into his bank's website and checked the amount of money in his account. *Id.* ¶ 386. He then opened the calculator app on his phone to determine whether he would be able to earn enough money to purchase the DDM4v7.[3] *Id.* ¶ 387. Just ***minutes*** after turning eighteen on May 16, the Shooter accepted Daniel Defense's offers to sell him the DDM4v7 that was "ready" and waiting for him in his cart. FAC ¶ 394. At 12:23 a.m. on May 16, Daniel Defense sent the Shooter a confirmation email thanking him for his purchase of the DDM4v7, which would be shipped to Oasis Outback, a Uvalde sporting goods store, for the Shooter to pick up. *Id.* ¶ 395. In the days after ordering the DDM4v7, the Shooter repeatedly returned to Daniel Defense's webpage for the DDM4v7, and also repeatedly checked his order status. *Id.* ¶ 399. He could not wait to receive the DDM4v7. *Id.* ¶ 400.

On May 20, 2024, the Shooter's DDM4v7 arrived. He went to Oasis Outback to pick it up. FAC ¶ 417-19. He brought with him a close-quarter battle sight manufactured by EOTech, which he had purchased the month before. *Id.* ¶ 420. The EOTech battle sight is a holographic

---

[3] The Shooter had a fast-food job. FAC ¶ 296.

weapons sight designed for one purpose: fast-paced, close-quarter killing in military and law-enforcement combat. *E.g.*, *id.* ¶ 323, 327. It allows enemies to be visualized, targeted, and terminated in split seconds. *Id.* ¶ 323. It works by projecting a targeting reticle onto holographic film in a glass viewing window, providing a "point-and-shoot" experience. *Id.* This eliminates the intricacies and skill required to aim with traditional iron sights and essentially turns shooting into a real-life video game. *Id.* Daniel Defense regularly markets its AR-15s equipped with the EOTech holographic battle sight. In April 2022, when the Shooter added the DDM4v7 to his shopping cart and received Daniel Defense's offers to sell, Daniel Defense's homepage prominently advertised the DDM4v7 accessorized with an EOTech sight. *Id.* ¶ 347. It was this combination – a Daniel Defense AR-15 equipped with an EOTech holographic battle sight – that Daniel Defense had marketed as "totally murdered out." *Id.* ¶¶ 153, 348.

The Shooter went home with his DDM4v7 equipped with the battle sight and began posting pictures of the assault rifle on social media, copying Daniel Defense's social media marketing *id.* ¶ 423, and now marketing for Daniel Defense himself.

Four days after picking up the DDM4v7, the Shooter used it to shoot his grandmother in the head. FAC ¶ 458. Then he stole his grandmother's truck and drove to Robb Elementary School. *Id.* ¶ 459. As the Shooter approached the school, he began firing. *Id.* ¶ 464. The Shooter entered the school and approached classrooms 111 and 112. *Id.* ¶ 466. The Shooter had attended fourth grade – and been bullied – in Classroom 111. Now he would exact his revenge. *Id.* ¶ 467. In the words of Daniel Defense, he was refusing "to be a victim." *Id.* ¶ 169. The Shooter used the "murdered out" rifle as criminally advertised: to murder nineteen fourth-grade students and two teachers. *Id.* ¶ 472.

The Shooter's rampage was beyond brutal. He did not just kill students and teachers, he displayed the cruelty, the sick sense of humor, and the fetishization of violence emphasized in the marketing of Daniel Defense. *Id.* ¶ 482. He relished the "hunt" for his victims that Daniel Defense had advertised. *Id.* ¶¶ 148-49, He was a "force to be reckoned with," *id.* ¶ 167, and he savored the life-or-death power the DDM4v7 gave him over everyone in the classrooms. The Shooter announced to his victims, "It's time to die." *Id.* ¶ 473. He approached one of the teachers in Classroom 112, told her, "good night," and shot her in the head. *Id.* ¶ 474. The Shooter made himself "at home in the storm." *Id.* ¶ 167. He kicked the bodies of his victims as they lay on the floor. *Id.* ¶ 479. He wrote "LOL," meaning "laugh out loud," on a classroom whiteboard using the blood of his victims. *Id.* ¶ 480. Daniel Defense marketed and then offered to sell the DDM4v7 to the Shooter as the violent solution to his aggrievement. He took Daniel Defense up on that offer and the Robb Elementary Shooting was the foreseeable result.

Additional facts will be provided below as necessary.

## II.    LEGAL STANDARD

In considering a Rule 12(b)(6) motion, the Court must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff ... and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them … and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co.*, 231 F.R.D. 493, 498 (W.D. Tex.

2005) (citation omitted). To defeat a Rule 12(b)(6) motion, the complaint need only include sufficient factual allegations "to raise a right to relief above the speculative level" and to provide "fair notice" of the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## III.    ARGUMENT: THE MOTION TO DISMISS MUST BE DENIED

The plaintiffs respectfully submit that Daniel Defense's Motion to Dismiss does not present a close call. It must be denied.

Daniel Defense intentionally and knowingly offered to sell the DDM4v7 to the Shooter when he was seventeen in violation of Texas Penal Code § 46.06. These offers to sell were the culmination of a course of illegal conduct and wrongful marketing intended to lure the Shooter to Daniel Defense's website and enable Daniel Defense to make these offers. Daniel Defense also knowingly violated the Federal Trade Commission Act by advertising the DDM4v7 to the Shooter as the brutal solution to his feelings of aggrievement and by promoting its violent and criminal misuse. PLCAA provides no refuge for that unlawful – and in the case of § 46.06, criminal – conduct.

PLCAA's predicate exception explicitly authorizes claims against a firearms manufacturer or seller who, like Daniel Defense, knowingly violates state and federal laws applicable to the sale or marketing of firearms, where that violation is a proximate cause of the damages claimed. Once the predicate exception is satisfied, PLCAA provides no further protection for claims based on the same facts. Because the plaintiffs have alleged facts satisfying the predicate exception, PLCAA permits the plaintiffs' negligence and gross negligence claims to proceed. Congress expressed no intention to protect the type of unlawful and wrongful conduct that Daniel Defense engaged in here.

Additionally, PLCAA explicitly authorizes claims for negligence per se to proceed. The plaintiffs have alleged Daniel Defense's intentional and knowing violation of Texas Penal Code § 46.06. These allegations state a claim for negligence per se under Texas law. Therefore, PLCAA also does not apply to the plaintiffs' negligence per se claims.

Daniel Defense's attempt to use the First Amendment to shield its criminal and unlawful conduct is unavailing. Its two illegal offers fall squarely within the "speech integral to criminal conduct" category of unprotected speech. Moreover, Daniel Defense's advertisements depicted in the complaint constitute commercial speech. Because that commercial speech promotes unlawful activity, it receives no First Amendment protections.

### A.       Plaintiffs' Claims Fall Within PLCAA's Exceptions for Violations of Predicate Statutes and Negligence Per Se

In enacting the Protection of **Lawful** Commerce in Arms Act, Congress intended to protect only firearms manufacturers and sellers who were engaged in lawful commerce. Congress made that clear in PLCAA's "findings," which state that

> [b]usinesses in the United States that are engaged in interstate and foreign commerce through the **lawful** design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

15 U.S.C. § 7901(a)(5) (emphasis added).

PLCAA's plain language and structure reflect that intent. PLCAA prohibits "certain types of claims." ECF No. 19-1, Daniel Defense's Amend. Mtn. to Dismiss (hereafter, "MTD") at 9 (quoting *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009)). Specifically, PLCAA prohibits what it calls "qualified civil liability actions" – claims "for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product," 15 U.S.C. § 7903(5)(A). As Daniel

Defense admits, however, such claims are not barred if they "fall[] within one of the enumerated exceptions" in PLCAA. MTD at 8.

PLCAA's "predicate exception" permits "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought …." 15 U.S.C. § 7903(5)(A)(iii). The predicate exception effectuates Congress' intent that individuals harmed by a manufacturer or seller's ***unlawful*** sale or marketing of a firearm must have recourse to the civil justice system for their damages. Additionally, PLCAA exempts claims "against a seller for … negligence per se." *Id.* § 7903(5)(A)(ii). The plaintiffs' negligence and gross negligence claims are for damages proximately caused by Daniel Defense's knowing violation of two predicate statutes: Texas Penal Code § 46.06(a)(2), which criminally prohibits offering to sell a firearm to a minor, and the Federal Trade Commission Act, which prohibits any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive act or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

Each of the plaintiffs' claims falls within one or more PLCAA exceptions and must be permitted to proceed.[4]

---

[4] Daniel Defense argues that "PLCAA is not just a defense to liability; it mandates immunity from suit." MTD at 1 (emphasis omitted). Nowhere in its plain language does PLCAA state that it provides immunity from suit. *See, e.g.*, *Doyle v. Combined Sys., Inc.*, No. 3:22-CV-01536-K, 2023 WL 5945857, at *4 (N.D. Tex. Sept. 11, 2023) ("The Court agrees with the Second Circuit that the PLCAA's prohibition on qualified civil liability actions is not jurisdictional because Congress did not clearly intend the PLCAA to limit the jurisdiction of the federal and state courts."). As *Doyle* finds, PLCAA is a defense, not an immunity.

**B.      Daniel Defense's Illegal Offers to Sell the DDM4v7 to the Seventeen-Year-Old Shooter Were PLCAA Predicate Violations**

This case shows exactly why Congress created the predicate exception. Congress created the predicate exception to ensure that gun makers and sellers who violate state or federal law governing their conduct, and cause harm to others as a result, can be held responsible. The predicate exception is satisfied here by the plaintiffs' allegations that Daniel Defense's blatantly illegal marketing scheme, including its two offers in violation of Texas law, proximately caused the shooting.

**1.      Daniel Defense Offered to Sell the DDM4v7 to the Seventeen-Year-Old Shooter – At Least Twice – in Violation of Texas Penal Code § 46.06(a)(2)**

Texas Penal Code § 46.06(a)(2) makes it a crime to "intentionally or knowingly … *offer[] to sell*, rent, lease, or give to any child younger than 18 years of age any firearm …." (emphasis added). Plaintiffs allege that Daniel Defense at least twice knowingly and intentionally offered to sell the DDM4v7 to the seventeen-year-old Shooter.

The plain language of § 46.06(a)(2) outlawing offers to sell firearms to minors is already clear. Texas law applying similar language in penal statutes makes its application even clearer. In a parallel penal statute, Texas outlaws "offering to sell" a controlled substance, *see* Tex. Health & Safety Code Ann. § 481.002(8). In that context, the Texas Court of Appeals has held that because "offer to sell" is not specifically defined in the penal statutes, it must be given its ordinary meaning. *See, e.g.*, *Francis v. State*, 890 S.W.2d 510, 512 (Tex. App. – Amarillo 1994, pet. ref'd) (holding that "[a] man of common intelligence would understand the meaning of an 'offer to sell....'" and "the phrase 'offer to sell' should not be defined under the law of contracts." *Id.* at 512, 514; *see also Schneider v. State*, 951 S.W.2d 856, 859-60 (Tex. App. – Texarkana 1997, pet. ref'd) (same); *Henderson v. State*, No. 03-96-00446-CR, 1998 WL 53967, at *5-6

(Tex. App. – Austin Feb. 12, 1998, no pet.) (same; and rejecting defendant's argument that under contract law, the buyer "made the offer to purchase cocaine and that [the defendant] only accepted her offer"); *McCarty v. State*, 616 S.W.2d 194, 196 (Tex. Crim. App. 1981) (term "offer" in Penal Code section criminalizing prostitution "can be sufficiently understood and complied with by the ordinary person exercising ordinary common sense") (quoting *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978)).

Under this ordinary meaning rule, a person commits the offense of offering to sell a controlled substance when he "promote[s] an exchange of a controlled substance to another person for value either by words or deed." *Schneider*, 951 S.W.2d at 861; *see also Stewart v. State*, 718 S.W.2d 286, 289 (Tex. Crim. App. 1986) ("when delivery is by offer to sell no transfer need take place. A defendant need not even have any controlled substance. All he need do, as appellant did, is state that he had a hundred dollar bag of heroin he would sell to the officers"); *Berrios v. State*, No. 14-93-01012-CR, 1995 WL 472338, at *2 (Tex. App. – Houston [14th Dist.] Aug. 10, 1995, pet. ref'd) ("an offer may be made by words or deed which would indicate a person intends to sell a controlled substance"). Texas Courts regularly uphold convictions for offering to sell a controlled substance where the defendant offers to sell a controlled substance for a certain price. For example, in *Stewart*, 718 S.W.2d 286, the Court of Criminal Appeals affirmed a conviction where a potential purchaser asked the defendant if he "got anything" and the defendant "replied that he had some heroin, a hundred dollar bag." 718 S.W.2d at 287. The Court explained, "[w]hen the prosecution involves delivery 'by offer to sell' that element can be met by the representation, by word or deed, that the person has a controlled substance to sell….

18

In the instant case the offense was complete when appellant stated that he had a hundred dollar bag of heroin to sell." *Id.* at 289.[5]

As these cases make clear, the plaintiffs have alleged facts establishing that Daniel Defense offered to sell the DDM4v7 to the Shooter when he was seventeen by "promot[ing] an exchange of [the DDM4v7 to the Shooter] for value either by words or deed." *See Schneider*, 951 S.W.2d at 861. First, Daniel Defense offered to sell the DDM4v7 to the Shooter through the Shooter's shopping cart. Because Daniel Defense had chosen not to create an age-barrier, when the Shooter selected the DDM4v7, Daniel Defense's website populated the firearm to his shopping cart, signaling Daniel Defense's intent to sell it to him. FAC ¶ 360. Confirming Daniel Defense's intent to sell, the shopping cart also populated with the price of the DDM4v7, the quantity (one), and the cost of shipping. *Id.* ¶ 360. These actions by Daniel Defense violated Penal Code § 46.06(a)(2). *See, e.g.*, *Stewart*, 718 S.W.2d at 289 ("the offense was complete when appellant stated that he had a hundred dollar bag of heroin to sell"); *Jimenez*, 838 S.W.2d at 664. (offer to sell complete when defendant stated "he had two kilos of cocaine and that the price was $37,000 or $38,000").

Daniel Defense offered to sell the DDM4v7 to the Shooter again two days later when it sent him an email with the subject line, "Hi Salvador, are you on the fence?" FAC ¶ 362. The body of the email offered, "Your DDM4®v7® is ready in your cart!" *Id.* The email listed the

---

[5] *See also, e.g.*, *Jimenez v. State*, 838 S.W.2d 661, 664 (Tex. App. – Houston 1992) (defendant made offer to sell when, in response to question whether he had cocaine, he "responded that he had two kilos of cocaine and that the price was $37,000 or $38,000"); *Frazier v. State*, 1999 WL 812312, at *3 (Tex. App. – Corpus Christi-Edinburg Oct. 7, 1999) (defendant offered to sell crack cocaine when defendant asked potential purchaser, "[t]hat is what you want, is them?" and stated, "I would give them to you two for eight, two for 800."); *Roy v. State*, 1987 WL 7583, at *1 (Tex. App. – Houston Mar. 5, 1987) (defendant made offer to sell when he "flagged down" undercover police officer, "asked if he wanted to buy some cocaine," and told officer "that he could sell him two bags for $30 apiece.").

price of the DDM4v7 and contained a "RETURN TO CART" button that hyperlinked directly to the Shooter's shopping cart on Daniel Defense's website, so that the Shooter could simply click the button and complete his purchase. *Id.* ¶ 362. Daniel Defense's "words and deed[s]" unmistakably "promote[d] an exchange of [the DDM4v7] to [the Shooter] for value." *Schneider*, 951 S.W.2d at 861. The email's expressed intent, in its subject line and through its hyperlinked "RETURN TO CART" button, was to get the shooter off "the fence" and completing a purchase. FAC ¶ 360. Any "man of common intelligence," *Francis*, 890 S.W.2d at 514, would understand the email to be exactly what it was: an offer to sell the DDM4v7.

As explained above, Texas authority indicates that "offer to sell" in penal statutes is understood in its ordinary meaning, rather than under the rules of contract law. *See, e.g.*, *Francis*, 890 S.W.2d at 512, 514; *Schneider*, 951 S.W.2d at 859-60; *Henderson*, 1998 WL 53967, at *5-6.[6] Even if contract principles applied here – contrary to Texas law – the outcome is the same: Daniel Defense made two illegal offers to the underage Shooter. "To prove that an offer was made, a party must show (1) the offeror intended to make an offer, (2) the terms of the offer were clear and definite, and (3) the offeror communicated the essential terms of the offer to the offeree." *Matter of Texxon Petrochemicals, L.L.C.*, 67 F.4th 259, 263 (5th Cir. 2023). The terms of the offers were clear and definite; the price and quantity were shown; the offers communicated the essential terms to the Shooter. FAC ¶¶ 360, 370-72. All the Shooter had to do was pay. *See Oliver v. Henley*, 21 S.W.2d 576, 578 (Tex. Civ. App. – Waco 1929) (advertisement in newspaper

---

[6] Daniel Defense does not argue that the meaning of "offer to sell" in § 46.06 is determined by contract law. And *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 237 (Tex. App. – Dallas 1993, writ denied), which Daniel Defense relies on in arguing that there was no offer, likewise did not hold that contract law determines whether something is an offer to sell under the Penal Code. *Way* simply held that magazine advertisements that did not propose any transfer of firearms were not offers to sell under the statute.

that communicated price, quantity, and shipping terms of cotton seeds was an "offer to sell" because it was "clear, definite, and explicit, [leaving] nothing open for negotiation").[7]

All of Daniel Defense's arguments here ask the Court to ignore either the plain language of § 46.06, its own equally plain illegal conduct, or both.

Daniel Defense simply fails to address the cart offer at all.

As to the email offer, it argues this was not an offer to sell, but "merely furnish[ed] product information" and "merely remind[ed] the recipient who placed an item in a cart on Daniel Defense's website of that fact and confirm[ed] the company's readiness to answer any questions about the item." MTD at 11-12. That argument fails on its face – the email offer is unequivocal. It does not say "merely" anywhere. It also fails because the Court cannot draw inferences in Daniel Defense's favor under this procedural standard.

Daniel Defense argues that the email contained additional text. Far from supporting Daniel Defense's position, the additional text indicates that the Shooter previously received ***additional email offers from Daniel Defense***. *See* MTD at 12 ("We wanted to circle back around and make sure you didn't miss our last e-mail."). These additional emails must be the subject of discovery.

---

[7] *See also Oliver v. Gallagher*, 26 S.W.2d 903 (Tex. 1930) (denying writ of mandamus and referring to newspaper ad as "offer to sell"); *ETC Intrastate Procurement Co., LLC v. JSW Steel (USA), Inc.*, 620 S.W.3d 168, 174 (Tex. App. – Houston 2021) ("price quotation email included pricing, quantity, specifications, and payment terms" was sufficiently detailed to qualify as an offer); *Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1119, 1121 (5th Cir. 1985) (concluding that a "letter proposal" seller sent to potential buyer setting forth "prices and terms" constituted an "offer in the sense that it was a promise to sell at the listed prices, justifying [the buyer] in understanding that its assent, *i.e.,* its purchase orders or telephone calls, would close the bargain"); *Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Int'l (N. Sea), Ltd.*, 7 F.3d 1230, 1233 (5th Cir. 1993) (concluding that a "telex quotation" was sufficient to constitute an offer where it "contained all material terms" and noting that "[i]f at any point in the negotiations [the offeree] had sent a telex saying, 'We accept,' the contract would have been concluded on the terms as negotiated to that point.").

Daniel Defense also argues that "The only reasonable inference … is that even the Assailant understood Daniel Defense's automated communication was not an 'offer to sell' him a firearm because he was not yet 18 years old, and his age would necessarily be verified by a licensed dealer before any sale or transfer could occur." MTD at 12 n.8. This argument reveals the extent of Daniel Defense's disregard for firearms safety laws. Its plan, apparently, was to market and sell firearms to underage minors and then, if an underage sale was discovered, to point the finger at the dealer. This marketing plan also enabled Daniel Defense to profit even more where dealers were negligent in following the law or willing to join it in breaking the law.[8]

Finally, Daniel Defense argues that § 46.06(a)(2) prohibits only "offer[s] to *imminently* sell a firearm to a minor." MTD at 11 (emphasis added). Daniel Defense ***did*** offer – at least twice – to imminently sell the DDM4v7 to the Shooter. Moreover, the statute does not say that the offer must be for an "imminent" sale, and "[i]t is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *E.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quotation marks omitted). Daniel Defense cites *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 237 (Tex. App. – Dallas 1993, writ denied), in support of its claim that § 46.06(a)(2) was not violated. *Way* held that mere advertisements in a magazine, which did not propose an "actual transfer," were not offers to sell under § 46.06(a)(2). *See* 856 S.W.2d at 237. *Way* did not hold

---

[8] *See generally* Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (2000) at x (concluding that licensed dealers "were associated with the largest number of diverted firearms – over 40,000 guns, nearly half of the total number of trafficked firearms documented during the two year period.")

that an offer had to be "imminent" or that the statute only criminalized transfers and not offers.[9]

Moreover, *Way* suggests that Daniel Defense's direct offers to the minor Shooter are precisely the

kind of conduct the statute means to prevent. *Way* emphasized that the advertisements at issue

promoted firearms safety and their legal, supervised use: "Photographs on the cover of the

supplement emphasize supervision and use of firearms in a structured environment. Similarly,

features present the use of firearms not as an experiment, ***but as a supervised and safety-

conscious activity***. A number of manufacturer advertisements in the supplement also depict a

child's use of firearms ***as a supervised activity***." *Way*, 856 S.W.2d at 236 (emphasis added).[10]

In sum, the Texas legislature banned offers to sell firearms to minors, and even based on

the limited record currently available to the plaintiffs, Daniel Defense made two banned offers.

---

[9] The statute criminalizes "sell[ing], rent[ing], leas[ing], or giv[ing]" a firearm to a child under eighteen and, separately, "offer[ing] to sell, rent, lease, or give" a firearm to a child under eighteen. Tex. Penal Code § 46.06(a)(2). The *Way* court did not – and this Court cannot – construe the statute to write-out the explicit prohibition on offering to sell. *See, e.g.*, *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) ("effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative."); Tex. Gov't Code Ann. § 311.021. Moreover, in the related context of criminal statutes prohibiting offers to sell controlled substances, Texas Courts are clear that an offer itself violates the statute, even if no transfer takes place. *See e.g.*, *Jimenez v. State*, 838 S.W.2d 661, 665 (Tex. App. – Houston 1992) ("When delivery is by offer to sell, no transfer need take place…. The offense is complete when by words or deed, a person knowingly or intentionally offers to sell what he states is a controlled substance.") (citing *Stewart v. State*, 718 S.W.2d 286, 288 (Tex.Crim.App.1986)); *Padilla v. Barr*, 938 F.3d 658, 660 (5th Cir. 2019) (per curiam) ("The nature of the substance ultimately delivered is immaterial and need not be proven.").

[10] Daniel Defense cites the title of § 46.06(a)(2): "Unlawful Transfer of Certain Weapons." MTD at 12. However, the Penal Code is clear that "[t]he heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute." Tex. Gov't Code Ann. § 311.024 (incorporated into the Penal Code by Tex. Penal Code § 1.05(b)).

### 2. Daniel Defense's Offers to Sell the DDM4v7 to the Underaged Shooter Were Knowing and Intentional

Daniel Defense argues that the plaintiffs have not alleged facts showing that the offers to sell were knowing or intentional within the meaning of Penal Code § 46.06(a)(2). Not so. Plaintiffs amply allege knowing and intentional offers.[11]

Penal Code § 46.06(a)(2) prohibits "intentionally or knowingly" offering to sell a firearm to a minor. Under the Penal Code,

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TX Penal Code § 6.03. Daniel Defense's mental state is a fact-intensive determination for the jury. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). "Establishment of culpable mental states is almost invariably grounded upon inferences to be drawn by the factfinder from the attendant circumstances." *Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989). The defendant's mental state may be inferred from his "words, acts, and conduct." *Smith*, 965 S.W.2d at 518. The plaintiffs have amply alleged facts to establish that Daniel Defense's offers to sell were both knowing and intentional.

---

[11] PLCAA's predicate exception applies when a defendant "knowingly" violates a state or federal law applicable to the sale or marketing of firearms, and the violation is a proximate cause of the plaintiff's damages. 15 U.S.C. § 7903(5)(A)(iii). Daniel Defense does not dispute that the Complaint's allegations satisfy the "knowingly" requirement of the PLCAA predicate exception.

### a.    Knowledge

First, the allegations show that Daniel Defense knew it was offering to sell the DDM4v7 to the under-eighteen Shooter:

- Daniel Defense used cookies to collect personal information for visitors to its website, including the Shooter, which included "social media cookies" and "targeting cookies" that tracked a user's browser across other sites and built a profile of the user. FAC ¶ 367.

- Daniel Defense collected "internal data" about its customers that was detailed enough to reveal the political affiliations of its customers. *Id.* ¶ 366. That internal data categorized the Shooter as under eighteen. *Id.* ¶ 365

- As an advertiser on Facebook and Instagram, Daniel Defense received demographic information from Facebook and Instagram regarding users of the platform. The Shooter used both platforms. Those platforms collected demographic information on the Shooter, including his age, and shared that information with Daniel Defense. *Id.* ¶¶ 374-79.

Daniel Defense also knew that its conduct was reasonably certain to result in it sending targeted offers to sell to minors:

- Daniel Defense knew and intended for its social media advertising to be attractive to adolescents under eighteen, and knew and intended that this would lure adolescents to its website. FAC ¶ 373(a)-(c).

- Daniel Defense chose not to have any age verification measures on its website, such that Daniel Defense knew and intended that children under eighteen would browse firearms on its website and would receive targeted offers to sell. *Id.* ¶ 373(d)-(f).

- Daniel Defense knew that the above conduct and decisions were reasonably certain to result in minors, including the Shooter, receiving targeted offers to sell. *Id.* ¶ 373(h).

Additionally, and in the alternative, Daniel Defense and its agents and employees consciously acted to remain deliberately ignorant of the age of the Shooter when it offered to sell him the DDM4v7. "Deliberate ignorance is the *legal equivalent of knowledge*." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) (emphasis added). It "exists where there is a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged ... so [the defendant] can plead lack of positive knowledge in the event he should be caught." *Id.* (quotation marks omitted). "[D]eliberate ignorance is reflected in a ... defendant's actions which suggest, in effect, 'Don't tell me, I don't want to know.'" Deliberate ignorance exists where the jury may infer that "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *E.g.*, *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). The inferences showing deliberate ignorance "may be established by direct or circumstantial evidence." *Id.* at 952.

The plaintiffs have pleaded facts showing that Daniel Defense and its agents and employees deliberately made themselves ignorant of the Shooter's age. Given Daniel Defense's intentional courting of adolescent boys through its marketing, with the intent of luring them to its website, Daniel Defense was subjectively aware of a high probability – and indeed a certainty – that by offering to sell specific AR-15s to specific visitors to its website it was making illegal offers to sell firearms to children under the age of eighteen. *E.g.*, FAC ¶¶ 178-84, 189-226, 380. By choosing not to implement any system for verifying the age of visitors to its website, those who signed up for an account, and those to whom it made offers to sell, Daniel Defense purposefully contrived to avoid learning the age of the individuals to whom it made offers to sell, including the Shooter. *Id.* ¶ 360; *see United States v. Juarez*, 866 F.3d 622, 631 (5th Cir. 2017)

("Not asking questions can be considered a purposeful contrivance to avoid guilty knowledge"). Daniel Defense made a deliberate choice to remain ignorant of the central fact – age – that determines whether an offer to sell a firearm under Texas law is legal. FAC ¶ 360.[12] Indeed, the Shooter was prevented from buying over 1,500 rounds of ammunition from another seller who required the shooter to present I.D. before it would sell him the ammunition. When the Shooter's I.D. showed that he was under twenty-one, the seller cancelled his order. *Id.* ¶ 250.

### b.    Intent

Daniel Defense intended to make an offer to sell to the Shooter and intended to make it to a child younger than eighteen years of age. As the plaintiffs allege, Daniel Defense markets its firearms to adolescent boys, intending to draw them to its website, get their email addresses, and then – if things go well – target them with offers to sell. *E.g.*, FAC ¶ 369(a). Daniel Defense makes offers to sell specific firearms to adolescents interested in those weapons because such offers are effective at converting browsers into buyers, exactly as occurred with the Shooter. *Id.* ¶ 369(b). More than that, a first offer to an underage buyer will win deep brand loyalty, exactly as it did here. *Id.* ¶¶ 242, 369(d), 369(f).

---

[12] In *Chaney*, 595 F.3d 219, the Fifth Circuit concluded that at the summary judgment stage, the first prong of the deliberate ignorance doctrine – that the defendant was subjectively aware of a high probability of the existence of the illegal conduct – cannot be established through "a corporation's collective knowledge." 595 F.3d at 241. However, a showing that "at least one individual" associated with the corporation had that awareness would be sufficient. *Id. Chaney*'s reasoning has never been applied at the motion to dismiss stage, before a plaintiff has had an opportunity to conduct discovery into what specific individuals at a corporation knew – knowledge that is accessible only to the corporate defendant in the absence of discovery. Nevertheless, the plaintiffs have alleged, based on publicly available information, that Daniel Defense's then-CEO, Marvin Daniel, was aware of, and indeed instigated, Daniel Defense's aggressive targeting of children under age eighteen with the goal of luring them to its website and converting them into customers. *See* FAC ¶¶ 53, 126-32, 366, 369.

### 3.      Daniel Defense Ignores the Complaint's Detailed Factual Allegations Regarding Knowledge and Intent

The plaintiffs make detailed allegations showing Daniel Defense's knowledge and intent. *See, e.g.*, FAC ¶¶ 53, 126-32, 178-84, 189-226, 242-50, 365-67, 369(a), (b), (d), (f), 373(a)-(h), 374-79, 380. Daniel Defense fails to address ***any*** of these allegations. Its contention that the plaintiffs rely on a single allegation is simply wrong. *See* MTD at 13 (arguing that plaintiffs rely only on allegation that "[u]pon information and belief, Daniel Defense knew and was aware that the [Assailant] was below the age of eighteen when it sent him a targeted offer to sell him the [Rifle].") (quoting FAC ¶ 364). The plaintiffs have alleged precisely the kind of "words, acts, and conduct," *Smith*, 965 S.W.2d at 518, that would support jury findings of knowledge and intent.

Daniel Defense argues that the plaintiffs' "allegations upon 'information and belief' [are] wholly insufficient." MTD at 14. Its argument is unfounded. A small minority of the Complaint's allegations regarding Daniel Defense's knowledge and intent are made on information and belief. Pleading "upon information and belief" satisfies Rule 12(b)(6) where the facts are "in the control and possession of a defendant" or "where the belief is based on factual information that makes the inference of culpability plausible." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). Both of those conditions are true here. Obviously, Daniel Defense has control and possession over the company documents, emails, and policies that would be relevant to showing its knowledge and intent (not to mention the depositions that would be necessary to explore the knowledge and intent of its agents and employees). And the plaintiffs have alleged detailed facts that make the inferences regarding Daniel Defense's intent and knowledge not only "plausible," but highly likely. Even at trial, Daniel Defense's mental state will largely be a matter of inference based on the evidence. *See Lane*, 763 S.W.2d at 787.

28

Daniel Defense improperly cites to the terms and conditions of its website, which it claims "explain that for the sale of any firearm, the purchaser must be of legal age and must present a valid government identification document when the purchaser personally receives the firearm from a Federal Firearms Licensee." MTD at 13 n.9. First, this appears to be a citation to the present day terms and conditions of its website, which are irrelevant. Even if there was any relevance to the terms and conditions (and there is not), the weight to give to these terms and conditions is a question for a jury. Second, the plaintiffs object to the Court considering these terms and conditions, which are outside of the record, and are certainly not "generally known within the territorial jurisdiction of the trial court or … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Funk,* 631 F.3d at 783. Lastly, if the Court were to consider these terms, which it cannot, it would need context that Daniel Defense has not provided – such as what measures, if any, Daniel Defense took to ensure that website users were made aware of this content.

In sum, the plaintiffs have alleged detailed facts establishing that Daniel Defense intentionally and knowingly offered to sell the DDM4v7 to the Shooter when he was under eighteen.

    **4.**    **Daniel Defense's Illegal Offers to Sell the DDM4v7 to the Shooter Were Proximate Causes of the Plaintiffs' Damages**

The complaint alleges that Daniel Defense's illegal offers to sell the DDM4v7 to the Shooter were "a proximate cause" of the plaintiffs' damages. *See* 15 U.S.C. § 7903(5)(A)(iii). Causation is a question of fact for the jury. *See, e.g.*, *Strakos v. Gehring*, 360 S.W.2d 787, 792 (Tex. 1962).

Daniel Defense's offers to sell the DDM4v7 to the Shooter were not isolated or random crimes. They were the lynchpin of Daniel Defense's illegal course of conduct that began with

unlawfully marketing the DDM4v7 and its other AR-15s to adolescents, teaching them, including the Shooter, that Daniel Defense is the brand of vengeance and domination. FAC ¶ 13. The offers fed off all the marketing that preceded them, marketing that had succeeded in causing the Shooter to create a Daniel Defense account and give Daniel Defense his email address.

The effects of that unlawful marketing scheme manifested in the Shooter's attack on Robb Elementary School: it would be a Daniel-Defense-brand assault. We know this in part because the Shooter waited for his DDM4v7. As of six days before the shooting, the Shooter had acquired all the firepower he needed to commit a mass shooting: a Smith & Wesson AR-15, 375 rounds of ammunition, and 60 30-round magazines. FAC ¶¶ 405-08. But he still did not have what Daniel Defense had told him he needed. *Id.* ¶¶ 409-14. He did not have his DDM4v7. He tracked it impatiently, waiting for it to arrive. *Id.* ¶¶ 399-400. To carry out this attack, he needed more than the AR-15 platform – he needed a Daniel Defense branded AR-15 to complete his Daniel Defense identity. *See id.* ¶¶ 409-415.

And when the DDM4v7 arrived, the Shooter implemented Daniel Defense's marketing even more closely. The Shooter requested that Oasis Outback attach an EOTech close-quarter battle sight to the DDM4v7, exactly the loadout that Daniel Defense had advertised on its website when Daniel Defense offered to sell the DDM4v7 to him. FAC ¶ 347. That combination – Daniel Defense AR-15 with EOTech close-quarter battle sight – was the loadout that Daniel Defense had marketed as "totally murdered out." *Id.* ¶ 153. It was the loadout that Daniel Defense marketed through Call of Duty: a black-clad figure, armed with a black version of the DDM4v7 and equipped with a holographic battle sight. *Id.* ¶ 209. And it was the loadout the Shooter chose for the shooting. *Id.* ¶¶ 396, 420. Daniel Defense's marketing directly shaped the Shooter's Call-of-Duty-cosplay, Daniel-Defense-brand assault on Robb Elementary School.

30

The mark of the Daniel Defense brand continued during the assault. The Shooter used the DDM4v7 in the attack for all the brutal, vengeful, and twisted attributes that Daniel Defense had marketed it as possessing. FAC ¶¶ 409-15, 428-30. When he carried out the shooting, his rampage embodied those attributes. Upon entering the classrooms, the Shooter announced to his trapped victims, "It's time to die," relishing the moment and his life-or-death power over everyone in the room. *Id.* ¶ 473. He told a teacher, "good night," before shooting her in the head. *Id.* ¶ 474. He mowed down children hiding under tables and kicked the bodies of his victim as they lay on the floor. *Id.* ¶¶ 477, 479. He wrote "LOL" – laugh out loud – on the whiteboard with the blood of the children he slaughtered. *Id.* ¶ 480. In short, the Shooter did not just kill students and teachers, he displayed the cruelty, the sick sense of humor, and the fetishization of violence Daniel Defense had glorified in its marketing. *Id.* ¶ 482.

Moreover, the Shooter's actions following the offers to sell also show that the offers in particular were a catalyst for the shooting. The same day that the shooter received the email offer, he logged into his bank website and checked the money in his account. FAC ¶ 387. He opened the "calculator" app on his phone to calculate whether he could acquire the funds he needed to purchase a DDM4v7. *Id.* ¶ 388. He then googled, "till may 23," and visited a website showing a countdown timer to May 23, 2022. *Id.* ¶ 389.

The Shooter's mental state and the effects that Daniel Defense's marketing scheme culminating in the offers to sell had on his ultimate decisions on whether and how to carry out the shooting will be disputed factual questions for the jury to determine at trial, and will be the subject of expert testimony. But the facts alleged already show how deeply influenced he was by Daniel Defense's unlawful marketing scheme, which culminated in the offers to sell. It can be no surprise to Daniel Defense that its illegal offers to sell influenced the Shooter's behavior. After

31

all, Daniel Defense makes offers to sell firearms to minors precisely because doing so influences their behavior. *E.g.*, FAC ¶¶ 5-13, 124-32.

Now ignoring the plaintiff's causation allegations, Daniel Defense asserts that the plaintiffs "plead no facts that the Assailant either chose to purchase the Rifle or used it to commit his crimes because he received the April 29, 2022 email in violation of Section 46.06." MTD at 15 (emphasis omitted). On the contrary – as set forth above, the plaintiffs amply plead facts establishing proximate cause.

Daniel Defense also argues that "Plaintiffs' allegations negate their proposed predicate exception. Specifically, Plaintiffs' allegations assert the Assailant had decided on his attack, and decided to use a Daniel Defense rifle, long before he received the April 29, 2022 email." MTD at 18 (emphasis omitted). Daniel Defense cherry-picks allegations from the plaintiffs' complaint regarding the Shooter's exposure to Daniel Defense's marketing before the Shooting, his acquisition of firearms accessories, and the Shooter's efforts to save money, and then presents these allegations as "expressly negat[ing]" the plaintiffs' allegations that the offers to sell were a proximate cause of their harm. MTD at 20. None of these allegations say or imply that the offers to sell were not a proximate cause of the shooting.

Simply put, Daniel Defense asks the Court to do what it absolutely cannot do under the governing standard: construe the allegations in the light ***least favorable*** to the plaintiffs and draw inferences ***against*** the plaintiffs. The only way to construe these allegations as negating proximate cause is to ***infer*** that, prior to the offers to sell, the Shooter had ***definitively decided*** to commit a Shooting at Robb Elementary, had ***definitively decided*** to use the DDM4v7, and ***never*** experienced any doubt, fear, or loss of confidence. There is nothing in the record that would permit those inferences, even if the governing standard permitted them (and it absolutely does

not). Daniel Defense certainly has more insight into the mind of a mass shooter than the plaintiffs

do – it has developed a marketing message and model attractive to them – but even Daniel

Defense must concede that it is not credible to believe that a seventeen-year-old decided to

commit a mass shooting months before carrying it out and never once waivered in that

decision.[13]

### 5. Daniel Defense's Attempt to Restrict the Predicate Exception to the Examples Provided in PLCAA Is Contrary to PLCAA's Plain Language and Absurd

Daniel Defense has previously asked the Court to expand PLCAA beyond the statute's

plain language and the bounds recognized by any court. *See* ECF Nos. 1, 14-1. Now, it asks the

Court to limit the predicate exception in an equally atextual and unsupported manner.

The predicate exception exempts from PLCAA any "action in which a manufacturer or

seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or

marketing of the product, and the violation was a proximate cause of the harm for which relief is

sought …." 15 U.S.C. § 7903(5)(A)(iii). Congress then listed two types of actions that are

"includ[ed]" in the predicate exception:

> (I) any case in which the manufacturer or seller knowingly made any false entry in,
> or failed to make appropriate entry in, any record required to be kept under Federal
> or State law with respect to the qualified product, or aided, abetted, or conspired
> with any person in making any false or fictitious oral or written statement with
> respect to any fact material to the lawfulness of the sale or other disposition of a
> qualified product; or

---

[13] Daniel Defense relies on *Bonin v. Sabine River Auth. of Texas*, No. 1:17-CV-00134-TH, 2019 WL 1246259 (E.D. Tex. Mar. 1, 2019). *See* MTD at 17. *Bonin* is inapposite. In *Bonin*, the plaintiffs' allegations expressly established as a matter of law that the defendant owed them no duty. *See id.* at 7 ("The Plaintiffs did not include *any facts* in the operative complaint to even remotely suggest that the waters which damaged their properties were surface waters. Instead, *all of the facts alleged* – and *all possible inferences* therefrom – are consistent with damages only caused by floodwaters.").

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18;

*Id.* Daniel Defense asks the Court to restrict the statutes that fall within the ambit of the predicate exception to those two "categories" of examples: namely, "recordkeeping laws regarding firearms" and "select provisions of Section 922 of the Gun Control Act." MTD at 21 (emphasis omitted).

This argument should not long detain the Court. There is absolutely no support in PLCAA's plain language for twisting the two **examples** Congress provided into the **limits** of the predicate exception. *See, e.g.*, *Delek Ref., Ltd. v. Occupational Safety & Health Rev. Comm'n*, 845 F.3d 170, 181 (5th Cir. 2016) (("[T]he word *include* does not ordinarily introduce an exhaustive list....") (emphasis in original) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (Thomas/West 2012)). Daniel Defense cites no authority in support of its argument because there is none. Its construction violates the rule that "[w]hen interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous." *E.g.*, *United States v. Molina-Gazca*, 571 F.3d 470, 474 (5th Cir. 2009). Its construction would render superfluous nearly all the text of the predicate exception coming before the two examples, and especially the text referring to "a State or Federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii).[14] If Congress had meant to restrict the predicate exception to "recordkeeping laws regarding firearms" and "select

---

[14] Notably, neither of the examples include statutes regulating the marketing of firearms. Daniel Defense's construction would read "marketing" entirely out of the predicate exception.

provisions of Section 922 of the Gun Control Act," MTD at 21, it would have said so. Instead, it spoke broadly of state or federal statutes applicable to the sale or marketing of firearms.[15]

Daniel Defense's construction of the predicate exception is baseless. And Daniel Defense does not dispute that Tex. Penal Code § 46.06(a)(2) is a "State ... statute applicable to the sale or marketing of the [DDM4v7]." 15 U.S.C. § 7903(5)(A)(iii). Accordingly, § 46.06(a)(2) is an appropriate predicate statute.

### C.    Daniel Defense's Violation of the Federal Trade Commission Act Was a PLCAA Predicate Violation

The Federal Trade Commission Act ("FTC Act") "declare[s] unlawful" any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive act or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An unfair act or practice is one that: "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). The plaintiffs have pleaded facts establishing all three elements of the FTC Act, as well as the knowing and proximate cause requirements of the predicate exception. FAC ¶¶ 7, 9-10, 52, 105-07, 123-32, 140, 186, 373(a), 486-87. Daniel Defense does not address the plaintiffs' FTC Act allegations. In fact, Daniel Defense appears not to be aware of them. *See* MTD at 1. Given that Daniel Defense has disputed the applicability of the FTC Act in other litigation before this court – *see Torres v. Daniel Defense, LLC, et al.*, 2:22-cv-00059-AM – the plaintiffs assume that Daniel Defense may want to make the same (unavailing) arguments

---

[15] The plaintiffs note that Daniel Defense's new construction of the predicate exception conflicts even with its own prior construction of that same provision. In briefing before this Court in *Torres v. Daniel Defense, LLC, et al.*, 2:22-cv-00059-AM, Daniel Defense has argued, without limitation, that statutes that "particularly regulate the manufacture and sale of firearms ... qualify as predicate statutes." 2:22-cv-00059-AM, ECF 141, Daniel Defense's Amend. MTD at 16.

here and will seek leave of the Court to do so. The plaintiffs have no objection to Daniel Defense

filing a supplement to its Amended Motion to Dismiss solely addressing the predicate exception

based on the FTC Act. If Daniel Defense does so, the plaintiffs reserve the right to file a

supplemental response on that topic.

**D.    Daniel Defense's Violation of Penal Code § 46.06(a)(2) Satisfies PLCAA's Negligence Per Se Exception**

In addition to the predicate exception, PLCAA permits claims "against a seller for …

negligence per se." 15 U.S.C. § 7903(5)(A)(ii). The plaintiffs assert negligence per se claims

against Daniel Defense arising from its knowing and intentional offers to sell the DDM4v7 to the

Shooter in violation of Penal Code § 46.06(a)(2). *See* FAC ¶¶ 488-93.

Negligence per se relies on a penal statute to define a reasonably prudent person's

standard of care. *See e.g.*, *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex. 1987) (unexcused

violation of statute governing sale of alcohol); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546,

549 (Tex. 1985) (unexcused violation of ordinance regarding property conditions). The

determination whether a penal statute provides the applicable standard of care in a given case is

discretionary. *See Perry v. S.N.*, 973 S.W.2d 301, 304 n.4 (Tex. 1998) ("the adoption of criminal

statutes into tort law is a matter of judicial discretion"); *Discovery Operating, Inc. v. BP Am.

Prod. Co.*, 311 S.W.3d 140, 162 (Tex. App. – Eastland 2010, pet. denied) (same); *Powell v.

Keeley*, 795 F. Supp. 2d 587, 592 (S.D. Tex. 2011) (same).

"The threshold questions in every negligence per se case are whether the plaintiff belongs

to the class that the statute was intended to protect and whether the plaintiff's injury is of a type

that the statute was designed to prevent." *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998). ***Daniel

Defense does not dispute that these threshold conditions are met here***. *See* MTD at 26.

Relevant additional considerations include:

36

> (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common-law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of wrongdoers; and (5) whether the plaintiff's injury is due to a direct or indirect violation of the statute.

*Discovery Operating, Inc.*, 311 S.W.3d at 162-63 (citing *Perry*, 973 S.W.2d at 309).[16] ***Daniel Defense does not dispute that additional factors (2), (3), (4), and (5) support the use of negligence per se here***. *See* MTD at 23-28. In other words, Daniel Defense does not dispute that ***six of the seven factors*** identified by the Texas Supreme Court in determining whether to recognize negligence per se support the use of negligence per se in this case. The Court can stop here and conclude that the plaintiffs have adequately alleged negligence per se.

For the sake of completeness, the plaintiffs will briefly address Daniel Defense's arguments. Daniel Defense argues that additional factor (1) – whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common-law duty – does not support the use of negligence per se. *See* MTD at 25-27. Specifically, Daniel Defense argues that "[t]here is no common law duty to protect others from criminal acts of third parties like those the Assailant perpetrated. *Id.* at 27. In previous briefing, the plaintiffs have thoroughly explained the error this argument. *See* ECF No. 8-1, Pls' Mtn. to Remand; ECF No. 42-1, Pls' Reply ISO Remand; *see also* Pls' Resp. to Oasis Outback's MTD (filed the same day as this Response). The plaintiffs will not needlessly repeat themselves here. Suffice it to say that "negligence will not be excused where the criminal

---

[16] These factors are not requirements for stating a claim for negligence per se, they are "guides to assist a court in answering the ultimate question of whether imposing tort liability for violations of a criminal statute is fair, workable, and wise." *Perry*, 973 S.W.2d at 306.

conduct is a foreseeable result of such negligence," *Nixon*, 690 S.W.2d at 550, and "the common

law recognizes the duty to take affirmative action to control or avoid increasing the danger from

another's conduct which the actor has at least partially created," *El Chico Corp.*, 732 S.W.2d at

312.[17]

     Daniel Defense also argues that "Plaintiffs lack an analogous common law duty

necessary for their negligence per se claims." MTD at 25. Again, Daniel Defense misconstrues

Texas law. Under Texas law, "[a] firearm is a deadly weapon per se." *Morin v. Moore*, 309 F.3d

316, 325 (5th Cir. 2002) (quoting *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso

1984, no writ)). A firearms seller like Daniel Defense has a duty of reasonable care with respect

to its practices in supplying firearms, and this duty is owed to third parties foreseeably injured as

a result of the breach of that duty. *See e.g.*, *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d

841, 847 (Tex. App. – San Antonio 1989, writ denied).[18] Daniel Defense's duty "to act as a

firearms seller of ordinary prudence," *Rodriguez v. Acad., Ltd.*, 694 S.W.3d 780, 787 (Tex. App.

– Houston [14th Dist.] 2024, pet. denied), and to abide by a "duty of ordinary care," *Peek*, 768

S.W. 3d at 847, absolutely encompasses the conduct here: offering to sell an AR-15 to a minor

---

[17] Daniel Defense does not argue that the plaintiffs have failed to sufficiently plead that the Shooter's conduct was the foreseeable result of Daniel Defense's tortious conduct or that Daniel Defense's conduct created and increased the danger of the shooting.

[18] *See also Hulsebosch v. Ramsey*, 435 S.W.2d 161, 163-64 (Tex. Civ. App. – Houston [14th Dist.] 1968, no writ); *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. – Corpus Christi-Edinburg 1997, pet. denied); *Tisdale v. Pagourtzis*, 2020 WL 7170491, at *5 (S.D. Tex. Dec. 7, 2020); *Rodriguez v. Acad., Ltd.*, 694 S.W.3d 780, 786-87 (Tex. App. – Houston [14th Dist.] 2024, pet. denied); *Diggles v. Horwitz*, 765 S.W.2d 839, 841 (Tex. App. – Beaumont 1989, writ denied); *Bryant v. Winn-Dixie Stores, Inc.*, 786 S.W.2d 547, 550 (Tex. App. – Fort Worth 1990, writ denied); *Love v. Zales Corp.*, 689 S.W.2d 282, 284 (Tex. App. – Eastland 1985, writ ref'd n.r.e.); *Reyna v. Acad. Ltd.*, No. 01-15-00988-CV, 2017 WL 3483217, at *7 n.8, *7-8 (Tex. App. – Houston [1st Dist.] Aug. 15, 2017, no pet.); *Morin*, 309 F.3d at 326-27; *Kennedy*, 682 S.W.2d at 378-79; *cf. McLain v. Hodge*, 474 S.W.2d 772, 777 (Tex. Civ. App. – Waco 1971, writ ref'd n.r.e.).

whom Daniel Defense was criminally prohibited from offering or selling that AR-15 to, while marketing that AR-15 to him as a weapon of vengeance, domination, and brutality. If that is not failing to act as a firearms seller of ordinary prudence, then nothing is. And as Daniel Defense concedes, the common law duty need only be "analogous," MTD at 25 – there is no requirement that courts previously have found a duty to exist under identical facts. Finally, even if there was no analogous common law duty – and there absolutely is – that is just one "guide[]," *Perry*, 973 S.W.2d at 306, out of seven that courts should consider. It is not a requirement.[19]

Daniel Defense also argues that "[t]o sufficiently plead a negligence per se claim, a plaintiff must not only allege the violation of a specific statute but also that courts have found a violation of the statute to be negligence per se." MTD at 24. That is not the law. As a matter of simple common sense, it could not be. If it were the law, there could never be ***any*** claim for negligence per se. Daniel Defense cites an unreported decision, *Allison v. J.P. Morgan Chase Bank, N.A.*, 2012 WL 4633177 (E.D. Tex. Oct. 2, 2012) (M.J.), in which the court dismissed the plaintiffs' negligence per se claims because "the pleading does not factually allege the violation of a specific statute, much less state how courts have determined that statute to establish negligence per se." 2012 WL 4633177, at *14. Failing to allege the violation of a statute ***should*** result in dismissal of a negligence per se claim. That is obviously not the case here. But to the extent *Allison* relied on a finding that the complaint did not allege "how courts have determined that statute to establish negligence per se," that is, respectfully, not the law. *Allison* cited *Parrott*

---

[19] Daniel Defense cites *Holcombe v. United States*, 388 F. Supp. 3d 777 (W.D. Tex. 2019), in which the court treated the existence of a "congruent" common law duty as a "requirement" for negligence per se. 388 F. Supp. 3d at 801. However, in *Holcombe* the plaintiffs had argued that that was a requirement for establishing negligence per se, and the court "assume[d]" that was correct. *See id.* The plaintiffs and the *Holcombe* court relied on a Texas Supreme Court decision decided before *Perry*, but in *Perry* the Court made clear that the analogous-duty inquiry was one of several "guides" and "considerations," not a requirement. 973 S.W.2d at 306.

*v. Garcia*, 436 S.W.2d 897, 900 (Tex. 1969) in support of that proposition, but *Parrott* does not

say that negligence per se requires allegations in the complaint that courts have previously

determined the violation of a particular statute constitutes negligence per se. *See Parrott*, 436

S.W.2d at 900. Daniel Defense's argument is logically untenable and *Allison*'s statement is not

the law.[20] It is troubling that Daniel Defense would waste the Court's time (and attempt to lead

the Court into error) through such an argument. In any case, courts in Texas and around the

country have repeatedly recognized the violation of firearms statutes as the basis for negligence

per se.[21]

---

[20] Daniel Defense cites three unreported cases in which courts dismissed negligence per se claims when the plaintiffs *in their briefing* failed to provide sufficient argument and authority supporting a claims of negligence per se. *See* MTD at 24-25. These cases are obviously inapposite.

[21] *See, e.g.*, *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 128 (Tex. App. – Corpus Christi-Edinburg 1997, pet. denied) ("it is clear that" knowing violations of federal Gun Control Act would "constitute negligence per se"); *Peek*, 768 S.W.2d at 844 (noting "support" in Texas law for "the proposition that … a violation of [the federal Gun Control Act] may constitute a basis for a claim of negligence per se."); *Ellsworth v. Bishop Jewelry & Loan Co.*, 742 S.W.2d 533, 533 (Tex. App. 1987, no writ) (noting that plaintiff's negligence per se claims against firearms seller for violating federal Gun Control Act went to trial); *Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 530 (3d Cir. 1979) (state firearms record-keeping statute); *King v. Story's, Inc.*, 54 F.3d 696, 697 (11th Cir. 1995) (ATF regulation); *Corporan v. Wal-Mart Stores E., LP*, 2016 WL 3881341, at *3-6 (D. Kan. July 18, 2016) (federal Gun Control Act; *Shirley v. Glass*, 308 P.3d 1, 7 (Kan. 2013) (state firearm-transfer statutes); ); *Spires v. Goldberg*, 106 S.E. 585, 586 (Ga. App. 1921) (state statute prohibiting sale of pistol to minor); *Kalina v. Kmart Corp.*, 1993 WL 307630, at *7 (Conn. Super. Ct. Aug. 5, 1993) (federal Gun Control Act).

Finally, Daniel Defense argues again that the plaintiffs "provide a mere conclusory allegation of proximate causation." MTD at 23. For the same reasons explained above, *see* Part III.B.4, above, the Court should reject that argument.[22]

### E.    The First Amendment Provides No Protection for Daniel Defense's Conduct

Daniel Defense invokes a First Amendment argument in a last-ditch effort to evade responsibility. But the First Amendment does not shield Daniel Defense here. Daniel Defense's offers to sell a gun to the seventeen-year-old Shooter are entitled to no more protection than any other offer to do something illegal. *United States v. Hansen*, 599 U.S. 762, 783 (2023) (federal law criminalizing "encourag[ing] or induc[ing]" illegal immigration was unprotected speech integral to unlawful conduct); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 ("no doubt" that an offer to sell narcotics or soliciting prostitution would be unprotected speech); *see also United States v. Williams*, 553 U.S. 285, 298 (2008) (an offer to provide "what is unlawful to possess" has no social value and thus enjoys no First Amendment protection).[23]

While the offers to provide a gun to an underage teen by a licensed firearms seller are shocking, this behavior is consistent with a company whose larger marketing strategy – as

---

[22] The plaintiffs also assert aiding and abetting claims. *See* FAC ¶¶ 494-505. These are viable claims under Texas law. However, the plaintiffs recognize that Fifth Circuit precedent would require the Court to dismiss these claims. *See DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018). The plaintiffs hereby withdraw these claims for purposes of litigation in this Court. The plaintiffs reserve the right to pursue these claims in Texas state court if the Court determines it lacks subject matter jurisdiction and remands this case.

[23] The defendant's prospects at enjoying First Amendment protections are so low, it did not even attempt the arguments in its previously filed Rule 12(b)(6) Motions to Dismiss in another Uvalde case. *See Sandra C. Torres, et al. v. Daniel Defense, LLC, et al.*, Case No. 2:22-cv-00059-AM-VRJ, ECF Nos. 35-1, 149 (raised only in an objection to a successive amended complaint, ECF No. 153-1).

41

alleged in the complaint and described in further detail below – openly promotes unlawful conduct. This was particularly true in the months leading up to the Robb Elementary School Shooting. Daniel Defense's marketing of violent, assaultive, and illegal uses of its weapons constitutes commercial speech that is equally unentitled to First Amendment protection. *See Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 133 (2019), *cert. denied sub nom. Remington Arms Co., LLC, et al. v. Soto*, 205 L. Ed. 2d 317 (Nov. 12, 2019) (the law is "well settled" that commercial speech proposing an "illegal transaction or that promotes or encourages an unlawful activity" is not protected by the First Amendment).

Utterly unapologetic for any of its actions, Daniel Defense attempts to equate its unsafe, provocateur advertising with cases involving sensible, lawful firearm advertisements. But there is no comparison. Daniel Defense's illegal marketing schemes are outliers. The company has attempted to wipe its internet footprint of the extreme content that predated Uvalde because it knows that content crossed a line. The advertisements at issue here are completely undeserving of First Amendment protection.

1. **Daniel Defense's Offers to Sell Broke the Law and Are Unprotected by the First Amendment**

a. **The Offers Were Speech Integral to Criminal Conduct**

"Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008) (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973) and *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). This is because the speech that comprises such an offer is "speech integral to criminal conduct," a long-recognized category of unprotected speech. *United States v. Alvarez*, 567 U.S. 709, 717 (2012). Even something less concrete than an

offer – such as speech that "encourages or induces" unlawful activity – can fall into this well-defined categorical exclusion. *Hansen*, 599 U.S. 762, 783 (2023)

Under both federal and Texas state law, it is illegal to sell a firearm to anyone under 18. 18 U.S.C. § 922(b)(1); Tex. Penal Code § 46.06(a)(2). Texas law goes further, making it a crime to *offer* to sell a firearm to anyone under 18. Tex. Penal Code § 46.06(a)(2). Decades ago, and with no subsequent relevant modifications or challenges, the Texas legislature criminalized offering to sell firearms to minors. Speech integral to this criminal act – which is to say, speech that constitutes the offer – has itself been formally criminalized and is not protected by the First Amendment. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("[S]peech or writing used as an integral part of conduct in violation of a valid criminal statute" has no protection under the First Amendment.).

In this case, the April 27 cart offer and April 29 email offer are unprotected speech. Both offers solicited an illegal transaction: Daniel Defense's intended sale of an AR-15 to an unsupervised 17-year-old boy. In Texas, both that transaction and the offer itself are illegal. Thus, the language employed to make each offer falls squarely within conduct prohibited by § 46.06(a)(2), is speech integral to criminal conduct, and is not protected by the First Amendment.

Daniel Defense spends five pages of its First Amendment discussion propping up a theory of incitement in order to knock it down.[24] But the concept of incitement is of no moment here. The plaintiffs allege Daniel Defense's violation of Texas law. *See, e.g.*, FAC ¶¶ 361-364. 483, 484. As the Supreme Court has consistently explained, "incitement" and "speech integral to criminal conduct" are two entirely separate categories of unprotected speech. *United States v. Stevens*, 559 U.S. 460, 468-69 (listing "historical and traditional categories long familiar to the bar"); *Alvarez* at 717 (same); *see also Williams* at 298 ("To be sure, there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality."). To fall under the speech integral to criminal conduct category, the speech must only be in violation of any valid criminal statute. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498. Here, as described above, the offers meet this requirement.

### b. Daniel Defense Improperly Challenges the Constitutionality of § 46.06 Without Proper Certification

Daniel Defense attempts to shield itself from liability through the First Amendment, raising a constitutional challenge to the state law itself. *See, e.g.*, MTD at 30 ("Section 46.06 as a basis for liability, and the application of that statute to the facts alleged, would violate the First Amendment."); *id.* at 39 ("But a facially valid law may nonetheless be 'unconstitutional as applied' to specific conduct.") (citing *Spence v. Washington*, 418 U.S. 405, 414 (1974)). It has

---

[24] There is irony to Daniel Defense's positions here. In the context of commercial speech, Daniel Defense needs to rely on marketing practices that promote non-violent, responsible gun ownership. *See, e.g.*, MTD at pp. 39-40. But in the context of core speech exclusions, Daniel Defense has no choice but to attempt to persuade the Court to apply an incitement analysis rather than speech integral to criminal conduct. To do this, it must concede that its marketing does promote violence, but just not the type that is imminent or specific enough for incitement. MTD at pp. 35-36. By contrast, an analysis of the correct category of speech that the April offers fall into – speech integral to criminal conduct – does not require the criminal conduct to be imminent or violent. *See, e.g., Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (soliciting restraint of trade).

not followed the proper procedure for doing so. *See* Fed. R. Civ. P. 5.1. Doing so would inevitably draw the State of Texas into the conversation, a prospect that would no doubt doom Daniel Defense's argument since it did, indeed, break Texas law. Where the defendant has questioned the as-applied constitutionality of a federal or state statute in a motion to dismiss without complying with Fed. R. Civ. P. 5.1, the motion to dismiss must be denied. *See United States v. State Farm Fire & Cas. Co.*, No. 1:06CV433-HSO-RHW, 2016 WL 3034326, at *5–6 (S.D. Miss. May 27, 2016).

Daniel Defense relies heavily on *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023), a case where the plaintiffs directly challenged the constitutionality of a California law (discussed in further detail *infra*). But in *Junior Sports*, the plaintiffs brought a direct constitutional challenge as soon as California passed the statute. *See Junior Sports* at 1114-15. In other words, the *Junior Sports* plaintiffs did not first break the law before challenging its validity.

Daniel Defense makes a half-hearted attempt to sidestep the issue by hypothesizing that the statute might be facially constitutional because of *Way v. Boy Scouts of America,* 856 S.W.2d 230, 233 (Tex. App. – Dallas 1993, writ denied). In doing so, it reinvents the text of the statute, quoting *Way* out of context to claim that the term "offer" within § 46.06(a)(2) is a synonym for "transfer," and not intended to criminalize speech. That argument misconstrues § 46.06 and *Way*. *See* Part III.B.1, above. Here, not only did Daniel Defense offer to sell its firearm to a minor, it prodded him to get off "the fence" and accept its offer. FAC ¶ 362.

### c.    Daniel Defense Has Only Itself to Blame

Daniel Defense's First Amendment quandary is a mess of its own creation. Known across the industry for its cavalier approach to marketing, it is easy to see how the company invited this trouble. FAC ¶¶ 6, 207. At the time that it was targeting the Shooter, Daniel Defense had no "age

45

gate" on its website. FAC ¶ 243. This is because the company had an admitted commercial

interest in marketing to minors, and an age gate would hinder that. FAC ¶¶ 128-131, 249, 369. In

this new age of web-based interactions with customers, a company with a sales-above-all-else

mentality must know state firearms laws – but Daniel Defense simply did not care. Daniel

Defense put profits over compliance with Texas law, and the Uvalde shooting is a result of that

wrongful conduct. The First Amendment does not protect speech that was integral to criminal

conduct.

> ### 2. Daniel Defense's Advertisements Constitute Commercial Speech That Promotes Illegal Activity

Daniel Defense's remaining First Amendment arguments center on commercial speech. It

goes as far as styling itself as a victim of plaintiffs' "content- and viewpoint-based

discrimination." These arguments are no less hollow than its straw man argument for incitement,

and conspicuously avoid any discussion of the details of the advertisements listed in the First

Amended Complaint. They also conflate its cart offer and email offer – already categorically

excluded by the long-recognized exclusion of speech integral to criminal conduct – with its

wider advertisements constituting commercial speech. *See Express Oil Change, L.L.C. v.*

*Mississippi Bd. of Licensure for Pro. Engineers & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019)

("Although the Constitution protects commercial speech, that protection is more limited than for

most other speech."). But this is ultimately a distinction without a difference, since neither the

offers nor the marketing materials receive First Amendment protection. *See United States v.*

*Williams*, 553 U.S. 285, 298 n. 2 (observing that "noncommercial proposals to engage in illegal

activity have no greater protection than commercial proposals do") (citing *Pittsburgh Press Co.*

*v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973)).

Astoundingly, Daniel Defense asserts in these sections that the plaintiffs have brought this case *not* because of the unimaginable damages they have suffered as a result of Daniel Defense's misconduct. Instead, according to Daniel Defense, the plaintiffs brought this lawsuit "***solely because*** [Daniel Defense] promotes a pro-Second Amendment viewpoint." MTD at 42 (emphasis in original). According to Daniel Defense, it is Daniel Defense who has been truly victimized by the Robb Elementary School shooting. This profoundly offensive assertion is – quite literally – its last argument.

Finally, any of the determinations below regarding whether Daniel Defense's speech is commercial, or whether it is untrue, unlawful, or misleading, are all questions of fact with serious constitutional implications that would be improper to decide at this juncture. *See State of Tex. v. Grundstrom*, 404 F.2d 644, 648 (5th Cir. 1968) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it.") (internal quotations omitted); *see also LLEH, Inc. v. Wichita Cnty., Tex.*, 289 F.3d 358, 364 (5th Cir. 2002) ("Whether free speech rights have been infringed is a mixed question of law and fact.") (citing cases).

> a. **Both the Offers and Daniel Defense's Marketing Campaign Described in the Complaint Are Commercial Speech**

Daniel Defense conducts a commercial speech analysis only as to its violations of § 46.06(a)(2) and does not address its individual advertisements identified in the complaint. *See* MTD at 38-40. The offers are plainly commercial speech. And the offers – commercial or not – are already unprotected as speech integral to criminal conduct. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973). Even *encouraging* illegal conduct, e.g., encouraging the sale of an AR-15 to an underaged teen, through speech can be criminalized and excluded from the First Amendment's core speech protections, when such encouragement is integral to the criminal conduct. *See Hansen*, 559 U.S. at 772-73. (use of "encourage" and

47

"induce" as synonyms for solicitation and facilitation is "longstanding and pervasive" in state criminal codes); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982) (upholding ordinance regulating displays that "encourage[s] illegal use of cannabis or illegal drugs").

Turning now to the balance of Daniel Defense's marketing tactics as detailed in the plaintiffs' allegations, each advertisement constitutes commercial speech with no indicia of any "message" about the Second Amendment. MTD at 41. As the Fifth Circuit has explained, commercial speech is an "expression related solely to the economic interests of the speaker and its audience." *Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) (internal quotations and citations omitted). In ascertaining whether speech is commercial or noncommercial, courts have considered: (1) whether the speech was in an advertising format; (2) whether there was reference to a specific product; and (3) economic motivation for publication. *See Gibson v. Texas Dep't of Ins.--Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Here, all of the advertising identified in the complaint constituted advertisements published by Daniel Defense on its various social media pages. Each of the advertisements linked (via #hashtag or otherwise) to specific products and/or the Daniel Defense brand. The obvious economic motivation was to influence users to buy Daniel Defense guns. *E.g.*, FAC ¶¶ 121-28, 134-38, 147.

None of the subject advertisements included any reference to the Second Amendment. By contrast, as discussed in further detail below, the subject advertisements glorified illegal use of firearms, in direct contrast to anything resembling a "pro-Second Amendment" viewpoint. Promoting civilian violence without any lawful justification is not a "pro-Second Amendment" stance. Even assuming – generously – that the advertising in question here had some oblique link

to a larger discussion about gun rights (it does not), simply "link[ing] a product to a current public debate" does not suddenly entitle it to protection afforded to noncommercial speech. *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 237 (5th Cir. 2014) (quoting *Bolger*, 463 U.S. at 68). Further the defendant's reliance on *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, (2011) to support the expression of "ideas" is misplaced, as that case did not involve commercial speech and its concomitant limited exceptions.

Daniel Defense attempts to retroactively reframe its history of incendiary advertisements – many of which are now deleted – as some sort of sober reflection on the Second Amendment. In an attempt to de-categorize them as commercial speech, it claims its past advertisements sent the "message" that "firearms—regardless of their style—are desirable and useful for self-defense and other lawful purposes." MTD at 41. Yet none of the contested images depict anything close to self-defense or "other lawful purposes." Moreover, none of them contain what one would think might be included in an advertisement about the Second Amendment – no hashtag, no quotes, no links to anything besides Daniel Defense and its products can be found. Claiming that an advertisement for Daniel Defense guns is a "message" about the Second Amendment is like saying an advertisement for Tito's Vodka is a message about the Twenty-First.

Daniel Defense seeks to avoid the fact that its marketing campaigns were commercial speech for a reason. First Amendment protection for commercial speech is "more limited than for most other speech." *Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Engineers & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019) (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). "In order for commercial speech to be protected under the First Amendment, 'it at least must concern lawful activity and not be misleading.'" *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017) (quoting *Cent. Hudson Gas &*

49

*Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)). Even if Daniel

Defense's arguments had merit, they could not be resolved at this stage of the case. Whether

speech concerns unlawful activity is ultimately a question of fact. *See Gibson*, 700 F.3d at 237

(5th Cir. 2012). Moreover, Daniel Defense's Motion to Dismiss does not even attempt to address

the specific examples of its marketing materials described in the plaintiffs' allegations, yet

another reason why its assertion of First Amendment defenses fails here.

> **b.**     **Daniel Defense's Commercial Speech Is Unprotected**

Commercial speech is entitled to limited First Amendment protections based on its

informational nature. *Cent. Hudson*, 447 U.S. at 563. But "there can be no constitutional

objection to the suppression of commercial messages that do not accurately inform the public

about lawful activity." *Id*. at 563-564. This includes when the advertising is more deceptive than

it is informative, and when it relates to illegal activity. *Id*. The four-part test outlined in *Cent.

Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980), is the

generally applied framework for determining whether commercial speech faces an

unconstitutional restriction. The four factors of the *Central Hudson* test are:

> (1) whether the commercial speech concerns lawful activity (thus warranting First
> Amendment protection in the first place);

> (2) whether the asserted government interest in restricting the speech is substantial;

> (3) whether the restriction directly advances that interest; and

> (4) whether the restriction is more restrictive than necessary to serve the interest.

*Central Hudson*, 447 U.S. at 566.

i.       **The Commercial Speech Identified in the Complaint Concerns Illegal Activity and Is Unlawful**

Daniel Defense fails to explain why any single item of its marketing material specifically described in plaintiffs' allegations is entitled to First Amendment protection, and that failure in briefing dooms its First Amendment challenge in this motion. There is a reason why Daniel Defense avoids defending its own advertising – and that is because its advertisements plainly relate to and promote illegal activity. For example:

- A March 2022 Instagram ad showed a rifle scope aimed at the passenger side of the windshield of a parked car in an urban, civilian environment. FAC ¶ 154. When a viewer questioned whether the advertisement depicted "an assassin's set up," Daniel Defense acknowledged that the only lawful use would be by "MIL/LE" ["military/law enforcement"], but went on to assert that "anyone" else outside of those lawful categories could use this set up, too. *Id*. No imminent threat which might warrant self-defense is visible in the advertisement. A number of viewers expressed their shock that the advertisement promoted criminal activity. FAC ¶ 157. **Daniel Defense removed this advertisement after the Uvalde shooting.** FAC ¶ 159.

- Another advertisement referenced the graphically violent Netflix show "Squid Game," a fictional television show involving extreme violence against civilians. FAC ¶ 180. This advertisement features one of the infamous executioner characters armed with a Daniel Defense AR-15, with Daniel Defense commenting that the executioner would have been more effective at murdering civilians if he used a Daniel Defense rifle. *Id*. **Daniel Defense removed this post after the Uvalde shooting.** FAC ¶ 181.

Contextualizing these posts with how courts have considered firearms advertisements in other cases is useful here. The Connecticut Supreme Court held that the First Amendment did not

prohibit the Sandy Hook families' case, which was based on advertisements less egregious than those here:

> We recognize that the advertisement and marketing of goods is a quintessential form of commercial speech under established first amendment jurisprudence ... ***At the same time, it is equally well settled that commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the First Amendment*** ... The plaintiffs' complaint in the present case alleges that the marketing in question promoted unlawful activity, namely, the civilian use of the XM15-E2S 'as a combat weapon ... for the purpose of waging war and killing human beings.' Accordingly, the First Amendment is not implicated by the claims as set forth by the plaintiffs in their complaint.

*Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 133 n.56 (2019) (emphasis added), *cert. denied sub nom. Remington Arms Co., LLC, et al. v. Soto*, 205 L. Ed. 2d 317 (Nov. 12, 2019).

The difference between Daniel Defense's advertisements and others in the firearms industry widens into a canyon when considering the plaintiffs in *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023) and *Way v. Boy Scouts of America*, 856 S.W.2d 230, 233 (Tex. App. 1993). In *Junior Sports*, the Ninth Circuit upheld the plaintiffs' right to run "truthful ad[s] about firearms used legally by adults and minors." *Junior Sports* at 1113. Of course, the plaintiffs in *Junior Sports* had not yet published any ads (because they properly first sought to enjoin the statute before running afoul of it). But on the Ninth Circuit's mind were advertisements showing "an ad showcasing a safer hunting rifle with less recoil for minors," "Californians hunting with their children," or guns that "come[s] with a more secure trigger safety." *Id*. at 1113, 1116, 1120. Restricting those types of ads, the court concluded, would be unconstitutional. In applying the *Central Hudson* test, the Court correctly pointed out that California law "permits minors under adult supervision to possess and use firearms for hunting, shooting competitions, and other lawful activities." *Id*. at 1116. Thus, restricting the firearms

industry from running ads geared towards minors' lawful use of firearms would be an improper restraint on commercial speech. *Id*. at 1116, 1121.

Similarly, the advertisements in *Way* depicted the biathlon, an Olympic sport, other shooting competitions, and included a checklist on firearm safety. *Way* at 232. The speech at issue in *Way* featured "the use of firearms not as an experiment, but as a supervised and safety-conscious activity." *Id*. at 236. The nature of the advertisements mattered, because it was inconsistent with the way the decedent in *Way* died (during unsupervised "experimentation" with a rifle). *Id*.

Nowhere in *Junior Sports* or *Way* do we see a company encourages civilians to take up sniper positions on city streets. Indeed, many of the advertisements broadcast by Daniel Defense *are themselves* violations of the law. For example, in creating the civilian sniper advertisement, FAC ¶¶ 155 through 158, Daniel Defense would have violated Texas Penal Code § 42.01(8) (Disorderly Conduct by way of "display[ing] a firearm . . . in a public place in a manner calculated to alarm") if the ad was staged in Texas.[25]

For these same reasons, the Court can reject Daniel Defense's assertion that the Plaintiffs are trying to "punish and deter" Daniel Defense's promotion of firearms "for self-defense and other lawful purposes, including to the military and law enforcement." MTD at 41. As described in detail above and in the complaint, the contested ads have no indicia of lawful, self-defensive, military, or police use. Here, the defendant's reference to *Heller* in support of its posts accomplishes the opposite of what it seeks. Daniel Defense would do well to heed Justice Scalia's now-famous admonition: "[T]he Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

---

[25] The details of the creation of this advertisement will be the subject of discovery.

purpose." *D.C. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2786, 171 L. Ed. 2d 637 (2008). Daniel Defense's outrageous advertisements promoting civilian violence, vigilantism, and unsafe use of firearms receives no protections here.

For all of these reasons, Daniel Defense's commercial speech does not survive the first step of the *Central Hudson* test.

### ii.     The Plaintiffs Prevail on the Remaining Three Factors of *Central Hudson,* to the Extent They Are Relevant Here

Because Daniel Defense's commercial speech relates to, promotes, and encourages unlawful activity, it is unprotected by the First Amendment and there is no need for this Court to proceed further. Moreover, the remaining three factors of *Central Hudson* would test the constitutionality of a statute or regulation, and mesh poorly with the issue before the Court, which is whether Daniel Defense's marketing content is actionable in a tort action for money damages. As to whether the Plaintiffs have a substantial interest in curbing Daniel Defense's advertisement of civilian violence, this is a tort action that focuses on Daniel Defense's marketing that led to the shooting. The outcome of this action will not regulate Daniel Defense's future speech. On whether the proposed regulation is more restrictive than necessary, again, there is no proposed regulation at issue. This is an action for money damages, and the First Amendment question – to the extent there is one at all – is whether Daniel Defense's conduct or speech is actionable. The First Amendment analysis is entirely retrospective. This Court's ruling, when one ultimately enters, would not regulate Daniel Defense's future speech. Notwithstanding that the remaining *Central Hudson* factors may not neatly align with a tort action, Daniel Defense's argument to apply strict scrutiny here is preempted by the Fifth Circuit's recent rejection of the same. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 279-84 (5th Cir.

2024), *cert. granted*, No. 23-1122, 2024 WL 3259690 (U.S. July 2, 2024). In that case, the court flatly rejected strict scrutiny where the plaintiffs alleged a mix of commercial and noncommercial speech and instead applied the *Central Hudson* test. *Id*. at 279-80.

### F.      Alternatively, the Court Should Grant the Plaintiffs Leave to Amend

"[D]ismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2002). The Fifth Circuit's "cases support the premise that [g]ranting leave to amend is especially appropriate … when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (quotation marks omitted). This is so, "even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading," with the result being that "leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim." Wright & Miller § 1357. Should the Court dismiss any portion of the First Amended Complaint as inadequately pled, the plaintiffs request leave to amend.

### CONCLUSION

For all these reasons, Daniel Defense's Motion to Dismiss should be denied.

55

Respectfully Submitted,

**THE PLAINTIFFS**,

By:   */s/ Erin Rogiers*
        Erin Rogiers, Esq.
        TX State Bar No. 24083597
        Francisco Guerra IV, Esq.
        TX State Bar No. 00796684
        Bailey Vannatta, Esq.
        TX State Bar No. 24119113
        GUERRA LLP
        875 East Ashby Place, Suite 1200
        San Antonio, TX 78212
        Tel: (210) 447-0500
        Fax: (210) 447-0501
        erogiers@guerrallp.com
        fguerra@guerrallp.com
        bvannatta@guerrallp.com

By:   */s/ Joshua D. Koskoff*
        Joshua D. Koskoff, Esq. (*pro hac vice*)
        CT State Bar No. 410518
        Alinor C. Sterling, Esq. (*pro hac vice*)
        CT State Bar No. 411754
        Colin S. Antaya, Esq. (*pro hac vice*)
        CT State Bar No. 440953
        Margaret Donovan, Esq. (*pro hac vice*)
        CT State Bar No. 445982
        KOSKOFF, KOSKOFF & BIEDER, PC
        350 Fairfield Ave., Suite 501
        Bridgeport, CT 06604
        Tel: (203) 336-4421
        Fax: (203) 368-3244
        jkoskoff@koskoff.com
        asterling@koskoff.com
        cantaya@koskoff.com
        mdonovan@koskoff.com

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I served the following counsel of record using the court's CM/ECF system, which will provide a notice of electronic filing to all counsel of record:

David M. Prichard
David R. Montpas
PRICHARD YOUNG, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216

J. Stephen Barrick
John B. Thomas
HICKS THOMAS LLP
700 Louisiana, Suite 2300
Houston, Texas 77002

Thomas W. Fee
Victor A. Rivera
FEE, SMITH & SHARP, L.L.P.
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240

Andre M. Landry, III
J.J. Hardig, Jr.
GRAY REED
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056

Daniel Paul Buechler
THOMSPSON, COE, COUSINS & IRONS, L.L.P.
700 North Pearl Street – 25th Floor
Dallas, Texas 75201

*/s/ Erin Rogiers*
Erin Rogiers, Esq.