**KIMBERLY RUBIO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of A.A.R, *deceased minor,* et al.,**

*Plaintiffs,*

**v.**

**DANIEL DEFENSE, LLC, et al.,**

*Defendants.*

Case No.  2:24-CV-00069-AM

**FILED**

November 21, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
AM
DEPUTY

### PLAINTIFFS' RESPONSE TO DEFENDANT OASIS OUTBACK, LLC'S <u>MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF NO. 30)</u>

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

I.      FACTUAL AND PROCEDURAL BACKGROUND ....................................................4

II.     LEGAL STANDARD .................................................................................6

III.    ARGUMENT: THE MOTION TO DISMISS MUST BE DENIED .............................7

        A.      The Plaintiffs Have Stated Texas Common Law Claims for Negligent
                Transfer of a Firearm and Negligence ...............................................8

                1.      Texas Law Recognizes Oasis' Duty of Reasonable Care in Supplying
                        Firearms Under Circumstances in Which that Foreseeably Results in
                        Harm to Third Parties.............................................................8

                2.      *Academy* Did Not "Foreclose" the *Peek* Rule; It Continues To Be
                        Applied................................................................................11

                3.      Oasis' Scattershot Duty Arguments Misconstrue Texas Law .................13

                4.      The Plaintiffs Have Pleaded Specific Facts Supporting the Standard
                        of Care and Causation...........................................................16

        B.      PLCAA Does Not Prohibit the Plaintiffs' Claims Against Oasis.........................18

                1.      PLCAA's Negligent Entrustment Exception Applies .............................18

                2.      PLCAA Does Not Apply at All to the Plaintiffs' Claims Against
                        Oasis...................................................................................22

                        a.      Oasis Was Not a "Seller" of the DDM4v7...................................22

                        b.      Oasis Was Not a "Seller" of the EOTech Sight..........................25

                        c.      The EOTech Sight Was Not a PLCAA "Qualified Product" .......28

                3.      Oasis' Argument that PLCAA Does Not Contain an Exception for
                        General Negligence Claims is Irrelevant ...................................37

        C.      Alternatively, the Court Should Grant the Plaintiffs Leave to Amend ...............38

CONCLUSION.................................................................................................38

i

# INTRODUCTION

On May 16, 2022, the day he turned eighteen, a slight, nervous-looking adolescent from Uvalde donned all-black clothing and went to Oasis Outback ("Oasis"). Over the course of the following week leading up to the Robb Elementary School Shooting, he returned again and again to Oasis, making a total of four visits. During these visits, he was hardly a window shopper or idle customer. Indeed, over the course of these four visits, Oasis transferred, sold, equipped, advised, and armed the teenager with an arsenal of military grade firepower, munitions, and accessories capable of carrying out a shooting of historic proportions.

The troubled kid was not the typical Oasis patron. He stood out and did little to hide his criminal intentions. His conduct and appearance were not lost on Oasis' customers, who readily took note: customers reported that he looked "like one of those school shooters," acted "very nervous," and "odd," and gave off "bad vibes." ECF No. 9, First Amend. Compl. (hereafter, "FAC") ¶ 565. By the time of his second visit, on May 17, Oasis would have known that the teen was awaiting delivery to the store of a Daniel Defense AR-15 that he had ordered online. Yet, when the school-shooter look-alike returned to Oasis that day and asked to buy a second AR-15, Oasis did not hesitate. *Id.* ¶ 402. What was apparent to Oasis' customers was disregarded by Oasis' employees, who did not question the teen's intentions or refuse to sell him the weapon, let alone call the police. It just sold him a second AR-15. *Id.* On May 18, he returned again and bought 375 rounds of 5.56mm 55-grain ammunition. *Id.* ¶ 403. Again, Oasis did nothing. It just sold him the ammo. *Id.*

If those were all the facts pleaded in the present case against Oasis, that would require denial of Oasis' Motion to Dismiss. But those are not all the facts. On May 20 – just four days before he would carry out the worst school shooting in Texas history – the teen returned again to

1

Oasis to pick up the Daniel Defense AR-15 that had arrived at the store. This time, he was even more demonstrative in his intentions. During the transfer process, Oasis handed him the weapon. In plain view of Oasis' employees, he locked in a thirty-round magazine and, **_with his finger on the trigger_**, pointed the weapon into the interior of the store where other customers were browsing. FAC ¶ 421. This conduct confirmed what Oasis should already have known: the Shooter was a mortal danger to those around him. If Oasis had done the smallest thing – refused to transfer the weapon or called the police – twenty-one lives would have been saved.

How could Oasis' conduct *as a matter of law* be protected under these facts? The answer is – of course – that it is not. Neither Texas law nor the Protection of **_Lawful_** Commerce in Arms Act ("PLCAA") shields such grossly negligent and irresponsible conduct. Indeed, both bodies of law explicitly recognize claims against Oasis under these facts.

Texas law is clear: a sporting goods store like Oasis must exercise "a duty of ordinary care" in its practices relating to the transfer of firearms where the transfer "could forseeably result in irresponsible use of the firearm by the purchaser with accompanying forseeable injury to a third party." *E.g.*, *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 847 (Tex. App. – San Antonio 1989, writ denied). The facts could not more clearly show that Oasis disregarded that duty. It watched as the Shooter previewed the Robb Elementary Shooting in its own store, but armed and equipped him anyway. The plaintiffs – the estates and families of seventeen children shot and killed at Robb Elementary, and two children who survived the shooting by hiding beside their dead classmates' bodies – seek to hold Oasis liable for the breach of that duty.

Just as Texas common law recognizes a negligence cause of action against a store that sells or transfers a firearm in a manner that results in foreseeable injury to third parties, PLCAA expressly exempts such negligence from its protections. PLCAA protects only lawful commerce

in arms. It does not protect gun sellers who break the law, and it does not protect gun sellers who are careless in their conveyance of firearms. The facts pleaded establish – certainly for purposes of the motion to dismiss – that Oasis was extremely careless in its interactions with the shooter and especially in transferring the DDM4v7 to the Shooter. Congress concluded that the type of negligent conduct that Oasis engaged in must not receive PLCAA protection, and it created what it labelled the "negligent entrustment" exception. Congress defined the type of claims that fit within this exception in terms instantly recognizable to Texas law: "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903(5)(B). Texas common law – which "impose[s] a duty of ordinary care upon the seller [of a firearm]" where "such a sale could forseeably result in irresponsible use of the firearm by the purchaser with accompanying forseeable injury to a third party," *Peek*, 768 S.W. 3d at 847 – accords with Congress' definition and fits squarely within PLCAA's negligent entrustment exception. Accordingly, the plaintiffs' claims against Oasis for transferring the DDM4v7 to the Shooter are exempt from PLCAA.

Moreover, even if PLCAA's negligent entrustment exception did not authorize the plaintiffs' claims against Oasis for transferring the DDM4v7 (and it does), the motion to dismiss must be denied because PLCAA does not even apply to Oasis' conduct in transferring the DDM4v7 to the Shooter or installing and adjusting the Shooter's holographic battle sight. That is made clear by the plain language of the statute, its application by courts, and the legislative history.

For these reasons and as set forth below, the motion to dismiss must be denied.

3

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Oasis watched the shooter break Texas law and it did nothing. In Texas, it is unlawful and a violation of the Texas Penal Code to "display[] a firearm or other deadly weapon in a public place in a manner calculated to alarm." TEX. PENAL CODE § 42.01(a)(8). To point an AR-15 in the direction of another person with a finger on the trigger goes far beyond an action "calculated to alarm." Such an action is an absolute violation of gun safety norms and a threat to everyone present. The National Rifle Association teaches three "fundamental rules of gun safety": "ALWAYS keep the gun pointed in a safe direction," "ALWAYS keep your finger off the trigger until ready to shoot," and "ALWAYS keep the gun unloaded until ready to use." FAC ¶ 422 (quoting National Rifle Association). Oasis knows these rules, and it knows why they are fundamental.

Oasis' first contact with the Shooter came via Daniel Defense. Within minutes of turning eighteen, on May 16, 2022, the Shooter bought a DDM4v7 AR-15 style rifle from Daniel Defense's website, paying Daniel Defense $2,024.28 for the weapon. FAC ¶¶ 393-95. Daniel Defense shipped the DDM4v7 to Oasis, where the Shooter would pick it up. *Id.* ¶ 397. Shipment would take several days.

That same day – the Shooter's eighteenth birthday – the Shooter went to Oasis. *Id.* ¶ 401.[1] He was dressed in all black. FAC ¶ 565. Customers at Oasis noticed him and were disturbed by him. *See id.* That strange young man dressed in all black returned to Oasis the next day, May 17. This time, he bought a Smith & Wesson AR-15 for $1,081.42. *Id.* ¶¶ 401-402. Again, customers noticed him and found him alarming. One customer described the Shooter as

---

[1] What precisely the Shooter did at Oasis on May 16 will be a subject of discovery.

4

looking "odd." *Id.* ¶ 402. He looked "like one of those school shooters." *Id.*[2] Other customers described the Shooter as "very nervous looking" and giving off "bad vibes." *Id.*

On May 18, the Shooter returned to Oasis for the third time and purchased 375 rounds of M193, a 5.56mm 55-grain round with a full metal jacket – military-grade ammunition. *Id.* ¶ 403. For the third day in a row, his presence alarmed other customers. *Id.* ¶¶ 402, 565.

On May 20, the Shooter's DDM4v7 arrived at Oasis. *Id.* ¶¶ 418-19. He went to the store a fourth time to pick up the rifle. *Id.* As if it were not enough – in this era of mass shootings carried out by isolated young men – that the young man who had haunted Oasis since his eighteenth birthday "looked like a school shooter" and gave off "bad vibes," *id.* ¶ 402, the Shooter gave more overt signs of being dangerous and deranged on the day he picked up the DDM4v7. That day in Oasis – four days before he would wage war on Robb Elementary School – the Shooter threatened Oasis' customers. *See* FAC ¶ 421. He twice raised the DDM4v7 to his shoulder and aimed it into the main area of the store *where customers were located*. FAC ¶ 421. His finger was located inside the trigger guard and on, or next to, the trigger. *Id.* Before he did this a second time, *he loaded a magazine into the rifle. Id*. These actions, which threatened the lives of the customers he targeted, constituted criminal conduct under Texas law. *See id.* ¶ 422; TEX. PENAL CODE § 42.01(a)(8).[3]

Oasis had reasonable options. It should have refused to transfer the DDM4v7 to the Shooter. It should have questioned the shooter and called the police. If it had, there would have

---

[2] Again, the full extent what Oasis employees and other customers saw and heard during the Shooter's four visits to Oasis will be a subject of discovery.

[3] Whether the Shooter similarly criminally and dangerously wielded the Smith & Wesson Rifle on May 17 will also be a subject of discovery. At this point, the reasonable inference is that he did.

been no shooting at Robb Elementary School. Not only did Oasis do neither of these things, it indulged the Shooter and optimized his ability to kill. The Shooter asked Oasis to install an EOTech holographic battle sight on the DDM4v7, and Oasis obliged. *Id.* ¶ 420. The EOTech holographic battle sight is not a hunting scope. *Id.* ¶ 323. It provides no magnification. *Id.* It projects a targeting reticle onto holographic film in a glass viewing window. *Id.* This allows the user to aim with both eyes open, allowing an unrestricted field of view and peripheral vision. *Id.* It is optimized for one purpose: fast-paced, close-quarter killing in military and law-enforcement combat. *E.g.*, *id.* ¶ 323, 327. It allows enemies to be visualized, targeted, and terminated in split seconds. *Id.* ¶ 323. The holographic battle sight provides a "point-and-shoot" experience, eliminating the intricacies of aiming with traditional iron sights and essentially turning shooting into a real-life video game. *Id.* There is no better sight for killing as many people as possible, as quickly as possible, in the confines of a school. *Id.* To work properly, however, such a sight needs to be correctly installed. *Id.* ¶ 420. The Shooter had never fired a firearm, let alone mounted a holographic battle sight on an AR-15. *Id.* ¶ 420. At the Shooter's request, Oasis installed and calibrated the battle sight on the DDM4v7. *Id.* ¶¶ 420, 571.

Oasis knew all of this. But the only question Oasis' owner has admitted to asking is where the Shooter got the thousands of dollars he spent on his arsenal. *Id.* ¶ 564.

Four days after the Shooter's last visit to Oasis, he used the DDM4v7 Oasis had transferred to him, accessorized with the holographic battle sight Oasis had mounted and calibrated for him, to carry out the Robb Elementary Shooting.

## II.     LEGAL STANDARD

To defeat a Rule 12(b)(6) motion, the complaint need only include sufficient factual allegations "to raise a right to relief above the speculative level" and to provide "fair notice" of

the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). In considering a Rule 12(b)(6) motion, the Court must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them . . . and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co*., 231 F.R.D. 493, 498 (W.D. Tex. 2005) (citation omitted).

## III.    ARGUMENT: THE MOTION TO DISMISS MUST BE DENIED

Oasis asks the Court to dismiss the plaintiffs' claims against it for two reasons. Oasis argues that the plaintiffs have not stated viable claims under Texas law. *See* ECF No. 30, Oasis Mtn. to Dismiss First Amend. Compl. (hereafter, "MTD") at 24-28. And Oasis argues that PLCAA bars the plaintiffs' claims. MTD at 9-24. Oasis' arguments are unavailing.

First, Texas law recognizes that a sporting goods store owes a duty of reasonable care in its conduct regarding the transfer or sale of firearms, and that duty is owed to third parties who are foreseeably injured or killed as a result of the breach of that duty. The Shooter's objectively alarming conduct during the course of four visits to Oasis in the week before the shooting alerted Oasis to the plain fact that this young man was a threat. Knowing that, Oasis transferred him the DDM4v7 and affixed and adjusted a holographic battle sight to that assault rifle. As a result, the plaintiffs were foreseeably killed or injured.

Second, PLCAA does not foreclose any of the plaintiffs' claims against Oasis. PLCAA's negligent entrustment exception applies to the plaintiffs' claims. Oasis' negligence in supplying the DDM4v7 to the Shooter is exactly the type of careless conduct that Congress intended to exempt from PLCAA. Even if the negligent entrustment exception did not apply, PLCAA applies only to manufacturers or sellers of firearms or ammunition that are criminally or unlawfully misused. Oasis, however, neither manufactured nor sold the DDM4v7 used by the Shooter. It was manufactured and sold by Daniel Defense, and Oasis acted merely as a location for the Shooter to pick up the rifle he had purchased directly from Daniel Defense. Likewise, Oasis undisputedly did not manufacture or sell the holographic battle sight used in the shooting. Moreover, the holographic sight was not a "qualified product" protected by PLCAA.

### A. The Plaintiffs Have Stated Texas Common Law Claims for Negligent Transfer of a Firearm and Negligence

#### 1. Texas Law Recognizes Oasis' Duty of Reasonable Care in Supplying Firearms Under Circumstances in Which that Foreseeably Results in Harm to Third Parties

Under Texas law, "[a] firearm is a deadly weapon per se." *Morin v. Moore*, 309 F.3d 316, 325 (5th Cir. 2002) (quoting *Kennedy v. Baird*, 682 S.W.2d 377, 378 (Tex. App. – El Paso 1984, no writ)). A sporting goods store like Oasis has a duty of reasonable care with respect to its practices in supplying firearms, and this duty is owed to third parties foreseeably injured as a result of the breach of that duty. *See e.g.*, *Peek*, 768 S.W.2d at 847; *Hulsebosch v. Ramsey*, 435 S.W.2d 161, 163-64 (Tex. Civ. App. – Houston [14th Dist.] 1968, no writ); *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. – Corpus Christi-Edinburg 1997, pet. denied); *Tisdale v. Pagourtzis*, 2020 WL 7170491, at *5 (S.D. Tex. Dec. 7, 2020); *Rodriguez v. Acad., Ltd.*, 694 S.W.3d 780, 786-87 (Tex. App. – Houston [14th Dist.] 2024, pet. denied); *Diggles v.*

*Horwitz*, 765 S.W.2d 839, 841 (Tex. App. – Beaumont 1989, writ denied); *Bryant v. Winn-Dixie Stores, Inc.*, 786 S.W.2d 547, 550 (Tex. App. – Fort Worth 1990, writ denied); *Love v. Zales Corp.*, 689 S.W.2d 282, 284 (Tex. App. – Eastland 1985, writ ref'd n.r.e.); *Reyna v. Acad. Ltd.*, No. 01-15-00988-CV, 2017 WL 3483217, at \*7 n.8, \*7-8 (Tex. App. – Houston [1st Dist.] Aug. 15, 2017, no pet.). For ease of reference, the plaintiffs will refer to this line of appellate authority as the *Peek* rule.[4]

In its practices in supplying firearms, a store has a duty "to act as a firearms seller of ordinary prudence." *Rodriguez*, 694 S.W.3d at 787. As the San Antonio Court of Appeals stated in *Peek*, Texas law "impose[s] a duty of ordinary care upon the seller [of a firearm]" where "such a sale could forseeably result in irresponsible use of the firearm by the purchaser with accompanying forseeable injury to a third party." 768 S.W. 3d at 847; *see also, e.g.*, *Diggles*, 765 S.W.2d at 841 (reversing summary judgment for pawn shop owner and gun manufacturer because "[t]here are fact issues as to whether selling the gun and giving the ammunition to the deceased was negligence"); *Tamez*, 960 S.W. 2d at 130 ("we agree that Wal–Mart had a common-law duty to act reasonably in selling ammunition"); *Tisdale*, 2020 WL 7170491, at \*5 ("Texas courts have … recognized, under common-law negligence principles … that ammunition sellers owe a duty of ordinary care toward third parties who might be injured by an unreasonable sale of ammunition").

This duty "rests primarily upon the existence of reason to anticipate injury." *Peek*, 768 S.W.3d at 847. It arises when a customer's "manifest behavior or comportment" "put[s] the seller on notice that the purchaser, if possessed of a firearm, would forseeably pose a danger to

---

[4] *See also Morin*, 309 F.3d at 326-27; *Kennedy*, 682 S.W.2d at 378-79; *cf. McLain v. Hodge*, 474 S.W.2d 772, 777 (Tex. Civ. App. – Waco 1971, writ ref'd n.r.e.).

third persons." *Id*. The "reasonably observable manifestations" that may put a firearms supplier on notice of foreseeable danger include "agitation, instability, incompetence, recklessness or intent to commit a crime." *Id.*[5] Stated generally, this duty requires a sporting goods store to act "[]reasonably in selling a firearm." *Id.*; *see also, e.g.*, *Tamez*, 960 S.W. 2d at 130. This includes the duty not to supply a firearm to an individual displaying such alarming behavior. *See, e.g.*, *Peek*, 768 S.W.3d at 847. It includes the duty not to take additional affirmative acts that would *further increase* the danger and foreseeability of harm: for example, affixing a close-quarter battle sight to a firearm at the request of that individual. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex. 1987) ("the common law recognizes the duty to take affirmative action to control or avoid increasing the danger from another's conduct which the actor has at least partially created."). This duty also includes the duty to notify law enforcement, including if the store has already transferred the weapon to the dangerous individual. *See El Chico Corp.*, 732 S.W.2d at 312 ("[I]if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others."); *Buchanan v. Rose*, 138 Tex. 390, 391-92, 159 S.W.2d 109 (1942) (same); *cf. Angell v. F. Avanzini Lumber Co.*, 363 So. 2d 571, 572 (Fla. Dist. Ct. App. 1978) (cited by *Peek*, 768 S.W. 3d at 847) (noting store clerk called law enforcement when firearms buyer displayed alarming behavior). The *Peek* rule, and the duty it recognizes, applies to Oasis' negligence here in transferring the DDM4v7 to the Shooter and affixing the holographic battle sight to the DDM4v7. All of that was done under circumstances in which the Shooter's behavior and comportment put Oasis on notice that the Shooter posed a grave danger to innocent third parties with the DDM4v7 and holographic sight.

---

[5] The Court in *Peek* did not state that it was providing an exhaustive list of circumstances that would give rise to this duty.

### 2.   *Academy* Did Not "Foreclose" the *Peek* Rule; It Continues To Be Applied

Oasis' arguments to the contrary misconstrue Texas law. Oasis argues that *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021) (orig. proceeding), "forecloses" any claims attempting to hold Oasis liable for its negligence regarding its practices in transferring the DDM4v7 to the Shooter. MTD at 24. But Academy left intact the controlling appellate authority that has long recognized a firearms seller's duty of reasonable care. *See* the *Peek* rule, *supra*, p. 8. ***After Academy, the Peek rule continued to be recognized by controlling appellate authority***. The Texas Court of Appeals applied the *Peek* rule as recently as 2024. In *Rodriguez*, 694 S.W.3d at 786-87, the court analyzed whether a firearms seller had "failed to act as a firearms seller of ordinary prudence" in selling a gun to a mentally ill woman.[6]

The continued vitality of the *Peek* rule should come as no surprise. *Academy* was litigated, argued, and labelled as a Texas "negligent entrustment" case, not as a claim under the *Peek* rule. The plaintiffs in *Academy* did not seek to hold the defendant liable under the *Peek* rule. Negligence in transferring or supplying firearms under the *Peek* rule and negligent entrustment are distinct theories of recovery in Texas. The claim for negligent entrustment is a

---

[6] Additionally, after *Academy*, the Texas Supreme Court refused to grant mandamus relief to an ammunition seller sued by the victims of a mass shooting for negligently *selling* ammunition to the shooter. The ammunition seller, represented by the same counsel who represent Oasis here, had moved to dismiss the plaintiffs' claims against them. The seller advanced the same unavailing arguments Oasis advances here regarding duty and causation. The plaintiffs responded that their claims were valid under the *Peek* rule. The trial court denied the seller's motion to dismiss. The seller sought mandamus relief and the Court of Appeals denied the petition for a writ of mandamus. *See In re LuckyGunner, LLC*, No. 14-21-00194-CV, 2021 WL 1904703 (Tex. App. – Houston [14th Dist.] May 12, 2021, orig. proceeding). The seller then sought mandamus relief with the Texas Supreme Court, which denied the petition for a writ of mandamus eight months after deciding *Academy*. *See In re Lucky Gunner, LLC* (Tex. Supreme Court Case No. 21-0463).

specialized claim that derives from property rights and duties framed by the law of bailments. "[L]iability for negligently entrusting a [chattel] … is a part of the law of bailments, but *not* of the law of sales or gifts…. A bailor entrusts, for what he entrusts is his. But a vendor does not entrust; he sells his chattel." *Academy*, 625 S.W.3d at 31 (citation omitted; emphasis in original). Under this law, negligent entrustment is a "*form of vicarious liability*" in which "the basis for imposing liability on the owner of the thing entrusted to another is that *ownership of the thing gives the right of control over its use*." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 686 (Tex. 2007) (emphasis added); *Academy*, 625 S.W.3d at 31 (same).[7]

The claims recognized under the *Peek* rule and in the definition of excepted claims under what PLCAA labels "negligent entrustment," *see* 15 U.S.C. § 7903(5)(A)(ii), (5)(B), are not restricted to bailments. The *Peek* duty does not arise from vicarious liability or a firearm seller's continued exercise of control over a firearm. It arises from a store's breach of its "duty of ordinary care" where the store's practices in supplying a firearm result in "forseeable injury to a third party." *Peek*, 768 S.W. 3d at 847. To succeed on a *Peek* negligence claim, a plaintiff must prove that the store breached its duty of reasonable care in selling or transferring (i.e., relinquishing control of) a firearm and that this caused foreseeable injury to a third party.

Since at least 1956, Texas has recognized a distinct claim for bailment-based negligent entrustment of a chattel. *See Academy*, 625 S.W.3d at 31 (citing *Rush v. Smitherman*, 294 S.W.2d 873 (Tex. Civ. App. – San Antonio 1956, writ ref'd). *At the same time*, the *Peek* rule has recognized a distinct tort-based duty of care owed by firearms suppliers to third parties

---

[7] In Texas, "the doctrine of vicarious liability, or respondeat superior, … is based on the principal's control or right to control the agent's actions undertaken to further the principal's objectives." *F.F.P. Operating Partners, L.P.*, 237 S.W.3d at 686.

foreseeably harmed when that duty is breached.[8] *Academy* reaffirmed that "no viable cause of action exists under Texas law for *negligent entrustment* based on a *sale* of chattel." 625 S.W.3d at 31 (emphasis added). *Academy* was not asked to consider a *Peek* claim. And this Court certainly cannot presume that *Academy* overruled an entire line of caselaw *sub silentio*. The *Peek* rule is binding on this Court. *See, e.g.*, *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 764 (5th Cir. 2019) (where "the Texas Supreme Court has not ruled on an issue," federal court should "typically treat state intermediate courts' decisions as the strongest indicator of what a state supreme court would do") (quotation marks omitted).

### 3.    Oasis' Scattershot Duty Arguments Misconstrue Texas Law

Oasis argues that "because Oasis did not have a recognized special relationship with the purchaser, it had no right or ability to control the purchaser's criminal use of the products he purchased, and it did not have a duty to protect others from his criminal conduct." MTD at 25. Oasis is simply wrong that a special relationship is required for a duty of ordinary care to exist on behalf of a firearms seller or transferor. *See* the *Peek* and related cases, *supra*, p.8. Not only that, there are questions of fact as to whether Oasis' actions created further duties. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex. 1987) ("the common law recognizes the duty to take affirmative action to control or avoid increasing the danger from another's conduct which the actor has at least partially created."). As the Texas Supreme Court has explained, a special relationship may be *sufficient* to create a duty, but it is by no means *necessary*:

---

[8] In most other jurisdictions, the *Peek* rule – i.e., negligent sale or transfer – is known as negligent entrustment. *See* Restatement (Second) of Torts § 390 (1965), cmt. a (negligent entrustment "applies to anyone who supplies a chattel for the use of another. It applies to sellers, lessors, donors or lenders, and to all kinds of bailors, irrespective of whether the bailment is gratuitous or for a consideration.").

> The dissent errs by concluding that absent a special relationship, there can be no duty in this case…. There are some cases in which a duty exists as a matter of law because of a special relationship between the parties…. In such cases, the duty analysis ends there. However, in most negligence cases a special relationship does not exist and, contrary to the dissent's view, the duty factors must be weighed by the Court. If the dissent's conclusion that without a special relationship there can be no duty were correct, there could be no recovery in most negligence cases.

*Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 292 (Tex. 1996). In the end, "every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987). Oasis affirmatively armed the Shooter with the DDM4v7 in the face of repetitive, deeply alarming behavior. Based on these facts alone, the *Peek* duty applies. On top of all this, Oasis assisted the Shooter by affixing a close-quarter combat sight to his DDM4v7. *See El Chico Corp.*, 732 S.W.2d at 312 ("the common law recognizes the duty to take affirmative action to control or avoid increasing the danger from another's conduct which the actor has at least partially created.").[9]

Oasis also argues that "Texas courts hold that intentional criminal conduct is not foreseeable." MTD at 26 (emphasis omitted). Again, Oasis misstates Texas law. *See, e.g.*, *Nixon*

---

[9] Oasis cites *Allen v. Wal-Mart Stores, LLC*, 2017 WL 978702, at *10 (S.D. Tex. Mar. 14, 2017), in which the court dismissed a claim against a retailer on the grounds that the "complaint's vague allegations that Wal-Mart employees sold a towel . . . and other inhalant paraphernalia without specifying what that paraphernalia was or who sold it to her" failed to show that it was foreseeable that the plaintiff's decedent would use these items together to inhale aerosolized sprays in a dangerous manner. *Id.* at *16. In contrast to the "vague allegations" in *Allen*, the plaintiffs have alleged with detail and specificity the nature and timing of the Shooter's purchases and transfer at Oasis; Oasis' repeated interactions with the Shooter when he was exhibiting alarming behavior; witness statements regarding the Shooter's behavior and comportment, including that he looked like a "school shooter;" and the Shooter's shocking conduct in front of Oasis employees with the DDM4v7. Additionally, the court in *Allen* relied on the fact that the plaintiff had "cited no case law that demonstrates a duty not to sell [aerosolized sprays]." *Id.* at *10. But under the *Peek* rule, Oasis had a duty not to transfer the DDM4v7 to the Shooter or install the EOTech sight under the facts of this case.

14

*v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 550 (Tex. 1985) ("negligence will not be excused

where the criminal conduct is a foreseeable result of such negligence"); *Finnigan v. Blanco

Cnty.*, 670 S.W.2d 313, 317-18 (Tex. App. – Austin 1984, no writ) (reversing summary judgment

for deputy sheriff who left car unlocked and running, and where escaped prisoner stole car and

caused fatal collision because "[o]nce the prisoner entered the car, it may very well be

foreseeable that a high-speed chase would ensue, with high risks of injury to other motorists").

Oasis cites three cases that not only fail to support its categorical statement about the

foreseeability of intentional criminal conduct, but actually reject it. *See* MTD at 26-27. In

*Cowart v. Kmart Corp.*, 20 S.W.3d 779 (Tex. App. – Dallas 2000, pet. denied) the court

explained that "when the third party's criminal conduct is a foreseeable result of the prior

negligence, the criminal act does not excuse the previous tortfeasor's liability." 20 S.W.3d at

793. In *Chapman v. Oshman's Sporting Goods, Inc.*, 792 S.W.2d 785 (Tex. App. – Houston

[14th Dist.] 1990, writ denied), the court noted that "there are certainly factual situations which

may make criminal conduct the foreseeable result of the sale of a gun." 792 S.W.2d at 788. And

in *Holder v. Bowman*, No. 07-00-0126-CV, 2001 WL 62596 (Tex. App. – Amarillo Jan. 25,

2001, pet. denied), the court again affirmed the principle that another person's criminal conduct

will not excuse a defendant's negligence where "the criminal conduct was a foreseeable result of

the negligence," 2001 WL 62596, at *3. The plaintiffs' claims in those cases failed for want of

evidence that sellers should have foreseen harm to third parties as a result of their sales, not

because the law foreclosed their claims. *See Cowart*, 20 S.W.3d at 785-86; *Champan*, 792

S.W.2d at 787; *Holder*, 2001 WL 62596, at *4.[10]

Plaintiffs' allegations here establish far more than is necessary to proceed to discovery on

their claims. Oasis' claims to the contrary, *see* MTD at 26-27, discount the plain allegations of

the complaint, in contravention of the 12(b)(6) standard. Witnesses described the Shooter as

"look[ing] like" exactly what he was: "a school shooter." FAC ¶565. Not only did he linger at

Oasis, amassing an arsenal, for four days running – he demonstrated his dangerousness on the

premises in plain view of employees. *See id.* ¶¶ 421-22. Foreseeability here is a question of fact,

*see, e.g.*, *Reyes v. Dollar Tree Stores, Inc.*, 221 F. Supp. 3d 817, 826 (W.D. Tex. 2016), and it is

more than sufficiently alleged.).[11]

### 4.     The Plaintiffs Have Pleaded Specific Facts Supporting the Standard of Care and Causation

Causation is a question of fact. *See Ryder Integrated Logistics, Inc. v. Fayette Co.*, 453

S.W.3d 922, 929 (Tex. 2015). Oasis does not dispute that the plaintiffs have adequately pleaded

causation with respect to Oasis' transfer of the DDM4v7 to the Shooter. Oasis challenges only

---

[10] *Cowart*, *Champan*, and *Holder* also implicitly reject Oasis' argument that a gun store has no duty to third parties injured as a result of the negligent sale of a firearm or ammunition unless there is a special relationship. None of these cases involved a special relationship. Yet in none of these cases did the court discuss the supposed need for a special relationship. That is because there is no such requirement.

[11] Oasis asserts that "the Court cannot consider age as a factor in addressing foreseeability" because "an eighteen-year-old is eligible to purchase the firearm and ammunition at issue in this case." MTD at 27. Oasis cites no authority for this categorical prohibition on the Court considering age as a factor. Merely because the Shooter was legally *able* to purchase a rifle and ammunition does not mean that the Court is *prohibited* from considering the fact that he began amassing an arsenal the day he turned eighteen. What is foreseeable always depends "upon all the facts and circumstances in each case." *Finnigan*, 670 S.W.2d at 317.

plaintiffs' causation allegations with respect to its installation and calibration of the holographic battle sight on the Shooter's DDM4v7.

Again, Oasis ignores plaintiffs' allegations. The FAC explains at length how the EOTech sight contributed to the carnage at Robb Elementary School. Oasis' installation and calibration of the sight for the Shooter "increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that Plaintiffs would be shot, be injured, suffer mental anguish, or be killed." FAC ¶ 572. The "Holographic Weapon Sight [is] built for close-quarter engagements with fast-moving targets" and "allow[s] the shooter to quickly pick up and lock on a target." *Id.* ¶ 329. According to EOTech, the sight is "breach-ready," meaning that it is ideal for bursting into a room and killing people. *Id.* ¶ 334. "[T]he EOTech sight gave [the Shooter] both a practical tool and, in EOTech's words, increased 'confidence.'" *Id.* ¶ 352. The Shooter used the sight in precisely these ways in his attack. ¶¶ 420, 568. Oasis' actions in installing and adjusting the sight contributed materially to the loss of life on May 24, 2022.

Oasis also argues that "Plaintiffs fail to allege any facts supporting the allegation that … Oasis failed to follow any cognizable standard of care in installing or adjusting the sight." MTD at 24. Again, Oasis ignores the plaintiffs' allegations and the governing law. The plaintiffs allege that, under the circumstances described above and given the Shooter's alarming conduct inside the store, Oasis "had a duty to exercise reasonable care in . . . installing firearms accessories . . . and to refrain from any activity creating reasonably foreseeable risks of injury to others," and that Oasis "breached its duty to exercise reasonable care by . . . installing the EOTech holographic combat sight" and "'zeroing' or otherwise adjusting the EOTech holographic combat sight for the Shooter." FAC ¶¶ 563–65, 571. Under Texas law, which holds a sporting goods store like Oasis to "a duty of ordinary care" in its practices related to the sale of firearms

17

and ammunition, *e.g.*, *Peek*, 768 S.W. 3d at 847, the plaintiffs have alleged duty and breach in Oasis' installation of the holographic sight under circumstances that made it clear that the Shooter intended to use it to harm others.

### B.    PLCAA Does Not Prohibit the Plaintiffs' Claims Against Oasis

PLCAA does not apply at all to plaintiffs' claims against Oasis, because plaintiffs' claims come within PLCAA's negligent entrustment exception. And even if the negligent entrustment exception did not apply, the plaintiffs' claims do not assert a "qualified civil liability action."

### 1.    PLCAA's Negligent Entrustment Exception Applies

PLCAA expressly exempts from its scope "an action brought against a seller for negligent entrustment," and it defines "negligent entrustment" as "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903 (5)(A)(ii), (5)(B). The negligence claims recognized by the *Peek* rule and asserted by the plaintiffs here clearly meet this definition. The plaintiffs negligence claims allege that Oasis breached its "duty of ordinary care" in transferring the DDM4v7 to the Shooter where doing so could (and did) "forseeably result in irresponsible use of the firearm by the purchaser with accompanying forseeable injury to a third party," *Peek*, 768 S.W. 3d at 847; *see* FAC ¶¶ 564-70. Accordingly, the plaintiffs' claims against Oasis regarding its transfer of the DDM4v7 fall within PLCAA's negligent entrustment exception and are not precluded by PLCAA. *See* 15 U.S.C. § 7903 (5)(A)(ii), (5)(B).

Oasis' arguments regarding the inapplicability of PLCAA's negligent entrustment exception misconstrue PLCAA and the plaintiffs' claims under Texas law. Oasis argues that

"Plaintiffs essentially argue that the definition [of negligent entrustment] gives rise to a cause of action, attempting to turn the PLCAA's definition of negligent entrustment … into a viable claim that can proceed …." MTD at 20-21. Not so. The plaintiffs do not attempt to (or need to) turn PLCAA's definition into a cause of action. The plaintiffs have pleaded *Peek* claims under Texas law, which fit squarely within the PLCAA exception. That the plaintiffs' *Peek* claims are not **labelled** negligent entrustment claims under Texas law is irrelevant. PLCAA does not say that the claim must be "an action … *called* negligent entrustment" but rather "an action … *for* negligent entrustment," which PLCAA then defines. *See* 15 U.S.C. § 7903(5)(A)(ii), (5)(B). Inserting Congress' supplied definition of "negligent entrustment," 15 U.S.C. § 7903(5)(b), into the language of the negligent entrustment exception, § 7903(5)(A)(ii), makes this clear: "an action brought against a seller for [the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others]." That is exactly the claim the plaintiffs bring under the *Peek* rule.

It is notable that Congress chose to define the type of claim that satisfies PLCAA's negligent entrustment exception. In doing so, Congress expressed its intent that claims falling within that definition must be permitted to proceed. In contrast, Congress identified other claims that create exceptions to PLCAA – actions for "negligence per se" or "breach of contract or warranty," *id.* § 7903(5)(iv) – but chose not to define the nature of the claims that fit within those exceptions. This disparate treatment suggests that Congress intended for courts to simply look to state law on negligence per se or breach of contract or warranty, but Congress intended for courts to look to the definition it provided to determine whether a claim fits within PLCAA's negligent

entrustment exception. *See Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 324 (Mo. 2016) ("[A] state-law claim may continue to be asserted, even if it is not denominated as a 'negligent entrustment' claim under state law, if it falls within the definition of a 'negligent entrustment' claim provided in the PLCAA.") (citation omitted).[12] For these reasons, Oasis' argument that "Texas does not recognize a negligent entrustment action against the seller of a product," MTD at 21, misses the mark. Texas *does* recognize a cause of action fitting withing PLCAA's negligent entrustment exception. To use a phrase of Oasis', that is where the analysis begins and ends.

Likewise, Oasis' reliance on *Academy* is misplaced. *See* MTD at 22. The plaintiffs in *Academy* attempted to bring a *Texas state law negligent entrustment claim* premised on the fact that the defendant store *sold* a firearm to the shooter, "arguing that [the seller's] sale of the rifle to [the shooter] '*satisfie[d] all the requisite elements of the tort of negligent entrustment under Texas law* ....'" 625 S.W.3d at 30 (emphasis added). The Court rejected the plaintiffs' argument because "no viable cause of action exists under Texas law *for negligent entrustment* based on a sale of chattel." *Id.* at 31 (emphasis added). The *Academy* plaintiffs did not bring general negligence claims under the *Peek* rule. Indeed, none of the cases from the *Peek* line of appellate authority is cited anywhere in *Academy*. In short, the plaintiffs did not argue, and *Academy* did

---

[12] There was good reason for Congress' unique treatment of negligent entrustment claims. Some states, like Texas, do not call actions involving negligence in transferring or selling a firearm to a dangerous individual "negligent entrustment." Instead, these actions may exist under general negligence law, as in the *Peek* rule. If Congress had not defined "negligent entrustment" this would have led to uneven and conflicting applications of PLCAA merely depending on the labels used by the states to describe conduct that Congress unequivocally found undeserving of PLCAA protection (which is exactly what Oasis is asking the Court to countenance here). PLCAA's findings and purpose show Congress' intent to avoid such "destabilization" and to preserve "comity between the sister States." 15 U.S.C. § 7901(6), (8).

not decide, whether PLCAA's negligent entrustment exception would apply to the distinct cause of action under Texas law that the plaintiffs allege here: negligence with respect to the transfer of a firearm.[13]

Additionally, the facts of this case are categorically different and set it apart from *Academy*. *Academy* was the kind of case that PLCAA was designed to defeat: strict vicarious liability against a seller for the criminal conduct of another person. In the present case it is Oasis' conduct – its breach of its duty of reasonable care – that forms the basis of its liability. Oasis' transfer of the DDM4v7 to the shooter under the facts alleged is exactly what the PLCAA negligent entrustment exception contemplates. The Uvalde Shooter purchased the DDM4v7 directly from a web-based seller, Daniel Defense, and a separate party, Oasis, transferred the weapon to the Shooter despite encountering him on four separate occasions leading up to the shooting, during which the Shooter displayed objectively alarming behavior. In contrast, the shooter in *Academy* bought the rifle and magazine in that case in the traditional manner: in-person, from a seller. The shooter in *Academy* did not dangerously mishandle the rifle in front of store employees, he did not make repeat visits to amass an arsenal, and there was no witness testimony describing the *Academy* shooter as alarming or suspicious in any way. Nearly 19 months passed between when the *Academy* shooter purchased his weapon and when he committed the shooting. *See Academy*, 625 S.W.3d at 23. Whether a set of facts gives rise to a negligence claim depends on the "particular circumstances" of a party's conduct, *see Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.2d 137, 145 (Tex. 2022), and the circumstances of this case

---

[13] Moreover, *Academy's* interpretation of PLCAA is not binding on this Court. *See, e.g.*, *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 359 (5th Cir. 2010); *Soc'y for Sav. in Cleveland v. Bowers*, 349 U.S. 143, 151 (1955).

have never been before the Texas Supreme Court. However, the *Peek* rule makes clear that

Oasis' conduct was not just irresponsible, but actionable, and that it owed a duty to the plaintiffs

here.

### 2. PLCAA Does Not Apply at All to the Plaintiffs' Claims Against Oasis

Even if the negligent entrustment exception did not apply to the plaintiffs' claims (it

does), PLCAA is inapplicable to their claims because they do not allege a "qualified civil

liability action" under PLCAA. PLCAA defines a qualified civil liability action as an action

"against a manufacturer or seller of a qualified product … for damages … resulting from the

criminal or unlawful misuse of a qualified product by the person or a third party" 15 U.S.C. §

7903(5)(A). Thus, PLCAA's protections apply only to "manufacturer[s]" or "seller[s]." Whether

a defendant is a "manufacturer" or "seller" is determined on a product-by-product basis. A

defendant may be a protected "seller" with respect to one qualified product (because it sold the

product), while simultaneously not qualifying as a "seller" of another qualified product (because

it did not sell it). PLCAA's plain language makes this product-by-product application crystal

clear: "'seller' means, *with respect to a qualified product* …."15 U.S.C. § 7903(6) (emphasis

added). Under the facts of this case, Oasis was not a seller of the DDM4v7 or the holographic

battle sight. Accordingly, plaintiffs' claims against Oasis are not a "qualified civil liability

action" and PLCAA does not protect Oasis at all in this case.

### a. Oasis Was Not a "Seller" of the DDM4v7

The sale of the DDM4v7 was a web-based sale, with payment going directly from the

Shooter to Daniel Defense. Daniel Defense – not Oasis – sold the DDM4v7 to the Shooter, who

purchased it directly from Daniel Defense's website. FAC ¶¶ 394-96. The Shooter paid Daniel

Defense – not Oasis – the over $2,000 purchase price for the rifle. *Id.* ¶ 395. Oasis' role was as a

transferor: providing a location for the Shooter to "pick up" the DDM4v7 that Daniel Defense shipped to the Shooter. FAC ¶¶ 397, 419. Oasis concedes this in its Motion. *See* MTD at 11 (stating that "Plaintiffs allege" that Oasis' role was to "*help[] facilitate the transfer* of the Daniel Defense rifle [the Shooter] *purchased online*.") (emphasis added).[14]

PLCAA defines "seller" to mean, in relevant part, "a dealer (as defined in section 921(a)(11) of title 18) …." 15 U.S.C. § 7903(6). And the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*, which PLCAA incorporates into the definition of "seller," confirms the difference between Daniel Defense as the dealer (and therefore the "seller" of the DDM4v7 under PLCAA) and Oasis as the transferor. Under the Gun Control Act, it is unlawful for a "dealer" to "sell" a firearm to a purchaser residing in another state unless the firearm is shipped to a transferor and the purchaser "meets in person with the transferor to accomplish the transfer." 18 U.S.C. § 922(b)(3). This provision applied to the DDM4v7 sale here because Daniel Defense shipped the DDM4v7 from Georgia to Texas, *see* FAC. ¶¶ 1, 4. The statutory scheme distinguishes between the "dealer" "sell[ing]" the rifle and the "transferor," "accomplish[ing] the transfer." Daniel Defense was a "dealer" and therefore a "seller" of the DDM4v7, while Oasis was the

---

[14] Oasis asserts that the plaintiffs "plead Oasis is 'a licensed seller of firearms'" MTD at 11. Under PLCAA, Oasis' general status as a federal firearms licensee does not make it a seller "with respect to," 15 U.S.C. § 7903(6), the DDM4v7, which it only transferred and did not sell.

"transferor." In sum, Oasis fails to establish that it was a "seller" protected by PLCAA with respect to its transfer of the DDM4v7 to the Shooter.[15]

Oasis argues that it should receive PLCAA protection because it sold *other* products to the Shooter. MTD at 10-11. Oasis' argument is unsupported by PLCAA's text. It is undisputed that the Shooter used one firearm in the shooting: the DDM4v7. As Oasis concedes, it did not sell the DDM4v7 to the Shooter. Its role with respect to the DDM4v7 was to "*help[] facilitate the transfer* of the Daniel Defense rifle [the Shooter] *purchased online*" from Daniel Defense. MTD at 11 (emphasis added). Oasis was not a protected "seller" "with respect to," 15 U.S.C. § 7903(6), the criminally misused qualified product at issue: the DDM4v7.

For purposes of PLCAA protection, it is irrelevant that Oasis sells firearms in general or sold the Shooter a Smith & Wesson rifle and ammunition. That conduct does not make the plaintiffs' claims against Oasis *for transferring the DDM4v7 and installing the EOTech sight* a qualified civil liability action. The plaintiffs do not bring an "action … against [Oasis] … for damages or other relief, resulting from the criminal or unlawful misuse of [the Smith & Wesson rifle or the ammunition]." 15 U.S.C. § 7903(5)(A) (defining qualified civil liability action).[16] The

---

[15] Additionally, To be a "dealer" under 18 U.S.C. § 921(a)(11) – and therefore a "seller" under PLCAA – it must be true that "the *intent* underlying the sale or disposition of firearms is predominantly one of *obtaining pecuniary gain*, as opposed to other intents …." 18 U.S.C. § 921(a)(22) (defining "predominantly earn a profit," an element of the definition of "dealer") (emphasis added). Although § 921(a)(22) speaks of the purported dealer's intent "underlying the sale or disposition of firearms" generally, PLCAA makes clear that for its purposes, a seller must be a dealer "with respect to a qualified product," 15 U.S.C. § 7903(6), not just a dealer generally. Accordingly, what matters for PLCAA's purposes here is Oasis' intent "with respect to" the DDM4v7. Oasis' intent in transferring the DDM4v7 is a question of fact on which the pleadings are silent. Under the governing standard, the Court cannot decide that issue of fact against the plaintiffs. *See, e.g.*, *Schydlower*, 231 F.R.D. at 498.
[16] To underscore this point, the plaintiffs hereby elect not to pursue their allegations that Oasis was negligent in selling the Smith & Wesson rifle or the ammunition to the Shooter.

plaintiffs' action "against" Oasis is "for damages" "resulting from" the use of the DDM4v7 equipped with the EOTech sight, which Oasis enabled and was a substantial factor in bringing about by transferring the DDM4v7 to the Shooter and installing the EOTech sight. It is undisputed that the Shooter did not "criminal[ly] or unlawful[ly] misuse" the Smith & Wesson rifle in the Shooting. *See* FAC ¶ 463. And the plaintiffs do not allege that the Shooter used or even brought with him the ammunition he purchased from Oasis.

### b.    Oasis Was Not a "Seller" of the EOTech Sight

Oasis was also not a "seller" of the holographic sight under PLCAA. The Shooter purchased it directly from the EOTech defendants. *See* FAC ¶ 322. Thus, PLCAA is inapplicable to the plaintiffs' claims regarding Oasis' conduct in installing and calibrating the sight. Faced with the undisputed facts, Oasis asks the Court to endorse an unprecedented and unjustified expansion of PLCAA. Oasis argues that PLCAA applies whenever the damages sought "resulted, at least in part, from the criminal or unlawful misuse of a firearm by a third party," MTD at 10 (quotation marks omitted), and the defendant "is a protected 'seller' of '*a* qualified product,'" *id.* at 12 (emphasis in original). Oasis' position appears to be that PLCAA does not require *any nexus* between the defendant as seller and the qualified product: as long as the defendant is a "seller" as to *some* qualified product, it receives PLCAA protection as to *any other conduct*. Not only is Oasis unable to provide any case law in support, the case law it relies on elsewhere shows the fallacy of its argument. Oasis quotes this passage from *Academy*, failing to understand that *Academy* correctly interprets PLCAA to provide a product-by-product defense: "a qualified civil liability action is … a civil action …brought … against a seller of *a qualified product* …for damages …resulting from the criminal or unlawful misuse of *the product* by a third party." MTD at 9-10 (emphasis added) (quoting *Academy*, 625 S.W.3d at 26).

25

PLCAA's product-by-product application is apparent in the definition of "seller" as well. The statute says that "'seller' means, *with respect to a qualified product* …."15 U.S.C. § 7903(6) (emphasis added). Oasis ignores that statutory language, reading PLCAA to mean that because Oasis sells *some* qualified products, PLCAA immunizes Oasis from liability relating to the misuse of *any* qualified product. That is not what the statute says. Congress could have written "seller with respect to ___***any***___ qualified product***s***." It did not. "[P]roduct" is in the singular and Congress did not say "any."

Moreover, Oasis' construction of PLCAA violates the "well-established maxim that statutes should be construed to avoid an absurd result." *Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008); *see also, e.g.*, *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989). A simple hypothetical demonstrates the extreme and absurd nature of Oasis' argument. Suppose a small-town gun store keeps a spare key for the local school behind its counter. An individual walks in acting erratically and threatening other customers. He walks up to the counter and says "I want to shoot up the school, but the doors are locked. I heard you have a spare key. Will you lend it to me?" The gun store hands over the key and the individual uses it to enter the school and commit a mass shooting using a firearm. Under Oasis' reading of PLCAA, the gun store is immune from liability for handing over the key simply because it sells "a qualified product." MTD at 12.

Or suppose an individual walks into a locksmith's store. The individual is furious, appears intoxicated, and says he just caught his wife cheating. He demands that the locksmith open a cable lock on a handgun he has brought with him because he wants to "kill that woman" but he lost the key to the lock. The locksmith removes the cable lock and the individual leaves the store and immediately returns home and shoots his wife. Plainly, the locksmith could be held

26

liable for opening the lock. Now assume the same facts, but also suppose that the locksmith happens to be a licensed firearms dealer and sells hunting rifles. The locksmith would now be immune under Oasis' reading of PLCAA because the locksmith happens to sell some qualified product and the individual happened to use a different qualified product to kill his wife. That is patently absurd, and it shows that Oasis' expansion of PLCAA cannot be adopted. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (refusing to construe statute to "produce an absurd and unjust result which Congress could not have intended").

The misguided nature of Oasis' construction of PLCAA is confirmed by the legislative history. In PLCAA's preamble, Congress stated that PLCAA's purpose was "[t]o prohibit civil liability actions from being brought or continued against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of *their products* by others.'" Pub. L. No. 109-92, 119 Stat. 2095 (2005) (emphasis added) (attached hereto as Ex. A). Congress did not intend to immunize sellers from liability for their own misconduct causing harm simply because a third party's misuse of *some* qualified product also contributed to the harm. During debate, Senator Craig, PLCAA's sponsor, explained, "[t]his bill *does not create a legal shield for anybody who manufactures or sells a firearm*. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. *It does not prevent them from being sued for their own misconduct*." 151 Cong. Rec. S9088 (statement of Sen. Craig) (emphasis added). Senator Sessions explained further:

> The bill is incredibly narrow. It only forbids lawsuits brought against lawful manufacturers and sellers of firearms or ammunition if the suits are based on criminal or unlawful misuse of *the product* by a third party.... Manufacturers and sellers are *still responsible for their own negligent or criminal conduct* and must operate entirely within the complex State and Federal laws.

27

151 Cong. Rec. S8911 (statement of Sen. Sessions) (emphasis added).

PLCAA's plain language, its application by courts, and its legislative history all confirm the fallacy of Oasis' unprecedented expansion of the statute. Oasis was not a protected "seller" of the holographic battle sight; therefore, PLCAA does not apply to the plaintiffs' claims regarding the sight.

### c.      The EOTech Sight Was Not a PLCAA "Qualified Product"

PLCAA does not apply to the plaintiffs' claims regarding the EOTech sight for another independent reason: the sight was not a "qualified product" under PLCAA. PLCAA's protections are framed exclusively in relation to "qualified products." The statutory definitions of "manufacturer" and "seller" are couched in terms of how those entities interact with qualified products. *See* 15 U.S.C. § 7903(2) ("The term 'manufacturer' means, with respect to a qualified product ...."); *id.* § 7903(6) ("The term 'seller' means, with respect to a qualified product ...."). Moreover, the type of action prohibited by PLCAA, a "qualified civil liability action," is one that "result[s] from the criminal or unlawful misuse of a qualified product." *Id.* § 7903(5)(A). In short, if the EOTech sight is not a "qualified product," PLCAA does not apply to the plaintiffs' claims against Oasis concerning the sight. It is not a qualified product, and, therefore, PLCAA does not apply.

PLCAA provides the following three-pronged definition of "qualified product":

The term "qualified product" means [1] a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or [2] ammunition (as defined in section 921(a)(17)(A) of such title), or [3] a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce.

28

15 U.S.C. § 7903(4). Oasis' argument is confined to prong 3; it argues that the EOTech sight is a qualified product because it is a "component part" of a firearm. MTD at 13-18. PLCAA does not define "component part," and Oasis acknowledges that the phrase must be given its "ordinary meaning." *Id.* at 13. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).

The common understanding of "component part" is something that plays an integral or necessary role in the entity it comprises. Indeed, the Merriam-Webster dictionary in circulation at the time PLCAA was enacted defined "component" as a "constituent part," and "constituent" as "an *essential* part." *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018) (citing Merriam-Webster Collegiate Dictionary 255, 267 (11th ed. 2003) (emphasis added); *cf. Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–67 (2012) (consulting older dictionaries "in use" when the statute in question was enacted). This comports with the ordinary meaning of the phrase. An engine is a component part of a car; a bumper sticker is not. A screen is a component part of a laptop; a ring light affixed to the screen to augment lighting during video calls is not.

Using that common-sense understanding, the EOTech sight at issue here is not a component part. It does not play an integral or necessary role in the operation of the underlying weapon: discharging a round of ammunition. It is an after-market accessory that impacts the shooter's experience, not the weapon's function. Treating any accessory that touches a firearm as a "component part" stretches the phrase's ordinary meaning beyond reason. Oasis insists that a holographic sight is a "component part" of a firearm because it "permits safe and effective firing at different ranges." MTD at 15. This factual contention is not alleged, and Oasis cannot simply propose it here. Moreover, Oasis' novel definition of component part as anything that makes a

rifle safer and more effective appears nowhere in PLCAA. To be a "firearm" under PLCAA, a product simply must "expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(A) (incorporated into PLCAA by 15 U.S.C. § 7903(4)). PLCAA does not say that a firearm must expel a projectile at a certain level of safety or efficacy. Further, if sights are so essential to firing a DDM4v7 "safely and effectively," why does Daniel Defense sell the DDM4v7 *without any sights*?



Daniel Defense, https://danieldefense.com/ddm4-v7.html. Indeed, Daniel Defense sold the DDM4v7 without a sight to the Shooter. *See* FAC ¶ 12 (showing DDM4v7 without iron sights).[17]

Additionally, two rules of statutory interpretation compel the conclusion that Oasis' interpretation is untenable. First, every word within a statute exists for a purpose, and "courts must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 364 (2000). If Congress intended for any part attached to a firearm, regardless of function or purpose, to be considered a "qualified product," there was no need to include the word

---

[17] Oasis also argues that a sight is "particularly" integral "for the outdoorsman accustomed to relying on sights for hunting large game at a distance." MTD at 14. That is irrelevant. The Shooter did not hunt large game at a distance, he murdered innocent children and teachers inside two classrooms.

"component." The simpler term "part" would have conveyed the broad meaning Daniel Defense now advances. But Congress chose instead to use the phrase "component part," and both words must be construed to have meaning. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024) ("Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are 'superfluous' or 'void' of significance.").

Second, when the phrase is read in its proper context – within the whole definition of "qualified product" – its meaning is plain. *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). As set forth above, the first prong of the qualified product definition is "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18)." The definition incorporated by reference is from the Gun Control Act ("GCA") of 1968. The subparagraphs identified, (A) and (B), define a firearm as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," respectively. 18 U.S.C. § 921(a)(3). This is as far as PLCAA tracks and incorporates the GCA, and this fact is significant.

Under the GCA, Congress defined "firearm" more expansively – under subparagraph (C), a "firearm" is also "any firearm muffler or firearm silencer." *Id.* Mufflers and silencers, like sights, are after-market accessories that are not essential to the weapon's basic function of "expel[ling] a projectile by the action of an explosive." *See id.* This demonstrates that Congress was aware of such accessories and that, in certain contexts, Congress found it appropriate to analogize them to firearms. It also demonstrates, with equal clarity, that Congress chose *not* to

paint with such a broad brush in drafting PLCAA. The incorporation of subparagraphs (A) and (B) *but not* (C) – a weapon which expels projectiles with an explosive, and a frame or receiver of such a weapon, *but not* a muffler or silencer – into the meaning of "qualified product" was an intentional choice. It should therefore be "presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217–18 (2001) (the meaning of a provision may be "clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (citation and quotation marks omitted). Further, even when Congress *did* mention certain accessories in the GCA (mufflers and silencers), it said nothing about after-market sights.

Oasis looks to recent federal authority construing the meaning of "component part." Curiously, Oasis relies on *Prescott v. Slide Fire Solutions, LP*, 341 F. Supp. 3d 1175 (D. Nev. 2018), a case that is not only unhelpful to its position, but directly contradictory. Oasis cites the case for the proposition that an "after-market" bump stock is a "qualified product." But the *Prescott* court's analysis does not support Oasis' argument regarding the sight. The court adopted a definition of "component part" from a dictionary published shortly before PLCAA was enacted: "an essential portion or integral element." *Id.* at 1188. It contrasted that with an "accessory," which it defined as "a thing of secondary or subordinate importance," or "an object or device that is not essential in itself but adding to the beauty, convenience, or effectiveness of something else." *Id.* So, although the bump stock is an "aftermarket modification," the relevant question is not *when* the bump stock was installed but *how* it operates within the weapon as a whole. Thus, the *Prescott* court's focus was the fact that the bump stock replaces the original

32

stock, which is indispensable to the rifle's functioning: "upon installation, *the bump stock is a rifle's operative stock and, therefore, becomes an integral part of a rifle.*" *Id.* at 1189 (emphasis added); *see also id.* (the fact that bump stocks "are substituted in for the original stock render[s] them essential units."). The court even explicitly contrasted a rifle stock with a sight, classifying the latter as not a component part: "Unlike cable gun locks, *sights*, and compensators – without which a rifle is fully functionally [sic] – a rifle cannot operate as a rifle without a stock." *Id.* at 1190 (emphasis added); *cf. United States v. Berger*, 2024 WL 449247, at *17 (E.D. Pa. Feb. 6, 2024) (holding that a silencer is not an "arm" under the Second Amendment because "it is merely an accessory which is unnecessary to the essential operation of a firearm").[18]

Oasis relies heavily on an ATF "Guidebook." *See* MTD at 15-16. The plaintiffs object to the Court considering this document.[19] In any case, the purpose of the Guidebook is not to construe PLCAA, but rather to "provide guidance in the [firearms] importation process." *See* Guidebook at 2. Oasis relies on a statement in the Guidebook that "[t]he Department of Commerce regulates the exportation of … firearm-type accessories and certain parts (e.g. sights, scopes, and mounts)." MTD at 16. Oasis' reliance on export regulations is ironic, given that Oasis is dismissive of a Federal Circuit case concluding that sights are mere accessories because the case concerned "excise tax regulations." *Id.* at 18 n.7 (emphasis omitted). Moreover, in the

---

[18] Oasis also cites *Lowy*, 2024 WL 3521508, which held that rifle grips and magazines were component parts under PLCAA. But the court's brief analysis simply relied on the fact that the defendants' grips and magazines, like the bump stock in *Prescott*, replaced the existing grips and magazines. *See* 2024 WL 3521508, at *3. This reasoning is inapposite, as the holographic battle sight installed by Oasis did not replace any existing sights or other parts of the DDM4v7. It was an add-on accessory.

[19] A court may take judicial notice of documents outside the record only when "the contents therein, cannot reasonably be questioned." *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 588-89 (5th Cir. 2020). As explained here, the meaning and applicability of the Guidebook's contents are highly doubtful and contested.

quotation Oasis refers to, it is ambiguous whether, "sights, scopes, and mounts" are examples of "parts" or "accessories." Oasis also reproduces an image from the Guidebook and says that it "identifies a sight as an integral part of a rifle." MTD at 15, ignoring that the same Guidebook elsewhere identifies "primary characteristics exhibited in the rifle category," such as the "receiver," "barrel," and "trigger," but not sights. *See* Guidebook, "Firearms Verification – Gun Control Act Definitions," at 19 (electronic p. 74). More to the point, Daniel Defense itself does not consider sights of any type, let alone holographic battle sights, to be "integral" parts of their AR-15s. In the Operation & Safety Manual for the DDM4 series of AR-15s, which includes the DDM4v7, Daniel Defense shows a full page "AR 15 Anatomy," which labels multiple parts of an AR-15 but does not identify sights (or even show sights attached to the rifle):

(Image on next page)



*See* Daniel Defense, "DD4/DDM4/DD5 Manual" at 3, https://danieldefense.com/dd-downloads.

In the same manual, Daniel Defense provides a "Parts Illustration" of the DDM4v7:



**6.1 DDM4® UPPER RECEIVER GROUP**
PARTS ILLUSTRATION
*DDM4® V7® SHOWN. SOME PARTS VARY BY PRODUCT.*

*See* Daniel Defense, "DD4/DDM4/DD5 Manual" at 45, https://danieldefense.com/dd-downloads.

36

It lists twenty-seven parts, none of which are sights. Elsewhere, the manual refers to "*accessories such as sights and optics*" that a purchaser may choose to attach to their firearm. *Id.* at 19 (emphasis added).

Oasis also argues that "the purpose and content of the PLCAA also inform the conclusion that a sight is a component part of a firearm." MTD at 16. Oasis quotes portions of PLCAA stating that manufacturers and sellers of "component parts" should not be liable for harm caused by others who criminally misuse firearm products. *See* MTD at 17. Oasis' reasoning is circular. The issue is not what level of protection Congress intended for sellers of component parts, but whether the holographic sight here was a component part. Congress chose to apply PLCAA's protections to manufacturers and sellers of "firearm[s]," "ammunition," and "component parts." 15 U.S.C. § 7903(4). If it intended to extend those protections to mere accessories, let alone any product that touches or in some way interacts with a firearm, it would have said so.

### 3. Oasis' Argument that PLCAA Does Not Contain an Exception for General Negligence Claims is Irrelevant

Oasis argues that "since none of the six enumerated exceptions to PLCAA apply," the Court should "decline to create" an exception to PLCAA immunity for general negligence claims. MTD at 22-23. Oasis' argument is irrelevant. PLCAA does not foreclose the plaintiffs' claims because (1) the negligent entrustment exception ***does*** apply to the plaintiffs' claims regarding the DDM4v7 and (2) PLCAA simply does not apply to the claims regarding the DDM4v7 and the holographic battle sight. The plaintiffs do not ask the court to create an additional exception for all general negligence claims.

### C.    Alternatively, the Court Should Grant the Plaintiffs Leave to Amend

"[D]ismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2002). The Fifth Circuit's "cases support the premise that [g]ranting leave to amend is especially appropriate … when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (quotation marks omitted). This is so, "even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading," with the result being that "leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim." Wright & Miller § 1357. Should the Court dismiss any portion of the First Amended Complaint as inadequately pled, the plaintiffs request leave to amend.

### CONCLUSION

For all these reasons, the Motion to Dismiss must be denied.

38

Respectfully Submitted,

**THE PLAINTIFFS**,

By: _/s/ Erin Rogiers_
Erin Rogiers, Esq.
TX State Bar No. 24083597
Francisco Guerra IV, Esq.
TX State Bar No. 00796684
Bailey Vannatta, Esq.
TX State Bar No. 24119113
GUERRA LLP
875 East Ashby Place, Suite 1200
San Antonio, TX 78212
Tel: (210) 447-0500
Fax: (210) 447-0501
erogiers@guerrallp.com
fguerra@guerrallp.com
bvannatta@guerrallp.com

By: _/s/ Joshua D. Koskoff_
Joshua D. Koskoff, Esq. (_pro hac vice_)
CT State Bar No. 410518
Alinor C. Sterling, Esq. (_pro hac vice_)
CT State Bar No. 411754
Colin S. Antaya, Esq. (_pro hac vice_)
CT State Bar No. 440953
Margaret Donovan, Esq. (_pro hac vice_)
CT State Bar No. 445982
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
jkoskoff@koskoff.com
asterling@koskoff.com
cantaya@koskoff.com
mdonovan@koskoff.com

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure, I served the following counsel of record

using the court's CM/ECF system, which will provide a notice of electronic filing to all counsel

of record:

David M. Prichard
David R. Montpas
PRICHARD YOUNG, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216

J. Stephen Barrick
John B. Thomas
HICKS THOMAS LLP
700 Louisiana, Suite 2300
Houston, Texas 77002

Thomas W. Fee
Victor A. Rivera
FEE, SMITH & SHARP, L.L.P.
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240

Andre M. Landry, III
J.J. Hardig, Jr.
GRAY REED
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056

Daniel Paul Buechler
THOMSPSON, COE, COUSINS & IRONS, L.L.P.
700 North Pearl Street – 25th Floor
Dallas, Texas 75201

*/s/ Erin Rogiers*
Erin Rogiers, Esq.

# EXHIBIT A

Public Law 109–92
109th Congress

## An Act

To prohibit civil liability actions from being brought or continued against manufactur-
ers, distributors, dealers, or importers of firearms or ammunition for damages,
injunctive or other relief resulting from the misuse of their products by others.

Oct. 26, 2005

[S. 397]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

Protection of
Lawful
Commerce in
Arms Act.
15 USC 7901
note.

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Protection of Lawful Commerce
in Arms Act".

### SEC. 2. FINDINGS; PURPOSES.

15 USC 7901.

(a) FINDINGS.—Congress finds the following:

(1) The Second Amendment to the United States Constitu-
tion provides that the right of the people to keep and bear
arms shall not be infringed.

(2) The Second Amendment to the United States Constitu-
tion protects the rights of individuals, including those who
are not members of a militia or engaged in military service
or training, to keep and bear arms.

(3) Lawsuits have been commenced against manufacturers,
distributors, dealers, and importers of firearms that operate
as designed and intended, which seek money damages and
other relief for the harm caused by the misuse of firearms
by third parties, including criminals.

(4) The manufacture, importation, possession, sale, and
use of firearms and ammunition in the United States are
heavily regulated by Federal, State, and local laws. Such Fed-
eral laws include the Gun Control Act of 1968, the National
Firearms Act, and the Arms Export Control Act.

(5) Businesses in the United States that are engaged in
interstate and foreign commerce through the lawful design,
manufacture, marketing, distribution, importation, or sale to
the public of firearms or ammunition products that have been
shipped or transported in interstate or foreign commerce are
not, and should not, be liable for the harm caused by those
who criminally or unlawfully misuse firearm products or
ammunition products that function as designed and intended.

(6) The possibility of imposing liability on an entire
industry for harm that is solely caused by others is an abuse
of the legal system, erodes public confidence in our Nation's
laws, threatens the diminution of a basic constitutional right
and civil liberty, invites the disassembly and destabilization
of other industries and economic sectors lawfully competing